**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 23 2008 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

The STATE OF NEW YORK, ALEXANDER B.   :
GRANNIS, as Commissioner of the New York State :
Department of Environmental Conservation, and the :
NEW YORK STATE DEPARTMENT OF           :
ENVIRONMENTAL CONSERVATION,            :
                                        :
                        Plaintiffs,     :
                                        :
        -against-                       :
                                        :
CARLOS GUTIERREZ, in his official capacity as  :
Secretary of the United State Department of     :
Commerce, the UNITED STATES DEPARTMENT :
OF COMMERCE, CONRAD C.                  :
LAUTENBACHER, in his Official Capacity as :
Under Secretary of Commerce and Administrator for :
the National Oceanic and Atmospheric    :
Administration, the NATIONAL OCEANIC AND :
ATMOSPHERIC ADMINISTRATION, and JAMES :
W. BALSIGER, in his Official Capacity as the :
Acting Assistant Administrator for the NATIONAL :
MARINE FISHERIES SERVICE,               :
                                        :
                        Defendants.     :

-------------------------------------------------------------- x

Case No.  08 CV 2503

**COMPLAINT AND
PETITION FOR REVIEW**

SIFTON

Plaintiffs State of New York, Alexander B. Grannis, as Commissioner of the New York

State Department of Environmental Conservation, and New York State Department of

Environmental Conservation (collectively "the State") by their attorney, Andrew M. Cuomo,

Attorney General of the State of New York, allege as follows:

## NATURE OF THE ACTION

1. Plaintiffs bring this action on behalf of the State of New York and its citizens, seeking

to invalidate the final management rule for the 2008 recreational summer flounder fishery (the

"2008 Summer Flounder Rule" or "Rule") issued by the Department of Commerce, through the

National Marine Fisheries Service ("NMFS"), pursuant to the Magnuson-Stevens Fishery

Conservation and Management Act, as amended in 1996 by the Sustainable Fisheries Act, 16

U.S.C. §§ 1801, *et seq.* ("Magnuson-Stevens Act" or "Act").[1]  The summer flounder fishery

ranges from Massachusetts to North Carolina.  The Rule establishes the management measures –

minimum size, maximum daily catch, and season limits – that recreational summer flounder

fishermen must follow in 2008.  In issuing the Rule, defendant National Marine Fisheries Service

("NMFS") chose to again adopt individualized sets of state-by-state "conservation equivalency"

management rules, and rejected using a uniform set of "coastwide" management measures for the

entire fishery, as New York and NMFS' own representative had advocated during the rulemaking

process.  The state-by-state management measures are based on obsolete, almost 10-year-old data

from a 1998 survey that recent high level technical review has confirmed was <u>never</u> an

appropriate basis for setting state-by-state recreational management measures.  The Rule's

irrational choice of the state-by-state limits, and rejection of coastwide measures that NMFS

itself argued would be better for managing the fishery, does nothing to further the Act's goals for

conservation and recovery of the species.  The Rule does, however, adversely affect the interests

of New York and its many citizens who fish for summer flounder, or depend for their livelihoods

on the recreational summer flounder fishery, saddling them with the most stringent restrictions in

the history of the fishery, with no benefit from this discriminatory treatment flowing to the

summer flounder stock.  The Rule was issued in violation of the Magnuson-Stevens Act and

---

[1] The challenged final rule for summer flounder is a portion of the final recreational
management measures for the 2008 summer flounder, scup and black sea bass fisheries, issued
by the National Marine Fisheries Service on behalf of the Department of Commerce.  73 Fed.
Reg. 29990, No. 101 (May 23, 2008).

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559 and 701-706, is arbitrary and capricious, and contrary to law, in that it violates certain "national standards" set forth in the Magnuson-Stevens Act with which all such fishery management regulations must comply. 16 U.S.C. § 1851.

2.   More particularly, each year a federal-state process governed by the Magnuson-Stevens Act and interstate compact develops conservation and management rules intended to restore the summer flounder fishery, while maximizing fishing opportunity consistent with that goal. The Secretary of Commerce, acting through NMFS, ultimately issues these rules as final regulations. For the much sought after summer flounder, the conservation and management measures are minimum size limits, daily bag (catch or landing) limits, and season limits. These are intended to keep landings at or below the total allowable landings ("TAL") established for each year at the start of the annual rule-making process.

3.   Under the Magnuson-Stevens Act, and the summer flounder fishery management plan ("Summer Flounder FMP") promulgated thereunder, each year the states in the fishery and NMFS generate either a single set of uniform "coastwide" measures for the entire recreational fishery, or individualized sets of limits for the different states using a state-by-state "conservation equivalency" approach. The linchpin of each state's limits has been its assigned allocation of the total, annually established TAL for the recreational fishery, with the state's management measures designed so that its recreational anglers do not land more than its assigned allocation. The states began to use state-by-state conservation equivalency in 1999, and it has been chosen under the current Summer Flounder FMP protocol every year since 2001. The 2008 Rule once again chooses state-by-state conservation equivalency, despite NMFS' earlier asserted support

3

for a return to coastwide measures as, among other things, better for the management and recovery of the summer flounder stock.

4. A critical factor under the conservation equivalency approach is the share of the coastwide TAL that each state is assigned. Since 2001, when the Summer Flounder FMP formalized the current system of choosing conservation equivalency or coastwide management measures, the respective states' allocations of the overall recreational harvest limit have been percentages derived from 1998 data as to recreational landings and angler effort from a survey program administered by NMFS called the Marine Recreational Fishing Statistical Survey ("MRFSS").[2] For example, New Jersey was assigned 39.09% of the recreational fishery reflecting its purported share of recreational landings in 1998, and New York 17.63%. The 1998 data was used because it was the last year uniform coastwide management measures governed the recreational fishery.

