UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X

The State of New York, Alexander B.
Grannis, as Commissioner of the New York
State Department of Environmental
Conservation, and the New York State
Department of Environmental Conservation,

                Plaintiffs,         08-CV-2503
                                    (CPS)(RLM)
  - against -

                                 MEMORANDUM OPINION
Carlos Gutierrez, in his official capacity  AND ORDER
as Secretary of the United States
Department of Commerce, the United States
Department of Commerce, Conrad C. Lauten-
bacher, in his official capacity as Under
Secretary of Commerce and as Administrator
for the National Oceanic and Atmospheric
Administration, James W. Balsiger, in his
official capacity as Acting Assistant
Administrator for the National Marine
Fisheries Service, and the National Marine
Fisheries Service,

                Defendants,

United Boatmen of New York, Inc., New
York Fishing Tackle Trade Association,
Inc., and the Fishermen's Conservation
Association,

                Applicant
                Intervenor-Plaintiffs.

-----------------------------------------X

SIFTON, Senior Judge.

     Plaintiffs the State of New York, Alexander B. Grannis as

Commissioner of the New York State Department of Environmental

Conservation, and the New York State Department of Environmental

Conservation bring this action against defendants Carlos

Gutierrez, in his official capacity as Secretary of the United

States Department of Commerce, the United States Department of
Commerce, Conrad C. Lautenbacher, in his official capacity as
Under Secretary of Commerce and Administrator for the National
Oceanic and Atmospheric Administration, the National Oceanic and
Atmospheric Administration, and James W. Balsiger, in his
official capacity as the Acting Assistant Administrator for the
National Marine Fisheries Service.  Plaintiffs claim that the
final management rule for the 2008 recreational summer flounder
fishery issued by the Deparment of Commerce (the "DOC"), through
the National Marine Fisheries Service (the "NMFS"), pursuant to
the Magnuson-Stevens Fishery Conservation and Management Act, as
amended in 1996 by the Sustainable Fisheries Act, 16 U.S.C. §§
1801, *et seq.* (the "MSA"), violates the MSA as well as standards
of decision making under the Administrative Procedure Act, 5
U.S.C. § 701, *et seq.* (the "APA").

Presently before this Court are motions by applicant
intervenor-plaintiffs United Boatmen of New York, Inc. ("UBNY"),
New York Fishing Tackle Trade Association, Inc. ("NYFTTA"), and
the Fishermen's Conservation Association ("FCA") (together,
"Applicants") to intervene and to join a new defendant pursuant
to Federal Rules of Civil Procedure 19, 20 and 24.  For the
reasons set forth below, Applicants' motions are granted.

## BACKGROUND

The following facts are taken from the Complaint and the

parties' submissions in connection with this matter, and are accepted as true for the purposes of this motion. Appendix A lists some of the bodies, statutes, regulations, and acronyms necessary to understand the factual background of this matter.

*Federal and State Fishery Regulatory Schemes*

The subject matter of this action is the regulation of fisheries, both at the federal and state level, specifically with regard to summer flounder, popularly known as "fluke." Federal fishery regulation is governed principally by the MSA, which embodies Congress' desire to implement a "national program for the conservation and management of the fishery resources of the United States." 16 U.S.C. § 1801(a)(6). The MSA establishes eight regional councils responsible for developing and recommending to the United States Secretary of Commerce (the "Secretary") fishery management plans ("FMPs") governing each fishery within their respective geographic areas. These FMPs govern fishing in federal waters in the United States Exclusive Economic Zone ("EEZ"), which encompasses ocean waters from three miles offshore to 200 miles offshore. 16 U.S.C. § 1811(a). State membership in the Councils is governed by statutory provisions. 16 U.S.C. § 1852(a). New York is a voting member of the Mid Atlantic Fishery Management Council (the "MAFMC"), which is responsible for the preparation of the federal summer flounder FMP.

The MSA requires that federal FMPs be consistent with ten "national standards," *see* 16 U.S.C. § 1851(a), including requirements that management plans adopted under the Act "prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry," and that they rest on the "best scientific information available." 16 U.S.C. § 1851(a)(1)-(2). The NMFS, by and through the authority of the Secretary, is charged with determining whether these standards have been met before approving proposed FMPs and promulgating rules implementing them. 16 U.S.C. § 1854(a). The rule managing summer flounder is usually published in late winter or early spring of each year, in time for the upcoming season.

The management of fisheries within state waters, including inland waters and costal waters extending three miles seaward from shore, is subject to regulation by the states under their police powers. In 1942, the fifteen Atlantic states, including New York, and the District of Columbia entered into an interstate compact establishing the Atlantic State Marine Fisheries Commission (the "ASMFC" or "Commission"), which was approved by Congress pursuant to Article I, Section 10, clause 3 (the "Compact Clause") of the United States Constitution,[1] for the

---

[1] The Compact Clause provides in relevant part that "[n]o state shall, without the consent of Congress . . . enter into any agreement or compact with another state, or with a foreign power[.]"

purpose of "promot[ing] the better utilization of the fisheries .
. . of the Atlantic seaboard by the development of a joint
program for the promotion and protection of such fisheries."
Pub. L. 77-539 (1942), *as amended by* Pub. L. 81-721 (1950)
("ASMFC Compact"), Art. I.[2]  Each member state appoints three
representatives to the ASMFC:  its director of marine fisheries,
a state legislator, and a public member appointed by the
Governor.  ASMFC Compact, Art. III.  The Commission operates
through species-specific management boards, including the Summer
Flounder, Scup, and Black Sea Bass Management Board (the
"Board"), which develops and proposes FMPs for summer flounder.
The ASMFC Compact does not limit the powers or sovereignty of its
member states over state waters.  *See* ASMFC Compact, Art. IX.
*The Atlantic Coastal Fisheries Cooperative Management Act*

In 1993, Congress enacted the Atlantic Coastal Fisheries
Cooperative Management Act, Pub. L. 103-206, 16 U.S.C. §§ 5101-
5108 (the "ACFCMA" or "Fisheries Act"), to promote the
conservation of "[c]oastal fishery resources that migrate, or are
widely distributed, across the jurisdictional boundaries of two
or more of the Atlantic States and of the federal Government[.]"
16 U.S.C. §§ 5101(a)(3), (b).  The Fisheries Act calls for the
coordination of federal and state efforts concerning inter-

---

[2] The ASMFC Compact, the ASMFC's Interstate Fishery Management Plan
Charter ("Charter"), and Rules and Regulations are available on the ASMFC's
website, http://www.asmfc.org (Last visited Oct. 30, 2008).

jurisdictional fisheries, such as the summer flounder fishery.
16 U.S.C. § 5101(a)(3).  In serving this objective, the Fisheries
Act imposes federal obligations on the Commission, in addition to
the original mandate of the Commission as expressed in the ASMFC
Compact.