5. In 1998, the summer flounder population was far more depleted than today, with average age and size truncated by overfishing. Since 1998, as stricter management measures have been imposed, the population has recovered significantly, with far more older and therefore larger fish. In addition, the stock has been generally shifting north, increasing relative abundance in New York waters. Fishing patterns have also changed significantly since 1998, with the recovered summer flounder population drawing more anglers and shifting the pattern of summer

---

[2] The MRFSS survey program is administered by NMFS and subcontracted to a private contractor or to states with the capability and interest in doing the survey themselves. MRFSS is used to estimate annual angling effort and landings by recreational anglers. Angling effort is estimated through a random telephone survey of the coastal population, and landings estimated based on a limited dock side interview process.

flounder fishing. Available data shows that New York's total number and share of all recreational trips for the summer flounder recreational fishery have increased dramatically since 1998.

6. Yet, each year the same state percentage allocations based on the 1998 MRFSS data have been used as the starting point for each state's management measures. Thus, although available data shows that New York's share of recreational trips for summer flounder (effort, in NMFSS terms) has increased dramatically since 1998 as the summer flounder stock has recovered, New York's baseline share has remained locked in stone at 17.63% of the fishery for the last nine years.

7. Although the 1998 MRFSS data has remained the linchpin of summer flounder recreational fishery, the survey itself has been increasingly criticized as a poor tool for managing the fishery, even when using up-to-date data. This criticism has come from both NMFS professionals and outside experts. The National Research Council (the "NRC") recently reviewed MRFSS at the behest of NMFS, and its 2006 peer-reviewed final report left no doubt that the survey is a poor and inaccurate tool upon which to allocate the recreational summer flounder fishery among the individual states, and at best could be of some use in developing one set of uniform coastwide management measures. Indeed, at the time this report was released, Cornell University Professor Dr. Patrick Sullivan, Chairman of the NRC and co-author of the report, deemed MRFSS "fatally flawed."

8. Although trawl surveys and other data demonstrate that the summer flounder stock has clearly been recovering since 1998 and is now in a far more robust state, the various states in the fishery have consistently exceeded their recreational harvest limits since coastal equivalency

5

based on the 1998 MRFSS data was instituted. In 2007 seven of the nine states in the fishery had

overages, and New York's landings exceeded its 17.63% share in five of the last seven years.

9. In light of this consistent failure of conservation equivalency measures to meet the

overall conservation target of the Summer Flounder FMP, as well as the growing body of

evidence demonstrating that basing any management scheme on the flawed and increasingly

outdated 1998 MRFSS data is irrational, defendant NMFS' representative in developing the 2008

Rule advocated adoption of coastwide management measures as, among other things, better for

the management and recovery of the summer flounder. Instead of heeding her advice, and over

the objection of New York's representatives, a majority of the state representatives instead voted

to again adopt state-by-state management measures.

10. In order to create management measures that do not result in overages for a particular

year, each state is assigned a target number of fish based on that year's coastwide TAL. The

allowable recreational harvest for the entire fishery is stated in numbers of fish, and each state is

assigned a number of fish based on its 1998 percentage. Under the Summer Flounder FMP, a

state that exceeds its annual target must, for the following year, craft management measures that

take the prior year's overage into account by reducing the target number of landings and crafting

measures intended to meet that reduced target. The state's quota for recreational landings, in

total number of fish based on its 1998 percentage remains the same. However, it must design its

management measures to meet the reduced target. This builds in a margin of error to increase the

likelihood that the state will in fact not exceed its annual quota.

11. Rather than address the fundamental flaw of basing state-by-state measures on the

1998 MRFSS, and updating the regulatory scheme to take into account the current status of the

6

fishery, the technical committee made up of state, federal and other fishery professionals that worked on developing the 2008 summer flounder rules compounded the problem by injecting an "performance-based reduction factor" based on the 1998 percentage allocations. The performance-based reduction factor additionally reduced the states' targets by their average overage for the previous seven years. This reduced New York's 2008 target 33.6%, by far the greatest reduction for any state's target. (Virginia's 8.9% reduction was the second highest, New Jersey's was 4.3%, and four states had no reduction.) In order to design management measures geared to meeting this much reduced target – again, completely rooted in the 1998 MRFSS-based allocation – New York was constrained to propose the most stringent size and bag limits in the history of the recreational fishery, even as the summer flounder population has been recovering. Under the Rule, an angler on the New York side of Raritan Bay can land four summer flounder per day that must be 20.5 inches long, while a New Jersey angler fishing that same water body just across the boundary can land eight fish that only have to be 18 inches long. Longer minimum sizes, such as those imposed by the Rule on New York anglers, are detrimental to a regulated species, because more fish that are hooked must be thrown back, and a certain percentage invariably die, without being credited to the angler's bag limit.

12. Although its representative had advocated adopting a coastwide approach, NMFS ultimately deemed the proposed 2008 summer flounder state-by-state conservation equivalency measures consistent with the Magnuson-Stevens Act's National Standards, and issued them in the 2008 Summer Flounder Rule. However, National Standard 2 requires that conservation and management measures be based upon the best scientific information available. 16 U.S.C. § 1851(a)(2). The 2008 Rule continues to be based on stale 1998 MRFSS data, even after

7

technical experts have confirmed that MRFSS is an inappropriate basis for state-by-state regulation of the recreational fishery, and current fishery data shows the 1998 MRFSS results are in any event obsolete due to changes in the fishery. The state, interstate and federal bodies developing the Rule failed to integrate this current scientific information as to changes in summer flounder population and fishing patterns as the stock has recovered, ignoring the best scientific information available.