The Fisheries Act directs the ASMFC to develop "coastal
fishery management plans to provide for the conservation of
coastal fishery resources."  16 U.S.C. § 5104(a)(1).  These FMPs
must be "based on the best scientific information available."  16
U.S.C. § 5104(2)(A).  In addition, the ASMFC must provide
"adequate opportunity for public participation" in the FMP
preparation process.  16 U.S.C. § 5104(a)(2)(B).  The Fisheries
Act requires the Commission to identify the states to which a
given FMP developed by the Commission applies, and those states
are in turn required to "implement and enforce the measures of
such plan within the timeframe established in the plan."  16
U.S.C. § 5104(b)(1).  In addition, the Fisheries Act confers
authority on the Commission to monitor a state's implementation
and enforcement of Commission FMPs.  If the Commission determines
that a state is not in compliance with an FMP, it is required to
notify the Secretary.  16 U.S.C. § 5105.  If the Secretary
independently determines that a state has not complied with the
FMP, and that the FMP is "necessary for conservation of the
fishery," 16 U.S.C. § 5106(a), the Secretary is directed to

declare a moratorium on fishing for the particular species within the coastal waters of the non-complying state. 16 U.S.C. § 5106(c).

Under the Fisheries Act, in the absence of a pre-existing approved federal FMP, fishing regulations implemented by the Secretary and the NMFS for federal waters must be compatible with those implemented by the states, and the Secretary "may include measures recommended by the [ASMFC] to the Secretary that are necessary to support the provisions of the coastal fishery management plan." 16 U.S.C. § 5103(b)(1). However, federal and state regulations need not be identical.

*The 2008 Summer Flounder Fishery Management Plan*

Summer flounder are currently distributed along the Atlantic Coast from North Carolina to Canada. They support both commercial and recreational fisheries along the Atlantic Coast, and are one of the most sought-after fish by both commercial and recreational anglers. Summer flounder are migratory, traveling between state and federal waters throughout their life cycle. However, most summer flounder landings are taken in shore from state jurisdictional waters. The 1980s and early 1990s saw extensive depletion of summer flounder stocks, followed by a partial and continuing recovery in more recent years. Congress has specified a January 1, 2013 deadline for the re-establishment of the summer flounder fishery.

The ASMFC Board on behalf of the Atlantic states and the federal MAFMC meet together twice a year to plan management measures for the summer flounder fishery. Beginning in 2001, and continuing through 2008, the Board and the MAFMC have voted to propose to their respective organizations yearly management regimes for the recreational summer flounder fishery known as "conservation equivalency," or "state-by-state" regulation, which have been subsequently adopted and implemented by the NMFS and the states each year. In simplified terms, this approach takes the annual coastwide quota ("total allowable landings," or "TAL") for summer flounder set for the entire coast and divides the quota among the participating states in the form of a percentage share of the total. Once the TAL and state quotas are set, each state is then required to formulate management measures in terms of minimum size limits, daily bag limits, and seasonal limitations, that are expected to constrain that state's recreational landings to their assigned percentage of the coastwide TAL.

The applicable state quotas are calculated based upon survey data instead of direct reporting of catch. For summer flounder quotas, both the federal government and the ASMFC employ the Marine Recreational Fisheries Statistics Survey ("MRFSS"), developed by NMFS as a means of obtaining estimates of recreational participation, effort, and catch in marine waters.

MRFSS data is collected by two independent surveys: (1) a telephone survey of households in coastal counties, and (2) an "intercept," or interview survey of anglers by trained interviewers stationed at fishing access sites. Since its inception, the accuracy of the MRFSS data and the manner of its application have been criticized and questioned by the fishing community, fishery scientists, and fishery managers. In addition, since 2002, through 2008, the recreational state quotas have been based upon MRFSS data from 1998, referred to as the "proxy year." Applicants contend that the 1998 data is not only contested, but obsolete. In its brief, ASMFC explains that the proxy year was selected because it provides a measure of flounder harvest at a time when all states were subject to uniform regulations, since an approach based on more recent catch data could effectively punish states that have done the most to promote conservation.

As noted *supra*, both the MAFMC, for federal waters, and the ASMFC, for state waters, are required to meet certain statutory standards when promulgating regulations for the various fisheries. For the purposes of this motion, the most important of these standards requires all FMPs and fishery management measures to be based on the "best scientific information available." *See* 16 U.S.C. §§ 1851(a)(2), 5104(a)(2)(A). In 2005, responding to continuing public criticism of the MRFSS

system of survey data, the NMFS commissioned the National Academy of Sciences/National Research Council ("NAS/NRC") to perform an independent, peer-reviewed evaluation of the MRFSS, and to make recommendations for its application and improvement. The report issued by NAS/NRC stated, among other things, that the MRFSS was not appropriate for small-scale management and allocation of fish stocks, but rather was better suited for large-scale stock management. The report observed that "[c]urrently, many fisheries are monitored at the state level, which is a finer stratification than intended originally for the data collected." Review of Recreational Fisheries Survey Methods, National Academies Press, 2006, at 49. It also remarked that "[a]s managers use recreational data on finer temporal and spatial scales, issues of precision and bias become more pronounced. Existing spatial and temporal sampling strata may be of too coarse a resolution to generate estimates that are adequate for the management requirements." *Id.* at 54.

On the basis of the NAS/NRC report, plaintiffs and Applicants contend that continued use of the MRFSS data constitutes a failure to use the "best scientific information available." *See* Compl. ¶ 12; Complaint in Intervention ¶ 4. Under plaintiffs' and Applicants' theory, defendants are liable for failure to comply with national standards, *see* 16 U.S.C. § 1851(a)(2), and the ASMFC, which Applicants propose to add as a

party to this action, would be liable for failure to comply with
Congress' direction in the Fisheries Act that the ASMFC's FMPs
must be "based on the best scientific information available." 16
U.S.C. § 5104(2)(A).