13. National Standard 4 provides that conservation and management measures not discriminate between residents of different States. 16 U.S.C. § 1851(a)(4). However, the 2008 Summer Flounder Rule clearly discriminates against the fishermen of New York by perpetuating the flaws inherent to basing the individual states' management measures on the 1998 MRFSS data-based allocations, even as all available scientific evidence shows that the fishery has changed significantly since 1998, and that New York's allocation is simply too small to reflect the current state of the fishery. The Rule in no way attempts to account for, or address, the reasons for New York's previous overages, such as the increase in more and larger fish in its waters that should rationally boost its allocation, but punishes the State for them through application of the performance-based reduction factor. New York is left with the most stringent conservation measures in the history of the fishery, making it bear a disproportionate share of the burden of the species' recovery, when there is no scientifically valid reason (such as being a critical breeding area) for New York to serve this function, and no evidence that imposing such disproportionately stringent limits on New York anglers is rationally related to the recovery of the summer flounder population. It is no surprise that the majority of states in the fishery outvoted New York and chose the conservation equivalency approach over a single set of

8

coastwide measures, because it is in their interest that New York's waters benefit the entire coastwide fishery, and the other states' party boats become a more attractive option for recreational anglers hoping to land summer flounder.

14. Finally, National Standard 6 requires that conservation and management measures take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches. 16 U.S.C. § 1851(a)(6). Although NMFS' representative specifically directed that these factors be addressed by the state and interstate bodies developing proposed rules, they did not. The resulting 2008 Summer Flounder Rule based on that work does not address them.

15. Given these violations of the National Standards, and under the totality of these circumstances, it was arbitrary and capricious for defendants to reject coastwide regulation, which defendant NMFS' own representative had advocated during the rulemaking, in favor of the conservation equivalency-based Rule.

16. Because of these flaws, plaintiffs request an order: vacating the conservation equivalency measures for summer flounder in the 2008 Summer Flounder Rule, and directing defendants to issue as final the alternate coastwide measures set forth in the Rule; declaring that Defendants issued the Rule in violation of the Magnuson-Stevens and Administrative Procedure Acts; and declaring that any state-by-state conservation equivalency management measures for the recreational summer flounder fishery based on the 1998 MRFSS violate the Magnuson-Stevens Act.

## JURISDICTION

17. This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

9

§ 1331 (federal question), 16 U.S.C. § 1855(f) (judicial review of actions pursuant to Magnuson-Stevens Fishery Conservation and Management Act), 5 U.S.C. §§ 701 *et seq.* (Administrative Procedure Act); and 28 U.S.C. § 2201(a) (the Declaratory Judgment Act).

## VENUE

18.  Venue over this action is proper in this District pursuant to 28 U.S.C. § 1391(e)(3), which establishes venue in an action against an officer or agency of the United States in any judicial district in which one of the plaintiffs resides, if no real property is involved in the action. Venue is additionally appropriate in this District because defendants are agencies of the United States or officers of agencies of the United States acting in their official capacities, because the action sought to be reviewed affects waters of the State of New York situated in the Eastern District of New York, and because New York State citizens adversely affected by the action, including individuals who fish for summer flounder in the waters of the State of New York or commercial boat operators who serve such individuals, reside in the Eastern District of New York.

## PARTIES

19.  Plaintiff State of New York, as a body politic and a sovereign entity, brings this action on behalf of itself, as owner of the fish within the state, and as *parens patriae*, trustee, guardian and representative on behalf of all residents and citizens of New York, particularly those individuals who fish for summer flounder in the waters of the State of New York and of the United States.

20.  Plaintiff Alexander B. Grannis is Commissioner of the New York State Department of Environmental Conservation ("DEC") and, in that capacity, is responsible for the protection,

propagation, and management of fish and fisheries of the State.

21. Plaintiff DEC is an executive department of the State of New York.

22. Defendant Carlos Gutierrez is the Secretary of Commerce of the United States and, in that capacity, is authorized to promulgate rules regulating fishing within United States waters.

23. Defendant United States Department of Commerce is an executive agency of the United States.

24. Defendant Conrad C. Lautenbacher is Under Secretary of Commerce and Administrator for the National Oceanic and Atmospheric Administration ("NOAA") and, in that capacity, and on behalf of the Secretary of Commerce, approves federal Fishery Management Plans regulating fishing within United States waters.

25. Defendant NOAA is a subdivision within the United States Department of Commerce.

26. Defendant NMFS is an operating branch within NOAA.  NMFS is delegated authority over the management, conservation and exploitation of living marine resources found in federal U.S. waters (those waters from 3 miles to 200 miles offshore, known as the Exclusive Economic Zone), and shares concurrent regulatory authority with the states over certain marine resources in state territorial waters (all inland marine waters and ocean waters up to three miles offshore), including summer flounder and other fish species that inhabit both federal and state waters.

27. Defendant James W. Balsiger is the Acting Assistant Administrator  for NOAA's NMFS, and in that capacity, is responsible for administering regulations implementing and enforcing federal fishery management plans ("FMPs") promulgated under the Act.

11

## STATUTORY BACKGROUND

28. The Magnuson-Stevens Act, 16 U.S.C. §§ 1801 *et seq.*, authorizes the Secretary of Commerce to promulgate regulations governing fishing within United States waters. Pursuant to the Act, regulations promulgated and final actions taken by the Secretary are subject to judicial review if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register. 16 U.S.C. §1855(f).