*Procedural History*

On the basis of the alleged violation described above, as
well as other violations not relevant for purposes of this
motion, plaintiffs filed their complaint against the Secretary,
NOAA, NMFS and their respective chief administrators on June 23,
2008. The suit was brought in New York's capacity as a sovereign
and body politic owner of fishery resources in the State of New
York, as well as *parens patriae* on behalf of New York citizens
aggrieved by the final management rule for the 2008 recreational
summer flounder fishery. Compl. ¶ 19. For reasons that remain
unclear, plaintiffs did not name ASMFC as a defendant in their
action. However, Applicants state that plaintiffs do not oppose
the joinder of ASMFC as a co-defendant, and plaintiffs have not
submitted any objection to this effect.

On July 16, 2008, Applicants moved to intervene in this
action for the purposes of joining ASMFC as a defendant.
Applicants are three separate citizens' groups. Applicant UBNY
is a professional trade organization representing the for-hire
fishing vessel industry in the New York Marine District.
Applicant NYFTTA is a professional trade organization

representing the wholesale and retail bait and tackle dealer industry in New York.  Applicant FCA is a non-profit public interest organization whose membership is comprised of individual recreational anglers throughout the New York Marine District, who target summer flounder (among other species) in both state and federal waters contiguous to New York State.

**DISCUSSION**

Applicants seek to intervene in this matter in order to join a new party as a defendant.  They request leave to intervene as of right under Federal Rule of Civil Procedure 24(a) ("Rule 24(a)"), or in the alternative, as permissive intervenors under Federal Rule of Civil Procedure 24(b) ("Rule 24(b)").

<u>Intervention</u>

Rule 24(a) provides that on a timely motion, a federal court must permit any party to intervene if such party:

> (1) is given an unconditional right to intervene by a federal statute; or
>
> (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a).

Because no federal statute confers an unconditional right to intervene on Applicants, in order to intervene as of right, Applicants must qualify under Rule 24(a)(2).  To intervene as of

right under Rule 24(a)(2), Applicants must establish the
following: (1) a timely motion; (2) an interest relating to the
property or transaction that is the subject matter of the action;
(3) an impairment of that interest without intervention; and (4)
that their interest is not adequately represented by other
parties to the litigation. *United States v. Pitney Bowes, Inc.*,
25 F.3d 66, 70 (2d Cir. 1994).

*1.   Timeliness*

The first consideration is whether Applicants' motion is
timely.  Factors to consider in determining timeliness include:
"(a) the length of time the applicant knew or should have known
of [its] interest before making the motion; (b) prejudice to
existing parties resulting from the applicant's delay; (c)
prejudice to [the] applicant if the motion is denied; and (d)
[the] presence of unusual circumstances militating for or against
a finding of timeliness." *MasterCard Intern., Inc. v. Visa
Intern. Service Ass'n, Inc.*, 471 F.3d 377 (2d Cir. 2006) (citing
*United States v. New York*, 820 F.2d 554, 557 (2d Cir. 1987).  The
parties do not contest the timeliness of this motion.  Because
Applicants filed their motion less than one month after the
filing of the complaint, and because I find that a few weeks'
delay does not prejudice the existing parties, I conclude that
Applicants' motion is timely.

*2.    Applicants' Purported Interest in the Action*

The second question is whether Applicants have an interest in the subject matter of this action, which in this case is the recreational summer flounder fishery.  An intervenor's interest must be "direct, substantial, and legally protectible," *New York News, Inc. v. Kheel*, 972 F.2d 482, 486 (2d Cir. 1992), rather than "remote or contingent."  *H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.*, 797 F.2d 85, 88 (2d Cir. 1986).  As associations whose membership is comprised of recreational fishermen in New York, as well as those who sell or rent necessary equipment to recreational fishermen, Applicants have a protectable interest in the management and continued viability of the recreational summer flounder fishery in New York.  This conclusion is supported by the decisions of courts in this district and others.  *See, e.g.*, *Great Atlantic & Pacific Tea Co., Inc. v. Town of East Hampton*, 178 F.R.D. 39, 42 (E.D.N.Y. 1998) (citizens' group dedicated to preservation of rural nature of municipality had sufficient interest in action by developer challenging ordinance limiting size of commercial developments); *British Airways Bd. v. Port Auth. Of New York & New Jersey*, 71 F.R.D. 583, 584 (S.D.N.Y. 1976) (environmental organizations and others located next to an airport's runways had sufficient interest in action brought by foreign airlines seeking relief from decision prohibiting them from operating supersonic jet

aircraft at airport); *United States v. Reserve Mining Co.*, 56
F.R.D. 408 (D.C. Minn. 1972) (environmental groups using lake for
recreational purposes had sufficient interest in action brought
by United States to secure abatement of alleged pollution of lake
by mining company).

*3.    Potential for Impairment of Applicants' Interest*

The third consideration is whether Applicants' interest in
this action would be impaired absent their intervention.  This
element of the intervention of right standard is met where
prospective intervenors demonstrate "that the disposition of the
action may, as a practical matter, impair or impede the person's
ability to protect that interest." *Pitney Bowes*, 25 F.3d at 69-
70.  Here, Applicants' interest in the management and continued
viability of the recreational summer flounder fishery in New York
might be impaired were defendants to prevail on the merits of
this action and the final management rule for the 2008
recreational summer flounder fishery to be upheld.  Further,
whether plaintiffs prevail or fail on the merits, Applicants'
ability to pursue their interests may be impaired by the effects
of *stare decisis*, *res judicata*, or collateral estoppel.  *See*
Moore's Federal Practice 3d § 24.03(3)(a)-(b) ("A movant's
interest is plainly impaired if disposition of the action in
which intervention is sought will prevent any future attempts by
the movant to pursue its interest.  For example, if the doctrine

of *res judicata* would prohibit a movant from pursuing a claim in a separate action, a total obstruction of the interest would result"). Thus, this element of the test is satisfied.