29. In order to manage the nation's fish stocks and prevent overfishing, the Act created eight fishery management councils, whose responsibilities include the drafting of FMPs for each fishery within their respective jurisdictions. 16 U.S.C. § 1852(h)(1).[3] One of those is the Mid-Atlantic Fishery Management Council (the "Council"), which is composed of voting representatives from the states of New York, New Jersey, Delaware, Pennsylvania, Maryland, Virginia and North Carolina, and NMFS, with non-voting representation from the Atlantic States Marine Fisheries Commission, United States Fish and Wildlife Service, United States Coast Guard, and United States Department of State. 16 U.S.C. § 1852(a)(1)(B). The regional councils submit their FMPs to the Secretary of Commerce, who acts through NMFS. NMFS solicits public comment and reviews the FMPs to ensure they are consistent with the national standards (*id.* at § 1853(a)(1)(c)) and other applicable laws. NMFS must approve an FMP if it is consistent with applicable law, and disapprove it if not. 16 U.S.C. § 1854(a)(3).

---

[3] A "fishery" is "(A) one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreation, and economic characteristics; and (B) any fishing for such stocks," 16 U.S.C. § 1802 (13). FMPs developed by the councils must balance the needs of the fishery users against conservation principles by reference to the ten National Standards. 16 U.S.C. § 1851(a).

with ten national standards specified at 16 U.S.C. §1851.

35. National Standard 1 provides that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. §1851(a)(1).

36. National Standard 2 provides that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2).

37. National Standard 3 provides that "[t]o the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination." 16 U.S.C. § 1851(a)(3).

38. National Standard 4 provides that:

Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

16 U.S.C. § 1851(a)(4).

39. National Standard 6 provides that "[c]onservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches." 16 U.S.C. § 1851(a)(6).

40. An FMP and any amendments to it prepared by the Council and Commission are reviewed for consistency with the National Standards and other applicable law, and ultimately promulgated in final regulations issued by the Secretary, through NMFS. 16 U.S.C. §§ 1852(h) and 1854.

41. Regulations promulgated by the Secretary under the Act, such as the Rule, are subject to judicial review in federal district court under APA standards. 16 U.S.C. § 1855(f). Pursuant to the Act and APA, the reviewing court must set aside any action, findings, and conclusions by the Secretary that it finds to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

42. Fishing in New York State waters is regulated by DEC under Article 13 of the Environmental Conservation Law ("ECL"). Taking fish that are undersized, in excess of a daily bag limit, or out of season subjects the angler to civil and/or penal sanctions. ECL §§ 71-0921, 0923, and 0925. Possession of fish in New York when the season is not open in the state constitutes presumptive evidence that the fish were taken illegally. ECL § 71-0917[2]. Such possession always constitutes presumptive evidence that the fish were taken by the possessor. ECL § 71-0917[2]. Anglers based in New York who fish in neighboring states' marine waters and land their catch in New York face the risk of civil and/or criminal liability if the season for that species is closed in New York and/or the fish do not comply with New York size or bag limits.

## FACTS

### A. The Summer Flounder

43. Summer flounder, or fluke (*paralichthys dentatus*), is a demersal (bottom-dwelling) flatfish distributed from the southern Gulf of Maine to South Carolina. Important commercial and recreational fisheries exist from Cape Cod to Cape Hatteras. Summer flounder are concentrated in bays and estuaries from late spring through early autumn, when the fish migrate to the outer continental shelf. Spawning occurs during autumn and early winter, and the larvae

15

are transported toward coastal areas by prevailing water currents. Development of post larvae and juveniles occurs primarily within bays and estuarine areas, notably Pamlico Sound and Chesapeake Bay. Summer flounder are excellent food fish and one of the most sought after recreationally caught fish on the East Coast. They are also a very valuable species to the commercial fishing industry and to those in the business of serving recreational anglers, notably party boat operators.

44. By the early 1980s the summer flounder population had been overfished and was severely depleted. The overall biomass of the species was lower than it would have been in a non-overfished, non-depleted state, and average age and size truncated. To address this overfishing, in 1982 the Commission promulgated its first FMP for summer flounder. In 1988 the Council adopted a federal FMP for the species, which NMFS approved.

45. Overall summer flounder biomass continued to decline into the early 1990's, but has generally been increasing since 1993, along with average summer flounder age and size.

46. In 1998, based on data from trawl surveys conducted by the NMFS for waters from New York to North Carolina, NMFS estimated that there were 10,530,000 summer flounder aged 3 years or older, with only 278,000 aged 5 years or older and 2,000 aged 7 years or older.

47. In 2007, again based on data from trawl surveys conducted by NMFS for waters from New York to North Carolina, NMFS estimated that there were 28,476,000 summer flounder aged 3 years or older, with 4,560,000 aged 5 years or older and 1,168,000 aged 7 years or older.

48. As the summer flounder population has recovered, with more older and therefore larger fish, the level and distribution of recreational angler effort has changed. The MRFSS indicated that there were 24.7 million marine recreational fishing trips taken in the Southern New

16

England-Mid Atlantic region in 1998, while in 2006 there were 36.5 million trips, an increase in effort of almost 48%. Angler effort and distribution have become much higher in New York as the species has recovered. Data collected as part of the MRFSS shows that in 2007 New York had the most directed trips for summer flounder on the entire East Coast at 36%. New Jersey had 33% of the directed summer flounder trips, and the remainder (31%) was divided among the other seven states.

49. Although the summer flounder population has been recovering since the early 1990s, New York and the other states have been subject to increasingly stringent management measures, driven, in part, by an increase in landings attributable to the species' recovery. Notwithstanding the increasingly stringent size and bag limits, New York has exceeded its recreational quota five out of the last seven years, in 2003, 2004, 2005, 2006 and 2007. In 2007, when it appeared that it was going to exceed its harvest quota, New York took the unprecedented step of shutting down the recreational summer flounder fishery in September, and kept it closed until May, 2008. Although all but two of the other states in the fishery, including New Jersey, exceeded their quotas, no state other than New York shut down its fishery.