4. *Whether Applicants Are Adequately Represented*

Finally, Applicants must also show that they are not adequately represented by a named party in order to intervene as of right. Generally, this showing places only a "minimal burden" on the would-be intervenor, as the applicant need only show that representation "may be" inadequate. *Trbovich v. United Mine Workers of Am.*, 404 U.S. 538, n.10 (1972); *United States Postal Serv. v. Brennan*, 579 F.2d 188, 191 (2d Cir. 1978). However, "the Second Circuit demand[s] a more rigorous showing of inadequacy in cases where the putative intervenor and a named party have the same ultimate objective." *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 179-80 (2d Cir. 2001); *see also Brennan*, 579 F.2d at 191. Here, plaintiffs and Applicants share the same ultimate goal: overturning the state-by-state approach to measures for the conservation of summer flounder in favor of coastwide quotas. In addition, where a government entity sues in *parens patriae* on behalf of its constituents, as in this case, a rebuttable presumption of adequate representation exists. *U.S. v. Hooker Chems. & Plastics Corp.*, 749 F.2d 968, 985 (2d Cir. 1984) ("to intervene in a suit in district court in which a state is already a party, a citizen or subdivision of

that state must overcome [a] presumption of adequate representation"); *see also United States v. City of New York*, 198 F.3d 360, 367 (2d Cir. 1999). For these reasons, Applicants must make a particularly strong showing that New York's representation of their interests is not adequate.

Applicants submit that the presumption of adequacy of representation by a sovereign state is rebutted if prospective intervenors can show misfeasance or nonfeasance by the sovereign with respect to the subject matter of the case. In support of this argument, Applicants cite *Chiglo v. City of Preston*, 104 F.3d 185, 187-88 (8th Cir. 1997) ("the proposed intervenor may rebut [a] presumption [of adequate representation by a sovereign state] by showing that the *parens patriae* has committed misfeasance or nonfeasance in protecting the public"). The Second Circuit has not set forth the conditions under which the *parens patriae* presumption may be rebutted, other than requiring "a strong affirmative showing that the sovereign is not fairly representing the interests of the applicant." *Hooker Chems.*, 749 F.2d 968 at 985. However, a showing of more than a mere disagreement on litigation strategy is necessary. "It is not enough that the applicant would insist on more elaborate pre-trial or pre-settlement procedures or press for more drastic relief, particularly when the sovereign's interest is in securing preventive relief of the same general sort as the applicant."

*Hooker Chems.*, 749 F.2d 968 at 985; *see also Chiglo*, 104 F.3d at 188. Rather, Applicants must show that plaintiffs are not fairly representing their interests, whether by misfeasance, nonfeasance or otherwise.

In this case, Applicants contend that the New York State plaintiffs' failure to name ASMFC as a defendant in this action was misfeasance or nonfeasance, and therefore constituted inadequate representation. According to Applicants, ASMFC and the Board exercise "final and binding authority over fisheries prosecuted in its members' state waters, and are free to implement regulations in state waters which are divergent from those issued by the defendant federal authorities in federal waters." Memorandum of Law in Support of Motion to Intervene and Motion for Joinder ("App.'s Memo.") at 12. Under this theory, even if plaintiffs should prevail, if ASMFC is not a named as a defendant, any relief ultimately accorded to plaintiffs would be incomplete as it would only apply to federal waters -- and more than 90% of recreational summer flounder fishing takes place in state waters. *Id.* at 16. Applicants claim that they have alerted plaintiffs to the need to name ASMFC as a defendant several times, but that to date, plaintiffs have "failed or refused to do so." *Id.* at 12. Although plaintiffs have made no submissions in connection with this motion, Applicants state that plaintiffs do not oppose it. *Id.* at 1.

In response, defendants argue that Applicants' attempt to rebut the *parens patriae* presumption fails because they have not shown that viable claims against ASMFC exist.  To support their argument, defendants refer to a submission from ASMFC, which has been submitted in opposition to Applicants' motion despite ASMFC's non-party status.  ASMFC argues that Applicants' motions should be denied because Applicants have no private right of action against ASMFC.

Applicants first argue that I should not consider ASMFC's opposition papers at all, since ASMFC has not yet been named as a defendant and since ASMFC has not sought leave to file papers as a non-party participant.  Applicants cite two cases in support of their argument.  In the first, the District Court of Connecticut stated that in the context of a plaintiff's motion for leave to file an amended complaint naming new defendants, the status of prospective new defendants to challenge the motion was "at best, dubious." *Vasquez et al. v. Summit Women's Center, Inc. et al.*, No. Civ. 301-CV-955, 2001 WL 34150397, at *1 n.1 (D. Conn. Nov. 16, 2001) (citing Moore's Federal Practice 3d. § 14.21(2)).  In the second case, citing the same authority in a different context, a district court in Pennsylvania noted that "[i]n the . . . setting of joinder of third parties, it has been observed that third parties do not have standing to contest the joinder because they are not of record." *Prendergast v. Baldino*, No.

Civ. A. 98-269, 1998 WL 800322, at *1 n.1 (E. D. Pa. Nov. 1, 1998) (citing Moore's Federal Practice 3d. § 14.21(2)). Applicants also argue that, as a policy matter, "to allow or entertain any of the discussion or arguments offered by the ASMFC at this time would be analogous to allowing a prospective defendant named in a prospective lawsuit to dispute the claims asserted in such a suit before the initiating Complaint has been filed by the prospective plaintiff." Applicants' Reply to Defendants['] Opposition to Intervention and Joinder ("App.'s Reply") at 9. While Applicants are correct that ASMFC is not a party to this matter, and its standing to make submissions at this stage is, therefore, if not wholly premature, at best "dubious," in this case the named defendants have themselves asserted the same argument advanced by ASMFC in its opposition papers. To the extent that ASMFC's submission supplements defendants' argument, I will therefore consider it.

a.  *Existence of a Private Right of Action Against ASMFC*

Whether Applicants have rebutted the *parens patriae* presumption of adequate representation turns on whether New York could and should have named ASMFC as a defendant. The ASMFC Compact, the acts of Congress approving it, *see* Pub. L. No. 77-539 (1942); Pub. L. 81-721 (1950), and the Fisheries Act do not expressly provide for judicial review of ASMFC actions. In the absence of express Congressional authorization, whether New York

has a state right of action against ASMFC is governed by the same standards that apply to determining the existence of a private right of action. *See, e.g.*, *State of N.Y. v. DeLyser*, 759 F.Supp. 982 (W.D.N.Y. 1991) (applying *Cort v. Ash* test, set forth by Supreme Court to determine existence of private right of action, to determine that no state right of action existed in that case); *State of N.J., Dept. of Envtl. Prot. and Energy v. Long Island Power Auth.*, 30 F.3d 403, 421-23 (3d Cir. 1994) (following *DeLyser* and holding that "[b]ecause we find the states are not especial beneficiaries of the [relevant statute] by its language, and no indication of legislative intent to create a cause of action in favor of states against private parties . . . [New Jersey's complaint against the non-federal agency defendants] must therefore be dismissed for failure to state a claim").