**B. Management Of The Summer Flounder Fishery**

50. Since the Council first promulgated a federal FMP for summer flounder in 1988, various amendments and adjustments to the FMP have been adopted by the Council and the Commission, to address issues that have arisen. The Act requires that certain fisheries' stocks be rebuilt to a level designated in the FMP by 2010, and others by 2011. The deadline for summer flounder was 2010, however the 2006 reauthorization of the Act extended that deadline to 2013 for summer flounder only. The FMP utilizes three management measures for the recreational

fishery: size limits, daily bag limits, and season limits.

51. Through the 1998 season, coastwide management measures were used to manage the summer flounder fishery under the FMP. Under that coastwide approach, one set of management measures applied to all states in the fishery. The management measures are based on the annually established recreational harvest limit for the entire fishery (for the calendar year). The coastwide limits on size, bag and season are designed so that the recreational harvest limit is not exceeded and total landings (recreational and commercial) do not exceed the total allowable landings (TAL).

52. During the late 1990s, due to variable fish size and availability throughout the species' range, states with summer flounder fisheries expressed interest in being allowed to develop regulations on a state-by-state basis that would allow traditional regional fisheries to continue while still providing for rebuilding of the stock. In 1999, the Commission's Summer Flounder Management Board ("Board") implemented a "conservation equivalency" approach as an interim measure to allow state-by-state regulation of the fishery in 1999 and 2000.

53. In 2001, the Board and the Council implemented Framework Adjustment 2 to the FMP which established the current process by which conservation equivalency or coastwide can be chosen as an option for the summer flounder recreational fishery on an annual basis. Each state is allocated a specific share of the overall recreational harvest limit for summer flounder, proportional to recreational landings from 1998, and is allowed to develop its own set of seasonal, size and daily bag limits, designed with the intent that the state's total recreational harvest does not exceed its allocated limit.

54. The process for deciding whether to implement state-by-state conservation

18

equivalency or coastwide management measures, and what those measures will be, involves the Council, the Commission and NMFS. Different states and NMFS have representatives on various boards, committees and panels that determine the TAL and make recommendations and vote on different management measures and decisions. For votes on the Council, each Council member has a vote; New York currently has four votes out of twenty one voting members. For the Commission, each state has three seats but just one vote, and a simple majority is required for most motions to pass.

55. The Commission carries out its summer flounder management responsibilities through the Board. The Board's actions are final, and pursuant to the terms of the ACFMA, binding upon member states. The Board consists of representatives of Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Delaware, Maryland, Virginia, North Carolina, and NMFS. Each state and NMFS has one vote on Board decisions.

56. The Summer Flounder Monitoring Committee ("Monitoring Committee"), which is created by the FMP, is made up of members from NMFS' Northeast Fisheries Science Center, NMFS Northeast Regional Office, the Commission, and the Mid-Atlantic, South Atlantic and New England Fishery Management Councils. The Monitoring Committee reviews scientific information, and recommends and votes on a TAL, whether to adopt conservation equivalency or coastwide measures, and other management measures meant to achieve a level of catch that will not result in overfishing. The Monitoring Committee operates by consensus.

57. The Commission's Technical Committee (the "Technical Committee") consists of state, federal and other fishery professionals. Among other things, the Technical Committee develops and recommends management measures, evaluates individual states' proposed

conservation equivalency measures, and provides technical advice to the Board on the summer flounder fishery.

58. The starting point for establishing annual management measures is the setting of the annual TAL for the entire fishery. In or around August, the Board and Council review and approve, modify or reject a Monitoring Committee recommendation for a TAL to be effective from January 1 to December 31 of the following year.

59. Under the Summer Flounder FMP, up to 3% of the TAL is set aside for research, and the remainder is allocated 60% for commercial harvest and 40% for recreational harvest (which includes recreational angling from commercial party boats).

60. In or around December, the Council and Board meet to decide on whether to use coastwide or conservation equivalency rules, drawing on the work of the Monitoring Committee. The matter is ultimately voted on by the various states' representatives, and by NMFS as well. If coastwide rules are chosen (which has not happened since the current process began in 2001), then a set of coastwide management measures is approved, including minimum size, bag and season limits. If conservation equivalency is chosen, then each state must determine, working with Technical Committee guidance, appropriate state-specific management measures to meet its allocation of the recreational summer flounder fishery. The combined effect of all of the states' management measures must achieve the same level of conservation as would coastwide measures developed to achieve the overall recreational harvest limit for the entire fishery, if implemented by the states. In addition, the Council and Board must approve a set of precautionary default measures, the adoption of which would be required by any state that either does not submit a management proposal to the Technical Committee, or that submits measures that, in the

20

judgment of the Technical Committee, would not succeed in keeping summer flounder recreational harvest for that state within the assigned limit. The states' management measures are submitted by the Commission to NMFS for approval and promulgation as federal regulation.

61. Data quantifying recreational landings is essential for setting the annual TAL, for determining whether states have exceeded their allocations, and to otherwise regulate the fishery.

62. The MRFSS was originally designed as a tool to analyze and predict trends in recreational fishing activities occurring over longer periods of time and larger geographic regions than individual states. Although MRFSS was not intended to be used as a state-by-state quota monitoring mechanism, it has become the linchpin of the state-by-state regulation of the summer flounder. No other recreational fishery is managed using conservation equivalency except scup, and the four states with the greatest scup harvest have formed a single larger region in order to avoid the problems associated with state-by-state management, including a lack of credible effort and landings data that can be appropriately used for that purpose. Recent past Assistant Administrator of NMFS, Dr. William Hogarth, has publicly stated that the councils should not use MRFSS as the basis for state-by-state conservation measures.