Whether a federal statute implicitly creates an implied cause of action "is basically a matter of statutory construction." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15 (1979). "[W]hat must ultimately be determined is whether Congress intended to create the private remedy asserted[.]" *Id.* at 15-16. "Congressional intent is the keystone as to whether a federal private right of action exists for a federal statute." *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116 (2d Cir. 2007). This intent may appear explicitly in

the language of a statute or its legislative history, or "[s]uch
an intent may appear implicitly in the language or structure of
the statute, or in the circumstances of its enactment."
*Transamerica,* 444 U.S. at 18; *see also Thompson v. Thompson*, 484
U.S. 174 (1988); *Touche Ross & Co. v. Redington*, 442 U.S. 560
(1979).

i.  *Congress' Silence Regarding a Private Right of Action
    Against ASMFC*

ASMFC argues that Congress' silence with regard to a private
right of action should not be interpreted to imply Congressional
intent to authorize such an action.  The lack of language
authorizing a private action distinguishes the ASMFC Compact and
legislation from other interstate compacts that expressly provide
for judicial review of compact decisions.[3]  According to ASMFC,
the absence of such authorizing language in its compact is
unsurprising, as the Commission's decisions are made in a
legislative manner with representatives of member states voting

---

[3] *See, e.g.*, Washington Metropolitan Area Transit Regulation Compact,
Pub. L. No. 101-505, 104 Stat. 1300, 1312, Art. XIII, Sec. 5(a) (1990) ("Any
party to a proceeding under this Act may obtain a review of the Commission's
order" in the Fourth or District of Columbia Circuits by filing a petition for
review within 60 days"); Tahoe Regional Planning Compact, Pub. L. No. 96-551,
94 Stat. 3247, Art. VI(j)(3) (1980) ("Any aggrieved person may file an action
in an appropriate court of the States of California or Nevada or of the United
States alleging noncompliance with the provisions of this compact or with an
ordinance or regulation of the agency"); Northeast Dairy Compact, § 16(C),
S.J. Res. 28 (1995) ("The district courts of the United States . . . are
hereby vested with jurisdiction in equity to review [Commission] ruling[s]");
*see also California v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1326
(9th Cir. 1985) (noting that "[t]he Tahoe Compact specifically provides for
private enforcement"); *New York State Dairy Foods, Inc. v. Northeast Dairy
Compact Comm'n*, 26 F. Supp. 2d 249, 259 (D. Mass. 1998); *Seattle Master
Builder's Ass'n v. Pacific Northwest Elec. Power and Cons. Planning Council*,
786 F.2d 1359, 1368 (9th Cir. 1986).

to adopt particular plans and measures.  Further, ASMFC argues

that it has no regulatory authority.  Although the Commission

develops FMPs that are binding on the states under the Fisheries

Act, the states control the implementation of those measures.[4]

Finally, ASMFC also points out that dissatisfied States have the

option of appealing to the Commission's Interstate Fisheries

Management Program ("ISFMP") Policy Board.  *See* "Appeals

Process," as approved by the ISFMP Policy Board on August 18,

2004, *available at*

http://www.asmfc.org/publications/ASMFCAppealsProcess.pdf (last

visited Nov. 13, 2008).

Applicants contend, however, that absent evidence to the

contrary, the existence of a private right of action for judicial

review of interstate compact decisions should be presumed.  In

this regard, Applicants cite *Seal & Co. v. Washington*

---

[4] As noted *supra*, the Fisheries Act did introduce a mechanism to enforce
FMPs developed by the Commission, under which the Secretary is directed to
impose a moratorium on fishing if he independently determines that the ASMFC's
recommendations are "necessary for conservation of the fishery" and that a
State has failed to implement them.  16 U.S.C. § 5106(c).  By itself, however,
ASMFC argues that this mechanism does not suffice to confer regulatory
authority on ASMFC.  Further, while a party aggrieved by a federal moratorium
under the Fisheries Act could seek judicial review of that federal "agency
action" under § 10 of the Administrative Procedure Act ("APA"), 5 U.S.C. §
702, nothing in the Fisheries Act expressly subjects the ASMFC's decisions or
recommendations underlying the moratorium to APA review.
    ASMFC puts forward two further reasons why the Fisheries Act cannot be
interpreted to have introduced a private right of action for judicial review
of ASMFC decisions.  First, given the ASMFC's emphasis on state sovereignty,
*see* ASMFC Compact, Art. IX, the introduction of a private right of action
against ASMFC would have been controversial -- yet there is no hint in the
Fisheries Act's text or legislative history that Congress intended to
introduce such a right.  Second, when the Fisheries Act was enacted in 1993,
the MSA's provisions expressly subjecting federal FMPs to APA review had been
in place for years, *see* 16 U.S.C. 1855, providing a ready model should
Congress have wished to subject ASMFC FMPs to APA review.

*Metropolitan Area Transit Authority*, 768 F. Supp. 1150, 1153 n.6
(E.D. Va. 1991) ("[t]he first question -- is there a private
cause of action or remedy? -- is presumed to have been answered
affirmatively by Congress, absent evidence to the contrary"
(citing *Japan Whaling Ass'n v. Amer. Catacean Soc'y*, 478 U.S.
221, 231 n.4 (1986)).  Applicants assert that barring judicial
review of interstate compacts "could potentially adorn
administrative tyranny with judicial imprimatur."  App.'s Reply
at 7; *see also Seal*, 768 F. Supp. at 1156 (absent a private right
of action, "it is hard to see how [the interstate compact's
provisions] would be monitored and enforced").  Applicants note
in a somewhat circular argument that other statutes approving
interstate compacts provide that the interstate compact entities
are not to be considered federal agencies, and had Congress
intended that a private right of action not exist, it would have
likewise provided that ASMFC is not a federal agency.[5]  Compare
*Seal*, 768 F. Supp. 1150 at 1157 (concluding that "Congress
intended [the interstate compact in that case] to conduct its
procurements as a federal agency would, and to be subject to
suits by aggrieved bidders").  In this regard, Applicants point
out that the Fisheries Act directs ASMFC's management boards to