63. In 2005, NMFS commissioned the National Research Council ("NRC") to conduct a study of the MRFSS and similar state surveys to evaluate their efficacy as tools for managing recreational fisheries. In 2006 the NRC published the results of its study in a report, the *Review of Recreational Fisheries Survey Methods*. The NRC concluded that "[t]he designs, sampling strategies, and collection methods of recreational fishing surveys do not provide adequate data for management and policy decisions." Statements made in the NRC review further support the conclusion that the MRFSS was not designed or intended to provide information with the degree

21

of accuracy, precision and timeliness needed for state-level management of any fishery. At the time the report was released, Cornell University Professor Dr. Patrick Sullivan, Chairman of the NRC and co-author of the report, deemed MRFSS "fatally flawed." At best, the MRFSS data might be useable for a regional approach to management, although the NRC review identified enough significant flaws with MRFSS that NMFS is sponsoring a complete overhaul of the survey.

64. Since state-by-state conservation equivalency became the norm for managing the summer flounder fishery, an important issue has been the allocation of the recreational fishery that each state receives. In order to be able to calculate the effect of state-specific management measures, the Commission initially assigned each state a percentage of the total coastal harvest limit using the 1998 MRFSS estimates as a baseline. Each state was assigned a percentage purportedly representing the number of summer flounder landed by that state's recreational anglers during 1998, when the same size, daily bag and season limits applied to all the states in the fishery. The MRFSS data resulted in the following allocations: New Jersey, 38.09%; New York,17.63%; Virginia, 16.69%; Rhode Island, 5.66%; North Carolina, 5.60%; Massachusetts, 5.49%; Connecticut, 3.75%; Delaware, 3.14%; Maryland, 2.95%.

65. Since 2001, the respective states' allocations have continued to be based on the 1998 MRFSS. The same allocations have been used even as the summer flounder population has recovered, changing the nature of the fishery and recreational angling patterns, and even as the MRFSS has been widely criticized by both scientists and fishermen as a poor tool on which to base management of the fishery, particularly on a state-by-state basis. As the NRC review demonstrates, utilizing any set of MRFSS data to allocate the summer flounder fishery is

22

scientifically flawed and problematic.  Relying on only one year of now almost ten-year-old

MRFSS data, generated when the species was far more depleted than now, with significantly

truncated average age and size and attendant different level of landings and angler effort, and

even as the stock has shifted north, seriously compounds that scientific inadequacy.

## C. The 2008 Summer Flounder Rule

66. In August, 2007, the Council and the Board approved a coastwide TAL for summer

flounder for 2008 of 15,770,000 pounds, the lowest TAL since those bodies began to set them.

The 2008 coastwide recreational harvest limit, after adjusting for removal of a 3% research set-

aside, is 6,215,800 pounds.

67. In November, 2007, the  Council's Monitoring Committee and Summer Flounder

Advisory Panel met to develop recommendations for the recreational fishery.  Neither group

reached consensus on whether to recommend coastwide or conservation equivalency measures.

68. On November 28, 2007, NMFS Northeast Regional Director Patricia Kurkul wrote to

the Council, stressing the need to build in precaution when setting recreational measures for

summer flounder for 2008, as the Monitoring Committee had failed to provide guidance for

addressing "increasing recreational angler effort, anticipated stock size increases and resultant

fish availability, angler noncompliance and the percent standard error around point estimates."

Ms. Kurkul stated that she "support[ed] the use of coastwide management measures as a means

to ensure that the 2008 recreational fishery does not exceed its target."

69. In December, 2007, the Council and the Board met to decide on summer flounder

specifications.  Council staff recommended the adoption of coastwide measures because the

elimination of multiple suites of size, bag and season limits for the different states would

improve the quality of future MRFSS estimates. Notwithstanding this recommendation, the Council and Board voted to adopt conservation equivalency. The Council and Board make separate motions and vote separately. When the Council voted, the tally was 11 in favor of conservation equivalency, eight opposed. Representatives from Delaware and Pennsylvania sided with New York against conservation equivalency. In the vote by the Board, New York, Delaware, Connecticut and Rhode Island voted against conservation equivalency, and North Carolina, Virginia, Maryland, New Jersey, Rhode Island, Massachusetts and the Potomac River Fisheries Commission lined up in favor. Pennsylvania does not have a vote on the Board, while the Potomac River Fisheries Commission does. While NMFS Regional Director voted in favor of coastwide when the motion was being amended, she abstained on both the Council and Board votes on the main motion. The main motion contained language stating that conservation equivalency plans should account for trends in increasing angling effort, increasing stock size, and rates of compliance, and consider the percentage standard error in the estimates. Following the vote, the Board charged the Technical Committee to analyze the issues covered in the motion to guide the states in developing their management measures.

70. For 2008, at the urging of NMFS and direction of the Board, the Technical Committee developed additional guidance for states to utilize in developing their conservation equivalency measures. The Technical Committee ultimately came up with the "performance-based reduction factor" for each state based on its average overage during the years 2001-2007, which required the states to design management measures intended to meet a landing target reduced by that amount. The Technical Committee considered but rejected a range of other options for building greater precaution into the states' harvest targets, including uncertainty in the

24

harvest estimates; changes in availability of fish; non-compliant harvest; increasing angler effort; and each state's performance under conservation equivalency. The Technical Committee's analysis of state performance did not identify the potential cause or causes of the past years' overages, but simply calculated each state's performance-based reduction factor and directed states to design their measures accordingly.