---

[5] *See, e.g.*, William S. Morrow, Jr., *The Case for an Interstate Compact
APA*, 29.2 Admin & Reg. L. News 12, 13 (2004) (listing examples of compact
entities which Congress has expressly stated do not amount to federal
agencies, including the Pacific Northwest Electric Power and Conservation
Planning Council Compact, 16 U.S.C. § 839b(a)(2)(A); the Delaware River Basin
Compact, § 15.1(m); and the Susquehanna River Basin Compact, § 2(1)).

allow public notice and comment, to create and maintain an administrative record, and to articulate measurable standards by which their actions may be reviewed -- just like a federal agency.  ISFMP Charter, § 6(a), (c).  Applicants also note that the "best scientific information available" language present in the Fisheries Act is a term of art drawn from the federal MSA, a factor considered by the *Seal* court.  *Seal*, 768 F. Supp. 1150 at 1156.

*Seal*, however, is distinguishable.  First, the *Seal* court noted that when the action of a *federal agency* is at issue, a private cause of action is presumed pursuant to § 10 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, which authorizes suits by any person "suffering legal wrong because of [federal] agency action."  *See Seal*, 768 F. Supp. at 1153; 5 U.S.C. § 702; 5 U.S.C. § 551(1) (defining "agency" for APA purposes as an "authority of the Government of the United States").  The Commission is a creature of interstate compact, not a federal agency, and thus the presumption to which Applicants refer does not apply to ASMFC.  Second, as to the alleged lack of an enforcement mechanism absent a private right of action, ASMFC has noted that an appeals process exists under which aggrieved States may appeal ASMFC management board decisions to the ISFMP Policy Board.  Third, the considerations that led the *Seal* court to conclude that the interstate compact

at issue in that case was intended to operate as a federal agency are not present in this case.  As the *Seal* court stated:

> Congress, rather than the participating states, was the motivating force behind creation of the Compact [at stake in *Seal*].  Furthermore, Congress, on behalf of the District of Columbia, was one of the parties agreeing to the Compact.  Moreover, the Compact, in creating WMATA, created an agency that took over the functions of a previously existing federal agency[.]  As Congress intended that federal agencies be subject to the APA in their procurement activities, and as WMATA replaced NCTA, it is likely that Congress also intended that WMATA be subject to APA-like review of its procurement activities.  And beyond this, large amounts of federal tax dollars flowed to WMATA . . .

*Seal*, 768 F. Supp. at 1157.  These considerations are not present here.  The ASMFC was not conceived of by Congress, nor was Congress a party to the compact, although the Fisheries Act does provide for federal funding of ASMFC.  *See* 16 U.S.C. § 5107.  ASMFC does not have directly enforceable agency powers, and it did not replace a pre-existing federal agency.

Taken together, the arguments for and against interpreting Congressional silence in the ASMFC and its legislation to imply that Congress intended to authorize a private right of action against ASMFC weigh against finding such Congressional intent.

ii.  *Whether ASMFC is a Quasi-Federal Agency Subject to APA Review*

In considering whether interstate compacts are subject to a private right of action, some courts, rather than following an approach of strict statutory interpretation, have reasoned that an interstate compact should be subject to APA review if the

compact is a "quasi-federal agency."  *See, e.g.*, *Coalition for Safe Transit, Inc. v. Bi-State Dev. Agency*, 778 F. Supp. 464, 467 (E.D. Mo. 1991) ("'[t]he degree of federal interest and participation in the Metro Link project' warranted a conclusion that Bi-State is a 'quasi-federal agency'" subject to APA review) (citing *Union Switch and Signal, Inc. v. Bi-State Dev. Agency, et al.*, No. 91-1401C(7) (E.D. Mo. 1991) (unpublished memorandum)); *The Bootery, Inc. et al. v. Washington Metro. Transit Auth. et al.*, 326 F. Supp. 794, 799 (D.D.C. 1971) ("[i]n view of the federal interest in the Compact, there appears no reason why the general criteria for standing to challenge action under a federal statute should not be employed"); *Otis Elevator Co. v. Washington Metro. Transit Auth.*, 432 F. Supp. 1089, 1094 (D.D.C. 1976) (same).  The *Seal* court also considered the "quasi-federal agency" justification for a private right of action as an alternative to the statutory interpretation approach set forth *supra.  Seal*, 768 F. Supp. at 1155-56 ("because of the strong 'federal interest' in the WMATA Compact, WMATA should be treated as a federal agency subject to the APA") (citing *Otis*, 432 F. Supp. at 1094).

In deciding whether an interstate compact created a "quasi-federal agency," courts have considered the degree of federal interest and participation in the compact.  Congressional approval of an interstate compact is one factor to be considered,

although it is not dispositive. *See Old Town Trolley Tours v. Washington Metro. Area Transit Commission,* 129 F.3d 201, 204 (D.C. Cir. 1997) (it does not follow from Congress' approval of compact that compact created federal agency governed by APA). Other factors bearing on the degree of federal interest include whether there is a federal role in appointing compact agency members, whether federal funding is authorized for the compact agency, and whether the compact furthers a federal objective. *See, e.g.*, Morrow, *supra* n.5, at 13. The federal interest inquiry is fact-intensive and case specific; the presence of one or more federal interest factors does not automatically convert an interstate compact into a quasi-federal agency. *See, e.g.*, *California Tahoe Regional Planning Agency v. Sahara Tahoe Corp.*, 504 F. Supp. 753, 762-63 (D. Nev. 1980) (approval of the compact by Congress and limited appointment power of president did not thereby establish TRPA as federal agency).

In this case, federal interest and involvement in the Commission is strong. ASMFC was expressly authorized by Congress under the Compact Clause. *See* ASMFC Compact, Preamble. Congress' enactment of the Fisheries Act provided federal funding for the Commission, *see* 16 U.S.C. §§ 5107, 5108, and imposed federal obligations on ASMFC, including the obligation to base FMPs on "the best scientific information available," 16 U.S.C. § 5104(2)(A), as well as to provide "adequate opportunity for

public participation" in the FMP preparation process.  16 U.S.C.