71. The standard reduction and new, performance-based reduction factor were applied – both rooted in the 1998 MRFSS estimates – and the states were required to develop management measures to meet harvest targets representing a *de facto* reallocation of the coastwide recreational harvest limit. The states were required to propose management measures designed to meet the following percentages of the total allowable recreational harvest: New Jersey, 41.36% (up from 38.09%); New York, 12.94% (down from 17.63%); Virginia, 16.82 (up from 16.69%); Rhode Island, 5.77% (up from 5.66%); North Carolina, 6.2% (up from 5.60%); Massachusetts, 6.10% (up from 5.49%); Connecticut, 4.07% (up from 3.75%); Delaware, 3.45% (up from 3.14%); and Maryland, 6.10% (up from 2.95%). The total coastwide recreational harvest target was reduced from 2,050,000 fish to 1,853,844 fish, and all of the states other than Massachusetts had their individual harvest targets, expressed in number of fish, reduced to some extent. However, only New York was assigned a target upon which to base its size, bag and season limits representing a reduction from its 1998 percentage allocation of the total recreational harvest limit, from 17.63% to 12.94%.

72. The Technical Committee considered but did not apply all of the factors NMFS had asked be factored into the 2008 conservation equivalency measures – increasing recreational angler effort, anticipated stock size increases and resultant fish availability, angler

noncompliance and the percent standard error around point estimates – notwithstanding that the motion pursuant to which conservation equivalency was chosen for 2008 required that these factors be applied.

73. The Technical Committee did not reach consensus on using the performance-based adjustment factor. It is not part of the Summer Flounder FMP, has not been independently peer-reviewed, and was not adopted by the Commission through a formal vote. New York's representative on the Technical Committee argued for a performance factor that looked back only at 2007. This approach was rejected because several other states would have had their targets reduced more (and their resultant management measures therefore more stringent) than under the averaging method, and argued that the 2007 overages were considered an "unusual occurrence." The Technical Committee did not reach consensus on this or any other approach.

74. The Board required that each state submit its conservation equivalency proposals to the Commission by late January 2008. The Technical Committee then evaluated the proposals and advised the Board of each proposal's consistency with respect to achieving the coastwide recreational harvest limit. New York complied with the Technical Committee's approach and submitted proposed recreational measures that would meet its required reductions after application of the Performance Factor. The Board met on February 7, 2008, and approved a range of management proposals for each state designed to attain conservation equivalency. New York's representatives on the Board spoke out against application of the Performance Factor at this meeting.

75. In February, 2008, the Commission met and approved the various states' proposed conservation equivalence management measures to meet the adjusted harvest targets. NMFS'

26

representative, Ms. Kurkul, reiterated that it was necessary and possible to apply the factors that the Technical Committee had looked at and rejected – increasing recreational angler effort, anticipated stock size increases and resultant fish availability, angler noncompliance and the percent standard error around point estimates – and encouraged continued effort to integrate those factors into the 2008 management measures.  Technical Committee Chair David Simpson of Connecticut and Ms. Kurkul each reiterated on the record their respective support for using coastwide, as opposed to conservation equivalency measures.

76.  On March 21, 2008, NMFS published its "proposed rule [and] request for comments" on the "Recreational Management Measures for the Summer Flounder, Scup, and Black Sea Bass Fisheries; Fishing Year 2008." 73 Fed. Reg. 15111, No. 56 (March 21, 2008).  The measures proposed for managing the recreational summer flounder fishery used conservation equivalency, including the Performance Factor, but otherwise did not apply the factors that the Technical Committee Chair and NMFS's representative had deemed necessary to incorporate.  The proposed rules also include proposed coastwide rules that NMFS would issue in the event it decided not to implement the proposed conservation equivalency management measures.  The coastwide measures were a minimum size of 19 inches, a daily bag limit of 2 fish, and an open season from May 23, 2008 until September 1, 2008.[4]

---

[4] The proposed rules additionally included precautionary default measures selected by the Management Board that any state would be assigned if its proposed conservation equivalency measures were rejected.  The measures were a size limit of 20 inches, a daily bag limit of 2 fish, and an open season of July 4 through September 1, 2008.  However, since the Commission had already initially approved the states' various conservation equivalency proposals, the precautionary measures would only be assigned if the final measures approved by the Commission were different or a state failed to finalize the approved measures.

77.  On April 18, 2008, the DEC submitted comments on the proposed recreational summer flounder management measures for 2008.  DEC's comment letter, a copy of which is attached as Exhibit A (without attachments), and incorporated by reference, urged NMFS to adopt and issue as final the proposed coastwide management measures, and to reject the proposed conservation equivalency rules as violating four of the National Standards established in Section 301 of the Magnuson-Stevens Act, 16 U.S.C. § 1851. More particularly, DEC asserted that the proposed conservation equivalency measures: (1) violate National Standard 2 in that they are not based on the best available science, because, among other things, they ignore the NRC Report's widely accepted conclusion that the MRFSS is a scientifically invalid tool for allocating catch on a state by state basis, and fail to take into account the known changes in the age and size of the summer flounder population since 1998; (2) violate National Standard 4 by discriminating against New York residents, who, notwithstanding the recovery of the species in New York waters, have the most stringent size and bag limits of any state; (3) violate National Standard 6 by failing to take into account the current status of the fishery, including the size and age of the population, and the recreational fishing effort that has evolved as the population has changed; and (4) violate National Standard 3 by failing to manage interrelated stocks of summer flounder as a unit or in close coordination.  DEC additionally noted that the conservation equivalency approach, which has been utilized since 1999, does not appear to be meeting the overriding goal of conserving the fishery, and that NMFS was on the record as agreeing that the coastwide approach is superior in that respect.

78.  On May 23, 2008, NMFS, reversing the earlier support for coastwide measures expressed by its representative in the rulemaking, and notwithstanding the failure by the Board

28

and Council to address various factors as she had requested, adopted the proposed conservation equivalency rules for the recreational summer flounder fishery and published the 2008 Summer Flounder Rule, 73 Fed. Reg. 29990, No. 101 (May 23, 2008).