§ 5104(a)(2)(B).  In addition, the ASMFC serves a federal

objective -- namely, the conservation and management of fishery

resources in the United States, a goal expressed in the federal

MSA.  *See* 16 U.S.C. § 1801(a)(6); 16 U.S.C. § 5101(a)(6).

Further, federal agencies directly participate in ASMFC

decisions:  the NMFS and the United States Fish and Wildlife

Service serve as voting Board members.  *See* ISFMP Charter, §

4(b)(3).

The strength of the federal interest in ASMFC does not,

however, automatically transform ASMFC into a quasi-federal

agency.  By its own terms, the ASMFC expressly states that

"[n]othing in this compact shall be construed to limit the powers

of any signatory state."  ASMFC Compact, Art. IX.  At the same

time, the Fisheries Act renders FMPs prepared by the Commission

binding on ASMFC member states.  The Fisheries Act expressly

requires each state identified in an FMP developed by the

Commission to implement and enforce the FMP, usually through

state enacted laws or regulations.  16 U.S.C. §§ 5104(b)(1)

("Each State . . . shall implement and enforce the measures of

such plan within the timeframe established in the plan"); 16

U.S.C. § 5102(10) ("The term 'implement and enforce' means to

enact and implement laws or regulations as required to conform

with the provisions of a coastal fishery management plan and to

assure compliance with such laws or regulations by persons participating in a fishery that is subject to such plan"). Thus, ASMFC member states are bound by Commission decisions. In addition, the Fisheries Act confers authority on the Commission to monitor a state's implementation and enforcement of Commission FMPs. 16 U.S.C. § 5104(c). If the Commission determines that a state is not in compliance with its FMP, the Commission is required to provide notice to the United States Secretary of Commerce. 16 U.S.C. § 5105. While it is true that the Secretary must make an independent determination that the FMP's measures are necessary for fishery conservation before taking action to enforce the Commission's FMP (namely, by imposing a fishing moratorium), this separation of the ASMFC's and the Secretary's powers appears more formal than substantive. It does not alter the fact that the Commission's FMPs are binding on the states, that the Commission monitors state compliance with its FMPs, and that the Commission's determination regarding a state's non-compliance is critical as to whether a moratorium on fishing will be imposed on that state. Taken together, these congressionally authorized activities may rise to the level of de facto regulatory power. Taken together, the strong federal interest and involvement in ASMFC and the Commission's de facto regulatory power may be sufficient to transform the Commission into a quasi-

federal agency.[6]

If ASMFC is a quasi-federal agency, then the APA affords both Applicants and plaintiffs a right of action against ASMFC. *See* 5 U.S.C. §§ 701-06. Since plaintiffs have on the face of it a colorable claim to relief against ASMFC, I find that plaintiffs' failure to join ASMFC as a defendant constituted nonfeasance and that in not pleading a claim against ASMFC, plaintiffs have not fairly represented the interests of Applicants in this matter. Plaintiffs have proffered no explanation for their failure to name ASMFC as a defendant. There is no evidence that plaintiffs' failure to name ASMFC as a defendant was a legitimate litigation strategy. Further, as previously discussed, without ASMFC as a defendant, any relief ultimately accorded to plaintiffs would be incomplete because it would not apply to state waters, where more than 90% of recreational summer flounder fishing takes place. Accordingly, because Applicants have shown that their motion is timely, that they have a protectable interest which may be impaired absent intervention, and that they are not adequately represented by

---

[6] At least one legal commentator has adopted the view that the Commission is a quasi-federal agency. *See* Shaun M. Gehan, Atlantic States Marine Fisheries Commission & the Atlantic Coastal Fisheries Cooperative Management Act: Constitutional Issues and Availability of Judicial Review of Commission Regulations (Apr. 13, 2005) at 10, *available at* http://www.abanet.org/adminlaw/interstate/Gehan_ASMFC_Paper.pdf (last visited Nov. 13, 2008) ("It may well be, largely as a necessary outgrowth of the fact that the ACFCMA essentially 'federalizes' all fishery management plans and regulations promulgated by the ASMFC, that the Commission is the epitome of a 'quasi-federal agency.'")

plaintiffs in this matter, Applicants are entitled to intervention as of right.[7]

5. *Scope of Intervention*

Defendants argue that if Applicants are permitted to intervene, the scope of Applicants' intervention must be limited to the parties and issues asserted in plaintiffs' complaint because unlike plaintiffs, Applicants did not timely file their proposed complaint in intervention within 30 days of the publication of the 2008 summer flounder fishery rule, as required by the MSA.  16 U.S.C. § 1855(f)(1).  In response, Applicants argue that the scope of their intervention need not be limited, as their claims relate back to plaintiffs' complaint and are therefore timely.

Federal Rule of Civil Procedure 24, which governs intervention, contains no relation-back provision.  However, in support of their relation-back argument, Applicants cite *Ross v. Patrusky, Mintz & Semel*, No. 90 Civ. 1356, 1997 WL 214957 (S.D.N.Y. Apr. 29, 1997) (collecting cases permitting intervenor's filing of complaint despite expiration of statute of limitations).  Citing, *inter alia*, *Cummings v. United States*, 704 F.2d 437, 440 (9th Cir. 1993), the *Ross* court reasoned that a complaint in intervention barred by a statute of limitations

---

[7] Because I conclude that Applicants are entitled to intervene in this matter as of right, I need not consider the parties' arguments relating to permissive intervention.

relates back to the date of the original complaint where (1) the proposed intervenor is the real party in interest, or there is a "community of interest" between proposed intervenor's and plaintiff's claims; (2) intervenor's motion is timely within the meaning of Rule 24; and (3) no prejudice to defendants would result. *Ross*, 1997 WL 214957 at *8-9.

The circumstances outlined in *Ross* are present here. Plaintiff New York brings this suit as *parens patriae*, on behalf of its citizens, and therefore Applicants -- three citizens' groups with protectable interests in the recreational summer flounder fishery -- are the real parties in interest plaintiff New York seeks to protect. As previously discussed, Applicants' motion is timely within the meaning of Rule 24. Finally, defendants do not argue that they would be prejudiced should Applicants be permitted to file a complaint in intervention. For these reasons, I conclude that Applicants' complaint in intervention relates back to plaintiffs' complaint, and accordingly, I decline to limit the scope of Applicants' intervention to the parties and issues asserted in plaintiffs' complaint.