## FIRST CLAIM FOR RELIEF

*5 U.S.C. § 706(2)(A)*
*Arbitrary and Capricious Rulemaking In Violation Of National Standard 2*

79.  Plaintiffs repeat and reallege each of the allegations in paragraphs 1 to 78 above, as if fully set forth herein.

80.  Defendants did not base the 2008 Summer Flounder Rule upon the best scientific information available, failing, among other things, to take into account the results of NRC's *Review of Recreational Fisheries Survey Methods* and other information demonstrating that MRFSS is not a scientifically valid tool on which to base state-by-state regulation of the recreational summer flounder fishery, and available data concerning increasing recreational angler effort, changes in the summer flounder population, anticipated stock size increases and resultant fish availability.  In promulgating the 2008 Summer Flounder Rule, Defendants violated Magnuson-Stevens National Standard 2, 16 U.S. § 1851(a)(2).

81.  Defendants' issuance of the 2008 Summer Flounder Rule in violation of National Standard 2 was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

82.  Plaintiffs are entitled, under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), to a declaration that defendants violated the Magnuson Stevens Act in this actual controversy by issuing the 2008 Summer Flounder Rule in violation of National Standard 2, and further

declaring that any state-by-state conservation equivalency management measures for the recreational summer flounder fishery based on the 1998 MRFSS-based percentage allocations violate the Act.

## SECOND CLAIM FOR RELIEF

*5 U.S.C. § 706(2)(A)*
*Arbitrary and Capricious Rulemaking in Violation Of National Standard 4*

83. Plaintiffs repeat and reallege each of the allegations in paragraphs 1 to 82 above, as if fully set forth herein.

84. The 2008 Summer Flounder Rule discriminates against the residents of New York. The Rule slashes New York's allocation of the recreational fishery, based on antiquated and scientifically flawed data, while all other states' shares increase. The Rule assigns New York the most stringent conservation measures in the history of the fishery, saddling it with a disproportionate share of the burden of the summer flounder's recovery, without any scientifically valid reason to place this burden on the residents of New York. This discriminatory treatment of New York is unnecessary to and not rationally related to the conservation and recovery of the summer flounder population. The 2008 Summer Flounder Rule was issued in violation of Magnuson-Stevens Act National Standard 4, 16 U.S.C. § 1851(a)(4).

85. Defendants' issuance of the 2008 Summer Flounder Rule in violation of National Standard 4 was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

86. Plaintiffs are entitled, under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), to a declaration that defendants violated the Magnuson Stevens Act in this actual controversy by

issuing the 2008 Summer Flounder Rule in violation of National Standard 4.

## THIRD CLAIM FOR RELIEF

*5 U.S.C. § 706(2)(A)*
*Arbitrary and Capricious Rulemaking In Violation Of National Standard 6*

87. Plaintiffs repeat and reallege each of the allegations in paragraphs 1 to 86 above, as if fully set forth herein.

88. The 2008 Summer Flounder Rule does not take into account and allow for variations among, and contingencies in, the summer flounder fishery, the fishery's resources, and catches, notwithstanding the specific direction by NMFS to do so during the rulemaking process. The 2008 Summer Flounder Rule was issued in violation of Magnuson-Stevens Act National Standard 6, 16 U.S. § 1851(a)(6).

89. Defendants' issuance of the 2008 Summer Flounder Rule in violation of National Standard 6 was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

90. Plaintiffs are entitled, under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), to a declaration that defendants violated the Magnuson Stevens Act in this actual controversy by issuing the 2008 Summer Flounder Rule in violation of National Standard 6.

## FOURTH CLAIM FOR RELIEF

*5 U.S.C. § 706(2)(A)*
*Arbitrary and Capricious Rulemaking*

91. Plaintiffs repeat and reallege each of the allegations in paragraphs 1 to 90 above, as if fully set forth herein.

92. During the rulemaking process, the Northeast Regional Director of defendant NMFS,

its representative in the rulemaking, advocated the use of coastwide management measures as superior to conservation equivalency in achieving the Summer Flounder FMP's conservation goals. Although the problems she articulated concerning conservation equivalency were not addressed in the subsequent development of the final Rule, NMFS ultimately issued it without explaining this change in position.

93. Defendants' issuance of the 2008 Summer Flounder Rule without explaining NMFS' change in position was arbitrary, capricious, and an abuse of discretion.

94. Plaintiffs are entitled, under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), to a declaration that defendants violated APA section 706(2)(A), 5 U.S.C. § 706(2)(A), in this actual controversy by issuing the 2008 Summer Flounder Rule.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment:

1. Declaring that in issuing the 2008 Summer Flounder Rule, Defendants violated Magnuson-Stevens National Standards 2, 4 and 6, 16 U.S. § 1851(a)(2), (4) and (6), and APA section 706(2)(A), 5 U.S.C. §706(2)(A).

2. Declaring that any state-by-state conservation equivalency management measures for the recreational summer flounder fishery that are based on the 1998 MRFSS-based percentage allocations to the various states in the fishery violate the Magnuson-Stevens Act.

3. Vacating the conservation equivalency measures for summer flounder in the 2008 Summer Flounder Rule, and directing defendants to issue the alternate coastwide measures set forth in the Rule as final.

4. Awarding plaintiffs their costs of litigation pursuant to Fed. R. Civ. P. 54 or any other

32

appropriate authority; and

     5. Granting plaintiffs such other relief as the Court deems just and proper.

Dated: New York, New York
       June 23, 2008

                    Respectfully submitted,

                    ANDREW M. CUOMO
                    Attorney General of the State of New York

                    By: _Andrew J. Gershon_
                      ANDREW J. GERSHON
                    Assistant Attorney General
                    New York State Department of Law
                    Environmental Protection Bureau
                    120 Broadway
                    New York, New York 10271
                    (212) 416-8474
                    Andrew.Gershon@oag.state.ny.us
                    Attorney for Plaintiffs