Joinder

Applicants move for required joinder under Rule 19(a)(1)(A) on the theory that without ASMFC as a named defendant, any relief accorded upon disposition of this matter will be incomplete.

Rule 19(a)(1) provides, in relevant part, "A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties[.]"  The Second Circuit has held that "'[i]f the court determines that any of the criteria set forth in Rule 19(a) is met, then it must order that the absent person be joined as a party.'"  *City of Syracuse v. Onondaga County*, 464 F.3d 297, 308 (2d Cir. 2006) (citing *Johnson v. Smithsonian Inst.*, 189 F.3d 180, 188 (2d Cir. 1999)).

Assuming for reasons set forth *supra* that Applicants have a right of action against ASMFC, I conclude that the criteria set forth for required joinder of ASMFC under Rule 19(a)(1)(A) are met.  In the event that plaintiffs prevail on the merits, this Court cannot accord complete relief among the existing parties.  The majority of recreational summer flounder fishing occurs in state waters, which are governed by ASMFC FMPs, not federal regulations.  Without ASMFC as a defendant, any relief accorded against the federal defendants will concern only federal waters.  Therefore, assuming ASMFC may be named as a defendant, joinder of ASMFC is necessary in order to afford complete relief should plaintiffs prevail upon the merits of this matter.[8]

---

[8] Because I find that ASMFC is a required party under Rule 19(a)(1), I need not consider the parties' arguments relating to permissive joinder.

## CONCLUSION

For the reasons set forth above, Applicants' motions are granted without prejudice to ASMFC's right to move to dismiss on the ground that it is not a quasi-federal agency, or on such other grounds as may exist.  The Clerk is hereby directed to transmit a copy of the within to the parties and the Magistrate Judge.


SO ORDERED.

Dated:     Brooklyn, NY
           November 19, 2008

                    By: /s/ Charles P. Sifton (electronically signed)
                        United States District Judge

**APPENDIX A**

Glossary of agencies, laws, and terminology related to the summer flounder fishery as used in the above memorandum and opinion.

ACFCMA:     Atlantic Coastal Fisheries Cooperative Management Act, 16 U.S.C. § 5101, et seq., (the "Fisheries Act") addressees the problem of fishery stocks common to waters under exclusive state jurisdiction, i.e., within 3 miles of the coast, and waters in the EEZ, which is under exclusive federal jurisdiction.  The ACFCMA was enacted to "support and encourage the development, implementation, and enforcement of effective interstate conservation and management of Atlantic coastal fishery resources."  16 U.S.C. § 5101(b).

APA:        Administrative Procedures Act, 5 U.S.C. § 701, et seq., requires federal agencies to consider the public comments it has received.

ASMFC:      Atlantic States Marine Fisheries Commission ("Commission"), an interstate compact consisting of all East Coast states from Maine to Florida, as well as the District of Columbia, Potomac River Fishery Commission, the NMFS, and the USDFW.  The commission prepares coastal fishery management plans for fisheries located in state waters.  16 U.S.C. § 5104(a).

Board:      Summer Flounder, Scup, and Black Sea Bass Management Board of the ASMFC, responsible for preparing the FMP for summer flounder applicable to state waters.

EEZ:        Exclusive Economic Zone, established by the MSA extending from 3 miles seaward of the states' coast to 200 nautical miles offshore. 16 U.S.C. §§ 1802(11), 1811.

FCA:        Fishermen's Conservation Association, a non-profit public interest organization whose membership is comprised of individual recreational anglers throughout the New York Marine District, who target summer flounder (among other species) in both state and federal waters contiguous to New York State.

Fluke:      See Summer flounder.

FMP:        Fishery Management Plan: a plan prepared by each

federal Regional Fishery Management Council and each ASMFC Board for each fishery under its authority that requires conservation and management. *See* 16 U.S.C. § 1852(h); 16 U.S.C.A. § 5102(1).

ISFMP:     ASMFC's Interstate Fisheries Management Program.  In cooperation with the NMFS, the ISFMP determines priorities for interjurisdictional fisheries management in coastal state waters and recommends to states, RFMCs, and the federal government management measures to benefit these fisheries.

MAFMC:     Mid-Atlantic Fishery Management Council ("Mid-Atlantic Council", "Council") one of the eight RFMCs established by the MSA, which prepares the federal FMP for summer flounder. 16 U.S.C. § 1852(a)(1)(B).

MRFSS:     Marine Recreational Fishing Statistical Survey: generates estimates of recreational summer flounder catch and landings estimates.

MSA:       Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1801, *et seq.*, passed to "conserve and manage the fishery resources found off the coasts of the United States" and "promote domestic commercial and recreational fishing under sound conservation and management principles[.]" 17 U.S.C. § 1801(b)(1), (3). The MSA establishes eight RFMCs, see 16 U.S.C. § 1852, and also requires that any federal FMP and any regulation promulgated to implement a federal FMP be consistent with ten "national standards" set forth. 16 U.S.C. § 1851(a).

NAS/NRC:   National Academy of Scineces / National Research Council.

NMFS:      National Marine Fisheries Service:  the federal agency, a division of the Department of Commerce, responsible for the stewardship of the nation's living marine resources and their habitat.  NMFS is responsible for the management, conservation, and protection of living marine resources within the EEZ.

NOAA:      National Oceanic and Atomospheric Administration:  a federal agency focused on the condition of the oceans and the atmosphere.

NYFTTA:    New York Fishing Tackle Trade Association, Inc., a

professional trade organization representing the wholesale and retail bait and tackle dealer industry in New York.

NYSDEC:    New York State Department of Environmental Conservation.

RFMC:      Regional Fishery Management Council: established by the MSA, and responsible for developing and recommending to the Secretary FMPs governing each fishery within its geographic area. 16 U.S.C. § 1852.

Sec-
retary:    Secretary of Commerce, who possesses final authority to approve federal FMPs under the MSA.  16 U.S.C. § 1854.

Summer
flounder:  Paralichthys dentatus, popularly known as fluke.

TAL:       Total Allowable Landings: summer flounder quotas that fix the total weight of summer flounder that may be harvested by commercial and recreational fishermen (sometimes referred to as "quotas").

UBNY:      United Boatmen of New York, Inc., a professional trade organization representing the for-hire fishing vessel industry in the New York Marine District.

USFWS:     United States Fishing and Wildlife Service.