UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

The State of New York, Alexander B.
Grannis, as Commissioner of the New York
State Department of Environmental
Conservation, and the New York State
Department of Environmental Conservation,

                    Plaintiffs,                08-CV-2503
                                               (CPS)(RLM)

United Boatmen of New York, Inc., New
York Fishing Tackle Trade Association,
Inc., and the Fishermen's Conservation
Association,

                    Intervenor-Plaintiffs

     - against -

                                               MEMORANDUM OPINION
Gary Locke, in his official capacity as        AND ORDER
Secretary of the United States Department
of Commerce, the United States Department
of Commerce, Jane Lubchenco, in her
official capacity as Under Secretary of
Commerce and as Administrator for the
National Oceanic and Atmospheric
Administration, James W. Balsiger, in his
official capacity as Acting Assistant
Administrator for the National Marine
Fisheries Service, and the National Marine
Fisheries Service,

                    Defendants.

----------------------------------------X

SIFTON, Senior Judge.

     Plaintiffs the State of New York, Alexander B. Grannis as

Commissioner of the New York State Department of Environmental

Conservation, and the New York State Department of Environmental

Conservation (together, "plaintiffs"), along with intervenor-

plaintiffs United Boatmen of New York, Inc. ("UBNY"), New York

Fishing Tackle Trade Association, Inc. ("NYFTTA"), and the

Fishermen's Conservation Association ("FCA") (together,

"intervenor-plaintiffs"), bring this action against defendants

Gary Locke, in his official capacity as Secretary of the United

States Department of Commerce, the United States Department of

Commerce, Jane Lubchenco, in her official capacity as Under

Secretary of Commerce and Administrator for the National Oceanic

and Atmospheric Administration, the National Oceanic and

Atmospheric Administration ("NOAA"), James W. Balsiger, in his

official capacity as the Acting Assistant Administrator for the

National Marine Fisheries Service ("NMFS") (together, the

"federal defendants"),[1] and the Atlantic States Marine Fisheries

Commission (the "ASMFC" or "Commission").  Plaintiffs claim that

the final management rule for the 2008 recreational summer

flounder fishery issued by the Department of Commerce (the

"DOC"), through the NMFS, pursuant to the Magnuson-Stevens

Fishery Conservation and Management Act, as amended in 1996 by

the Sustainable Fisheries Act, 16 U.S.C. §§ 1801, *et seq*. (the

"MSA"), violates the MSA as well as standards of decision making

under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq*.

---

[1] Plaintiffs originally named Carlos Gutierrez and Conrad
C. Lautenbacher, in their former official capacities as Secretary of Commerce
and Under Secretary of Commerce and Administrator for the National Oceanic and
Atmospheric Administration, respectively, as defendants.  Since the
commencement of this action, however, Gary Locke replaced Mr. Gutierrez as
Secretary of Commerce, and Jane Lubchenco replaced Mr. Lautenbacher as Under
Secretary of Commerce and Administrator for the National Oceanic and
Atmospheric Administration.

(the "APA"). In addition to these claims, intervenor-plaintiffs
claim that that the final management rule for the 2008
recreational summer flounder fishery issued by the ASMFC violates
the ASMFC Compact & Rules and Regulations, Pub. L. 77-539 (1942),
*as amended by* Pub. L. 81-721 (1950) ("ASMFC Compact"), the
Atlantic Coastal Fisheries Cooperative Management Act, Pub. L.
103-206, 16 U.S.C. §§ 5101-5108 (the "ACFCMA"), the ASMFC
Interstate Fisheries Management Program Charter (hereinafter
"ISFMP Charter," *available at* http://www.asmfc.org (last visited
Apr. 7, 2009)), and the APA.

Presently before this Court is intervenor-plaintiffs' motion
for a preliminary injunction pursuant to Federal Rule of Civil
Procedure 65(a) and the Administrative Procedures Act, 5 U.S.C. §
705, to prevent the implementation of the proposed 2009 summer
flounder conservation equivalency regulations pending this
review. In addition, the County of Suffolk and the Town of East
Hampton (together, "amici") request leave to appear in this case
as *amici curiae* and to submit memoranda of law in support of
intervenor-plaintiffs' motion. For the reasons that follow,
intervenor-plaintiffs' motion is denied, and amici's requests to
appear in this matter are denied.

## BACKGROUND

The following facts are taken from the Complaint, the
Complaint in Intervention, and the parties' submissions in

connection with this matter.  Disputes are noted.  Appendix A
lists some of the bodies, statutes, regulations, and acronyms
necessary to understand the factual background of this matter.

*Federal and State Fishery Regulatory Schemes*

The subject matter of this action is the regulation of
fisheries, both at the federal and state level, specifically with
regard to summer flounder, popularly known as "fluke."  Federal
fishery regulation is governed principally by the MSA, which
embodies Congress' desire to implement a "national program for
the conservation and management of the fishery resources of the
United States."  16 U.S.C. § 1801(a)(6).  The MSA establishes
eight regional councils responsible for developing and
recommending to the United States Secretary of Commerce (the
"Secretary") federal fishery management plans ("FMPs") governing
each fishery within their respective geographic areas.  The
Secretary, advised by the Councils and the National Marine
Fisheries Service ("NMFS"), possesses final authority to approve
federal FMPs under the MSA.  These federal FMPs govern fishing in
federal waters in the United States Exclusive Economic Zone
("EEZ"), which encompasses ocean waters from three miles offshore
to 200 miles offshore.  16 U.S.C. § 1811(a).  State membership in
the Councils is governed by statutory provisions.  16 U.S.C. §
1852(a).  New York is a voting member of the Mid Atlantic Fishery

Management Council (the "MAFMC" or "Council"), which is responsible for the preparation of the federal summer flounder FMP.

The MSA requires that federal FMPs be consistent with ten "national standards," *see* 16 U.S.C. § 1851(a), including requirements that management plans adopted under the Act "prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry," and that they rest on the "best scientific information available." 16 U.S.C. § 1851(a)(1)-(2). The NMFS, by and through the authority of the Secretary, is charged with determining whether these standards have been met before approving proposed FMPs and promulgating rules implementing them. 16 U.S.C. § 1854(a).

The management of fisheries within state waters, including inland waters and costal waters extending three miles seaward from shore, is subject to regulation by the states under their police powers. In 1942, the fifteen Atlantic states, including New York, and the District of Columbia entered into an interstate compact establishing the Atlantic State Marine Fisheries Commission (the "ASMFC" or "Commission"), which was approved by Congress pursuant to Article I, Section 10, clause 3 (the

"Compact Clause") of the United States Constitution,[2] for the
purpose of "promot[ing] the better utilization of the fisheries .
. . of the Atlantic seaboard by the development of a joint
program for the promotion and protection of such fisheries."
Pub. L. 77-539 (1942), *as amended by* Pub. L. 81-721 (1950)
("ASMFC Compact"), Art. I.[3]  Each member state appoints three
representatives to the ASMFC:  its director of marine fisheries,
a state legislator, and a public member appointed by the
Governor.  ASMFC Compact, Art. III.  The Commission operates
through species-specific management boards, including the Summer
Flounder, Scup, and Black Sea Bass Management Board (the
"Board"), which develops and proposes FMPs for summer flounder.
The ASMFC Compact does not limit the powers or sovereignty of its
member states over state waters.  *See* ASMFC Compact, Art. IX.
*The Atlantic Coastal Fisheries Cooperative Management Act*

In 1993, Congress enacted the Atlantic Coastal Fisheries
Cooperative Management Act, Pub. L. 103-206, 16 U.S.C. §§ 5101-
5108 (the "ACFCMA"), to promote the conservation of "[c]oastal
fishery resources that migrate, or are widely distributed, across
the jurisdictional boundaries of two or more of the Atlantic

---

[2] The Compact Clause provides in relevant part that "[n]o state shall,
without the consent of Congress . . . enter into any agreement or compact with
another state, or with a foreign power[.]"

[3] The ASMFC Compact, the ASMFC's Interstate Fishery Management Plan
Charter ("Charter"), and Rules and Regulations are available on the ASMFC's
website, http://www.asmfc.org (last visited Apr. 16, 2009).

States and of the federal Government[.]" 16 U.S.C. §§ 5101(a)(3),
(b).  The ACFCMA calls for the coordination of federal and state
efforts concerning inter-jurisdictional fisheries, such as the
summer flounder fishery.  16 U.S.C. § 5101(a)(3).  In serving
this objective, the ACFCMA imposes federal obligations on the
Commission, in addition to the original mandate of the Commission
as expressed in the ASMFC Compact.

The ACFCMA directs the ASMFC to develop "coastal fishery
management plans to provide for the conservation of coastal
fishery resources."  16 U.S.C. § 5104(a)(1).  These FMPs must be
"based on the best scientific information available."  16 U.S.C.
§ 5104(2)(A).  In addition, the ASMFC must provide "adequate
opportunity for public participation" in the FMP preparation
process.  16 U.S.C. § 5104(a)(2)(B).  The ACFCMA requires the
Commission to identify the states to which a given FMP developed
by the Commission applies, and those states are in turn required
to "implement and enforce the measures of such plan within the
timeframe established in the plan."  16 U.S.C. § 5104(b)(1).  In
addition, the ACFCMA confers authority on the Commission to
monitor a state's implementation and enforcement of Commission
FMPs.  If the Commission determines that a state is not in
compliance with an FMP, it is required to notify the Secretary.
16 U.S.C. § 5105.  If the Secretary independently determines that
a state has not complied with the FMP, and that the FMP is

"necessary for conservation of the fishery," 16 U.S.C. § 5106(a),
the Secretary is directed to declare a moratorium on fishing for
the particular species within the coastal waters of the non-
complying state.  16 U.S.C. § 5106(c).

Under the ACFCMA, in the absence of a pre-existing approved
federal FMP, fishing regulations implemented by the Secretary and
the NMFS for federal waters must be compatible with those
implemented by the states, and the Secretary "may include
measures recommended by the [ASMFC] to the Secretary that are
necessary to support the provisions of the coastal fishery
management plan."  16 U.S.C. § 5103(b)(1).  However, federal and
state regulations need not be identical.

*The Summer Flounder Fishery*

Summer flounder are currently distributed along the Atlantic
Coast from North Carolina to Canada.  They support both
commercial and recreational fisheries along the Atlantic Coast,
and are one of the most sought-after fish by both commercial and
recreational anglers.  Summer flounder are migratory, traveling
between state and federal waters throughout their life cycle.
However, most summer flounder landings are taken in shore from
state jurisdictional waters.  The 1980s and early 1990s saw
extensive depletion of summer flounder stocks, followed by a
partial and continuing recovery in more recent years.  Congress
has specified a January 1, 2013 deadline for the re-establishment

of the summer flounder fishery.  Pub. L. 109-479, Sec. 120(a)
(Jan. 12, 2007); 72 Fed. Reg. 32813 (June 14, 2007).

The ASMFC Board on behalf of the Atlantic states and the
federal MAFMC meet together twice a year to plan management
measures for the summer flounder fishery.  Beginning in 2001, and
continuing through 2009, the Board and the MAFMC have voted to
propose to their respective organizations yearly management
regimes for the recreational summer flounder fishery known as
"conservation equivalency," or "state-by-state" regulation, which
have been subsequently adopted and implemented by the NMFS and
the states each year.  In simplified terms, this approach takes
the annual coastwide quota ("total allowable landings," or "TAL,"
sometimes referred to as "specifications") for the total number
of pounds of summer flounder that may be harvested in a given
year and divides the quota among the participating coastal states
in the form of a percentage share of the total.  Once the TAL and
state quotas are set, each state is then required to formulate
management measures in terms of minimum size limits, daily bag
limits, and seasonal limitations, that are expected to constrain
that state's recreational landings to their assigned percentage
of the coastwide TAL.

*Technical Information and Data Underlying the Summer Flounder FMP*

Federal, ASMFC, and state participants jointly coordinate
the review and development of scientific and technical

information necessary to develop FMPs.  Technical staff develop
stock assessment models that estimate the total stock abundance,
the stock status (*i.e.*, whether overfishing is occurring), and
forecast future stock abundance based on fishing mortality rates.
These assessments are subject to outside peer review.  A summer
flounder Monitoring Committee composed of technical staff from
the NMFS, the United States Fishing and Wildlife Service
("USFWS"), the Commission, ASMFC member states, and the Council
convenes to assess information concerning stock status in order
to provide advice on management measures.

TALs and state quotas used for the commercial summer
flounder fishery are calculated based upon records of direct
reporting of catch.  Because the recreational summer flounder
fishery is more dispersed and irregular than its commercial
counterpart, however, TALs and state quotas for the recreational
fishery are calculated based upon survey data rather than direct
reporting of catch.  For recreational quotas, both the federal
government and the ASMFC employ the Marine Recreational Fisheries
Statistics Survey ("MRFSS"), developed by NMFS as a means of
obtaining estimates of recreational participation, effort, and
catch in marine waters.[4]  MRFSS data is collected by two
independent surveys: (1) a telephone survey of households in

---

[4] *See* NOAA Fisheries, Office of Science and Technology, Recreational
Fisheries, General Survey Methodology, *available at*
http://www.st.nmfs.gov/st1/recreational/overview/overview.html#intro (last
visited Apr. 7, 2009).

coastal counties, and (2) an "intercept," or interview survey of anglers by trained interviewers stationed at fishing access sites. Data from the two independent surveys are combined and analyzed to produce estimates of fishing effort, catch, and participation for six two-month periods ("waves") each year.

*Criticism of Technical Information and Data Underlying the Summer Flounder FMP*

According to intervenor-plaintiffs, since its inception, the accuracy of the MRFSS data and the manner of its application have been criticized and questioned by the fishing community, fishery scientists, and fishery managers. Interv. Compl. ¶¶ 5, 66-71. In 2006, allegedly responding to this criticism, NOAA commissioned the National Academy of Sciences/National Research Council ("NAS/NRC") to perform an independent, peer-reviewed evaluation of the MRFSS and to make recommendations for its application and improvement. *Id.* ¶¶ 6, 69. According to intervenor-plaintiffs, the report issued by NAS/NRC indicates that use of the MRFSS data is not appropriate for small-scale management and allocation of fish stocks, but rather is better suited to large-scale stock management. The report observes that "[c]urrent users require data with higher resolution -- spatially, temporally, and taxonomically -- than the current MRFSS can deliver." Federal Administrative Record ("FAR") at 1181. It further notes that "[c]urrently, many fisheries are monitored at the state level, which is a finer stratification

than intended originally for the data collected." *Id.* It also remarks that "[a]s managers use recreational data on finer temporal and spatial scales, issues of precision and bias become more pronounced. Existing spatial and temporal sampling strata may be of too coarse a resolution to generate estimates that are adequate for the management requirements." *Id.* at 1184.

In addition, since 2002 and through 2009, the recreational state quotas have been based upon MRFSS data from 1998, referred to as the "proxy year." According to Toni M. Kearns, Senior Fishery Management Plan Coordinator for Management at the Commission, the selection of 1998 as the baseline proxy year was the product of extensive research and debate both by the summer flounder Technical Committee ("Technical Committee"), which is composed of biologists from all coastal states and a biologist from NMFS, and the ASMFC Board. Declaration of Toni M. Kearns ("Kearns Decl.") at ¶¶ 16-17. The New York delegation to the Board supported the use of 1998 as the baseline. *Id.* ¶ 17. Both the Technical Committee and the Board reevaluated the use of 1998 as the proxy year as recently as 2007 and 2008, and decided to retain the use of 1998 as the proxy year. *Id.* ¶ 18.

Government fisheries managers at both the state and federal level, along with scientists and members of the recreational fishing community, are currently collaborating to improve the methodology used to survey anglers to generate estimates of

recreational summer flounder catch and landings. *Id.* ¶ 25. An
updated angler survey program funded by NOAA, the Marine
Recreational Information Program ("MRIP"), will be phased in over
the next two to three years. *Id.* ¶¶ 25-26. MRIP is expected to
address many of the issues raised with MRFSS, including data
gaps, bias, consistency, accuracy and timeliness. *Id.* ¶ 26.
Currently, however, MRFSS remains the only coastwide
comprehensive survey of recreational summer flounder harvest.
*Id.* ¶ 19.

*The 2008 Summer Flounder FMP*

This action challenges the 2008 regulations for the
recreational summer flounder fishery. As previously noted, the
2008 TAL was calculated based upon MRFSS data, using 1998 as the
base year for allocation of the TAL among the states. *See*
Commission Administrative Record ("CAR") at 70, 73, 75-76. The
MAFMC and the ASMFC Board set the 2008 TAL for summer flounder at
15,770,000 pounds, of which the recreational harvest limit was
6,215,800 pounds. *See* FAR at 366, 1546. In December 2007, over
the objections of representatives from New York and other states,
the MAFMC and the Board voted to implement the TAL by means of
conservation equivalency measures, rather than coastwide
regulations. FAR at 304-05, 362; Interv. Compl. ¶ 75.

In addition, as part of the 2008 summer flounder
conservation management process, both the Board and the MAFMC

adopted measures to respond to repeated "overages" in many states. *See, e.g.*, CAR at 361-62 (discussing overages in 2007), CAR at 367 (noting that New York's recreational fishery was 55 percent over its quota for 2007). The incidence of overages, or landings in excess of the portion of the TAL allotted to each state, prompted the Board and the MAFMC, on the advice of the Technical Committee, to adopt and implement a Performance Based Adjustment Factor ("Adjustment Factor"). FAR at 384-414, CAR at 298. The Adjustment Factor was intended to address the issue created by the failure of certain states' management measures to achieve landings within that state's allocated share of the recreational portion of the TAL. The Adjustment Factor requires that states with a recent record of exceeding annual targets adopt more conservative regulations (*i.e.*, size, bag, and seasonal limits), in proportion to the magnitude of past overages. *See* CAR at 298-301. It does not change a state's allocated quota, but rather requires states with past chronic overages to adopt regulations more likely to result in total landings within the state's quota.

Following the implementation of the Adjustment Factor, the ASMFC evaluated and approved proposed regulations submitted by states in the summer flounder fishery. As finally approved, New York's management measures for 2008 consist of: (1) a minimum size of 20.5 inches; (2) a possession limit of four fish; and (3)

a season of May 15 to September 1. *See* FAR at 1547, CAR at 319, 344-45.

On May 23, 2008, NMFS published a final rule approving, for federal waters, management measures identical to those approved by the Board for state waters. FAR at 1546-56. Like the ASMFC's approach, the federal regulations provide for a state-specific conservation equivalency approach to respecting the 2008 TAL.

*The Proposed 2009 Summer Flounder FMP*

The present motion for a preliminary injunction seeks to prevent the implementation of the proposed 2009 summer flounder regulations pending this review of the 2008 regulations. In the fall and winter of 2008, the federal MAFMC and the ASMFC Board adopted a recommendation to increase the summer flounder TAL for 2009 to 18.45 million pounds, of which the recreational harvest limit was set at 7.16 million pounds. *See* Declaration of Philip L. Curcio ("Curcio Decl.") Exs. A (copy of December 15, 2008 press release); C (copy of August 11, 2008 press release); Kearns Decl. ¶ 28. The MAFMC and Board also once again adopted conservation equivalency measures to achieve state-specific harvest limits. *Id.* Ex. A; *see also* Kearns Decl. ¶ 33. In addition, for states having exceeded their 2008 target, the Board passed a motion requiring that at least fifty perfect of the necessary reductions for 2009 be achieved by season closures rather than by imposing more stringent size or bag limits. *Id.*

The Board and the MAFMC did not adopt a Performance Based
Adjustment Factor for 2009.

In 2008, New York recreational anglers landed an estimated
583,031 summer flounder, representing an overage of 61% with
respect to the 2008 recreational harvest limit of 361,000 fish
for New York.  Kearns Decl. ¶ 29; Curcio Decl. Ex. B.  For 2009,
New York's harvest limit is 365,000 fish, which requires New York
to develop measures to constrain its harvest by 37% relative to
2008.  Curcio Decl. Ex. B.  On March 25, 2009, NYDEC finalized
New York's recreational summer flounder regulations for 2009, as
approved by ASMFC, which include a 21-inch minimum size limit
(half an inch larger than 2008), a two-fish maximum possession
limit, and an open season from May 15-June 15 and July 3-August
17.  Kearns Decl. ¶ 37.

On January 25, 2009, the MAFMC made its recommendations to
the Secretary concerning federal regulations for the summer
flounder fishery for the 2009 season.  However, the Secretary's
proposed regulations were not published until April 1, 2009.
Because a 30-day notice and comment period is necessary,
following which the Secretary must review the comments and comply
with other federal rulemaking procedures, the promulgation of a
final federal regulation for the 2009 summer flounder
recreational fishery is not expected until June 1, 2009.

*Effect of Summer Flounder FMPs, Including Proposed 2009*
*Regulations*

Intervenor-plaintiffs state that due to the conservation equivalency state-by-state approach to respecting the recreational portion of the summer flounder TAL, which has been in place since 2001, New York's recreational fishing community has suffered grievously. Dennis Kanyuk, president of intevenor-plaintiff United Boatmen of New York and owner of a party boat in Point Lookout, New York, states that from 2003 to 2008, he saw gross revenue losses of 30% and knows other professional party boat owners who have either suffered similar losses or gone out of business. Declaration of Dennis Kanyuk ("Kanyuk Decl.") ¶¶ 1-2, 5. Mr. Kanyuk attributes these losses and business failures to the conservation equivalency measures. *Id.* ¶ 3. In addition, according to Melissa Dearborn, vice-president of a wholesale supplier of fishing bait and tackle products and a member of intervenor-plaintiff organization New York Fishing Tackle Trade Association, from 2001 to 2008, her company's aggregate sales of bait products specific to the fluke fishery have decreased by 68%. Declaration of Melissa Dearborn ("Dearborn Decl.") ¶¶ 1-3. Ms. Dearborn also attributes these losses to the conservation equivalency measures. *Id.* ¶ 4.

Should the proposed 2009 regulations be implemented, Mr. Kanyuk states that the party and charter boat industry anticipates, on average, an additional 40% loss from 2008 to

2009.  Kanyuk Decl. ¶ 2.  According to Ms. Dearborn, her fluke bait sales will experience another 42% decrease from 2008, and her aggregate loss on bait and tackle products since 2001 will exceed 80%.  Dearborn Decl. ¶ 4.

Defendant ASMFC states that an order enjoining implementation of the 2009 regulations would create multiple problems.  According to Ms. Kearns, because the 2008 New York regulations resulted in a large overage, failure to implement stricter regulations can be expected to result in another large New York overage for 2009.  Kearns Decl. ¶ 38.  In addition, once states' measures for a season are adopted, the Commission is required to inform NOAA that, collectively, the state plans will not exceed the overall recreational quota of the TAL.  *Id.* ¶ 39. Ms. Kearns states that in order for the Commission to fulfill its obligations, if New York retains its 2008 regulations, other states must make additional adjustments to their 2009 regulations to make up for the extra fish harvested in New York.  In addition to creating the appearance of inequity, according to Ms. Kearns, this process could result in a delay in the start of states' fishing seasons.  *Id.*

*Procedural History*

Plaintiffs filed their complaint against the Secretary, NOAA, NMFS and their respective chief administrators on June 23, 2008.  The suit was brought in New York's capacity as a sovereign

and body politic owner of fishery resources in the State of New York, as well as *parens patriae* on behalf of New York citizens aggrieved by the final management rule for the 2008 recreational summer flounder fishery. Compl. ¶ 19. On November 20, 2009, I granted leave to intervenor-plaintiffs, which include professional trade and citizens' organizations interested in the recreational summer flounder fishery, to intervene and join ASMFC as a co-defendant in this action.

This motion for a preliminary injunction followed on March 3, 2009. During the briefing of this motion, on March 9, 2009, I denied ASMFC's motion to dismiss the claims against it. On April 7, 2009, I denied reconsideration of my March 9, 2009 order, but certified the order for interlocutory appeal to the Court of Appeals for the Second Circuit.[5]

## DISCUSSION

### I. Jurisdiction

As a preliminary matter, defendants argue that I am without jurisdiction to grant the relief requested by intervenor-plaintiffs by virtue of the MSA. Because the jurisdictional analysis is different with regard to the federal defendants and "interstate" defendant ASMFC, I consider this argument as it

---

[5] Although defendant ASMFC filed a petition for permission to appeal my March 9, 2009 order before the Second Circuit Court of Appeals on April 16, 2009, permission to appeal has not yet been granted, and no party has objected to my consideration of this motion in light of my certification of the March 9, 2009 order. Accordingly, I will consider the merits of this motion.

relates to both groups of defendants in turn.

A.  *Federal Defendants*

Pursuant to the MSA, "[r]egulations promulgated by the Secretary under this chapter . . . shall be subject to judicial review to the extent authorized by, and in accordance with, chapter 7 of Title 5 [the APA] . . . except that [] section 705 of such Title is not applicable[.]"  16 U.S.C. 1855(f)(1). Section 705 of the APA provides, in relevant part:

> On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

5 U.S.C. § 705.  Accordingly, pursuant to 16 U.S.C. 1855(f)(1), a court reviewing regulations promulgated under the MSA is without jurisdiction to grant preliminary injunctive relief.  *See State of Conn. v. Daley*, 53 F.Supp.2d 147, 156 (D. Conn. 1999), *aff'd*, 204 F.3d 413 (2d Cir. 2000) (noting that MSA "expressly forbids a reviewing court from postponing the effective date of the Secretary's action"); *Turtle Island Restoration Network v. U.S. Dep't. of Commerce*, 438 F.3d 937, 944 (9th Cir. 2006) ("the court reviews the contested regulations in accordance with the APA *except* that § 1855(f)(1)(A) precludes preliminary injunctive relief") (emphasis in original); *Kramer v. Mosbacher*, 878 F.2d 134, 137 (4th Cir. 1989) ("The exclusion of Section 705 powers

prevents a reviewing court from issuing the sort of preliminary injunction granted by the district court").

Intervenor-plaintiffs argue that the legal bar identified by the federal defendants in the MSA is irrelevant here, as they do not seek to enjoin regulations promulgated or proposed for promulgation under the MSA. Interv. Pl.'s Reply at 4. Instead, intervenor-plaintiffs argue that they seek to enjoin "only the Conservation Equivalency rules and the Secretary's moratorium power, which arise under the [ACFCMA]."[6] *Id.* This argument is difficult to reconcile with intervenor-plaintiffs' statement in their moving papers that they seek "to prevent the implementation of the proposed 2009 summer flounder (or 'fluke') conservation equivalency regulations . . . as currently contemplated by the defendants [NMFS] and [ASMFC]." Interv. Pl.'s Mem. In Supp. at 1. Any summer flounder regulations proposed or implemented by the NMFS, a federal agency, by and through the authority of the Secretary, would necessarily be implemented pursuant to the MSA. *See* 16 U.S.C. § 1854(a) (describing rulemaking process and authority for federal management of fisheries). Therefore, to

---

[6] Intervenor-plaintiffs are correct that the Secretary's "moratorium power" -- pursuant to which the Secretary may impose a moratorium on fishing a certain species in a given state if the Secretary independently determines that the state in question has not complied with an applicable FMP that is necessary for the conservation of the fishery -- arises under the ACFCMA, not the MSA. 16 U.S.C. § 5106(a), (c). However, intervenor-plaintiffs did not seek to enjoin the Secretary from imposing a moratorium in their notice of motion or their moving papers, and only indirectly raise the moratorium issue in one sentence of their reply. Accordingly, I do not construe intervenor-plaintiffs' application for a preliminary injunction as a request to enjoin the Secretary from exercising his moratorium power.

the extent intervenor-plaintiffs seek to enjoin proposed federal

regulations regarding summer flounder for the 2009 season, I am

without jurisdiction to grant such a request.[7]

B.  *"Interstate" Defendant ASMFC*

As set forth above, the MSA precludes my jurisdiction to

grant preliminary injunctive relief with regard to regulations

implemented under that statute.  However, defendant ASMFC does

not implement regulations under the MSA; rather, pursuant to its

Compact and the ACFCMA, it develops FMPs and requires states to

implement and enforce its FMPs by enacting state-specific

regulations.  Therefore, because ASMFC does not implement

regulations pursuant to the MSA, the MSA does not by its terms

prohibit a grant of preliminary injunctive relief against ASMFC.

Defendant ASMFC does not dispute this conclusion.  Rather,

it argues that because I based my decision to allow it to be

joined as a defendant and subjected to judicial review under the

APA on the premise that the ACFCMA had transformed it into an

---

[7] The federal defendants also argue that I am without jurisdiction to
consider intervenor-plaintiffs' application as it relates to them because no
federal 2009 summer flounder regulation has yet been promulgated, and thus no
final agency action has been taken that is subject to judicial review.  *See* 5
U.S.C. § 704 (providing that under the APA, "final agency action for which
there is no other adequate remedy in a court [is] subject to judicial
review"); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) ("When, as
here, review is sought . . . under the general review provisions of the APA,
the 'agency action' in question must be 'final agency action.'").  Because I
conclude that intervenor-plaintiffs' motion for preliminary injunctive relief
is barred as a matter of law with respect to the federal defendants because
the MSA expressly renders such relief unavailable, I need not consider this
argument.  Nor need I consider intervenor-plaintiff's counter-argument that
federal summer flounder regulations are never published early enough in the
year to precede the opening of the summer flounder season in New York.

entity closely resembling a federal agency, *see New York v. Gutierrez*, No. 08-CV-2503, 2009 WL 605830, at *3, 5-6 (E.D.N.Y. Mar. 9, 2009), on the same theory, judicial review of FMPs prepared by ASMFC should be subject to the same limitations that Congress expressly imposed in the MSA on judicial review of FMPs implemented by federal agencies.  I agree.

The fact that, in the MSA, Congress expressly rendered inapplicable that portion of the APA authorizing a reviewing court to grant preliminary injunctive relief reflects Congress' concern that interim relief would be disruptive in the context of highly time-sensitive fishery management regulations.  As the Ninth Circuit recently noted:

> [T]hree key aspects of § 1855(f) [of the MSA] -- the thirty-day time limitation, the bar on preliminary injunctive relief, and the provision for expedited review -- demonstrate Congress's intent to ensure that regulations promulgated under the Magnuson Act are effectuated without interruption and that challenges are resolved swiftly.  This concern for timely implementation of regulations comports with one of the primary purposes of the Magnuson Act: "to provide for the preparation and implementation . . . of fishery management plans which will achieve and maintain, *on a continuing basis*, the optimum yield from each fishery." § 1801(b) (emphasis added).

*Turtle Island Restoration Network v. U.S. Dept. of Commerce*, 438 F.3d 937, 948 (9th Cir. 2006).

Congress did not affirmatively speak to the application of APA review to ASMFC actions.  Where, as here, a court must discern the scope of a cause of action which Congress may not have realized existed, the Supreme Court has reviewed closely

related causes of action in an effort to ascertain the
limitations Congress would have set had it been aware of the
cause of action.  *See, e.g.*, *Lampf, Pleva, Lipkind, Prupis &*
*Petigrow v. Gilbertson*, 501 U.S. 350, 359 (1991) (reviewing
statutes of limitations of closely related causes of action to
determine the statute of limitations Congress would have applied
to a Rule 10b-5 claim, had it known such a claim existed).  The
express provision in the MSA confirming that APA review is
available with regard to federal FMPs is closely related to the
right of action I concluded the APA afforded intervenor-
plaintiffs against ASMFC as a "quasi-federal agency," given that
both causes of action are based upon the APA and both authorize
challenges to the same type of fishery regulations, which
themselves are closely intertwined parts of an interconnected
regulatory regime.  Congress's affirmative decision to render
injunctive relief unavailable with regard to actions seeking
review of federal FMPs leads me to conclude that had Congress
spoken on the specific issue of the APA's application to ASMFC's
decisions, it would likewise have rendered the section of the APA
authorizing preliminary injunctive relief inapplicable to ASMFC.
Accordingly, intervenor-plaintiffs' application is barred as a
matter of law as it relates to defendant ASMFC.

II. <u>Motion for Preliminary Injunction</u>

Even if the MSA did not bar the relief requested by intervenor-plaintiffs, the present motion would still be denied because plaintiffs have failed to show that they are entitled to injunctive relief.

A.    *Standard for Preliminary Injunction*

In order to obtain a preliminary injunction in the Second Circuit, the movant must show (1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *County of Nassau, N.Y. v. Leavitt*, 524 F.3d 408, 414 (2d Cir. 2008) (citing *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476 (2d Cir. 2004). Where the moving party seeks a preliminary injunction affecting government action purportedly taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the likelihood-of-success portion of the second prong. *Id.* (citing *Wright v. Giuliani*, 230 F.3d 543, 547 (2d Cir. 2000)).

The parties dispute whether intervenor-plaintiffs must simply demonstrate a likelihood of success on their claims, or whether a heightened "clear" or "substantial" showing of likelihood of success is required.  Certain Second Circuit

opinions simply note that where a preliminary injunction would affect a government action purportedly taken in the public interest pursuant to a statutory or regulatory regime, "plaintiffs 'must establish a clear or substantial likelihood of success on the merits.'"  *Leavitt*, 524 F.3d at 414 (quoting *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (quoting *Tunick v. Safir*, 209 F.3d 67, 70 (2d Cir. 2000) (citing *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc*., 60 F.3d 27, 34 (2d Cir. 1995)))).  In *Tom Doherty*, however, upon which the opinions cited above rely, the Second Circuit reasoned that a heightened "substantial likelihood" standard should apply in cases where a movant's request for an injunction would "alter, rather than maintain, the status quo, or . . . provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits."  *Tom Doherty*, 60 F.3d at 33-34.  Other Second Circuit precedent makes clear that the "substantial likelihood" standard applies only if the *Tom Doherty* criteria are satisfied.  *See, e.g.*, *Wright v. Giuliani*, 230 F.3d 543, 547 (2d Cir. 2000) (where an action challenges a government action taken in the public interest pursuant to a statutory or regulatory scheme, "when the injunction sought will alter rather than maintain the status quo the movant must show clear or substantial likelihood of success.") (internal citations and quotation marks omitted);

*Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir. 1999) (same); *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996) (same).

Here, the "substantial likelihood" standard applies because the preliminary injunction sought by intervenor-plaintiffs would not merely maintain the status quo. Although presented as a request to "freeze" regulations for the summer flounder recreational fishery affecting New York as they were promulgated in 2008, because those regulations are only one component of an integrated regulatory scheme involving many players, maintaining 2008 regulations in 2009 with regard to New York would have dramatic repercussions for other states. If granted, the injunction would effectively compel ASMFC to require other states to alter their regulations so as to respect the coastwide recreational quota of the TAL. Such an effect hardly maintains the status quo.

Accordingly, in order to succeed on their motion for a preliminary injunction, intervenor-plaintiffs must show (1) a clear or substantial likelihood of success on the merits; and (2) irreparable harm in the absence of the injunction. In addition, I must also consider the whether the balance of public interests weighs against granting a preliminary injunction:

> [w]henever a request for a preliminary injunction implicates public interests, a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief. Otherwise a claim that appears meritorious at a preliminary stage but

is ultimately determined to be unsuccessful will have precipitated court action that might needlessly have injured the public interest.

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 424 (2d Cir. 2004).

A.   *Substantial Likelihood of Success*

Intervenor-plaintiffs argue that a substantial likelihood of success on the merits exists with regard to their claims (1) that defendants violated the APA by failing to base their decisions on the "best scientific information available," as required by 16 U.S.C. § 1851(a)(2) (federal defendants) and 16 U.S.C. § 5104(a)(2)(A) (ASMFC); and (2) that the federal defendants violated the APA by implementing regulations that discriminate between residents of different states, as prohibited by 16 U.S.C. § 1851(a)(4).

1.   *Standard of Review Under the APA*

The APA provides that a reviewing court must "set aside agency action" that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).  Where the agency decisions at issue involve interpretations of federal statutes the agency administers, the court's review is guided by the principles announced in *Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984), which confirmed that "[t]he judiciary is the final authority on issues of statutory

construction and must reject administrative constructions which are contrary to clear congressional intent." *Id.* at 843 n.9. If, however, the statute is silent or ambiguous with respect to the specific issue at hand, the question for the court is whether the agency's action is based on a permissible construction of the statute. *Id.* at 842-43.

In reviewing the reasonableness of an agency's action, the court's inquiry is governed by the standards set forth in *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*:

> The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action . . . . Normally, an agency [action] would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

463 U.S. 29, 43 (1983) (citations and quotation marks omitted). Additionally, "courts may not accept . . . counsel's post hoc rationalizations for agency action. It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.* at 50 (citations omitted).

The court's review of agency actions is particularly deferential "where the agency's particular technical expertise is involved, as is the case in fishery management." *Boatmen v.*

*Gutierrez*, 429 F.Supp.2d 543, 547-48 (E.D.N.Y. 2006) (citing

*Nat'l Fisheries Inst. v. Mosbacher*, 732 F.Supp. 210, 223 (D.D.C.

1990) (noting that it is "especially appropriate for the Court to

defer to the expertise and experience of those individuals and

entities -- the Secretary, the Councils, and their advisors --

whom the [MPA] charges with making difficult policy judgments and

choosing appropriate conservation and management measures based

on their evaluations of the relevant quantitative and qualitative

factors" (citing *Pittston Coal Group v. Sebben*, 488 U.S. 105, 150

(1988))).[8]   At the same time, courts must conduct "a thorough,

probing, in-depth review," *Citizens to Preserve Overton Park,*

*Inc. v. Volpe*, 401 U.S. 402, 415 (1971), and may not "stand aside

and rubberstamp their affirmance of administrative decisions that

they deem inconsistent with a statutory mandate or that frustrate

the congressional policy underlying a statute."   *NLRB v. Brown*,

380 U.S. 278, 291 (1965); *see Chemung County v. Dole*, 781 F.2d

963, 970 (2d Cir. 1986).

---

[8] In their reply, intervenor-plaintiffs argue that no particular
deference is due to defendants' decisions here because "the issues going to
the merits of this case are fiendishly simple, requiring no great degree of
technical understanding or expertise."  Interv. Pl.'s Reply at 9.  I disagree.
The crafting of fishery management regulations is unquestionably a complicated
endeavor involving multiple competing technical and policy considerations.  In
particular, reviewing and assessing the adequacy of MRFSS data, as well as the
implications of the NAS/NRC's criticism of that data, and applying that
assessment to craft fishery regulations that further statutory mandates and
goals unquestionably falls within the realm of defendants' technical
expertise.  Accordingly, deference is due to defendants' related decisions.

2. *"Best Scientific Information Available" Claims*

Both the MSA and the ACFCMA require that defendants base their FMPs and implementing regulations on "the best scientific information available." 16 U.S.C. § 1852(a)(2) (also known as MSA "National Standard 2"); 16 U.S.C. § 5104(a)(2)(A). There is no dispute that in preparing 2008 management measures for the summer flounder fishery, defendants relied on the estimates of recreational participation, effort, and catch with regard to summer flounder as set forth in the MRFSS survey data. Nor do intervenor-plaintiffs argue that defendants should not have relied on the MRFSS data. Rather, intervenor-plaintiffs contend that the NAS/NRC report, which the NOAA commissioned to explore the weaknesses of the MRFSS data, is the "best scientific information available" with regard to the use of MRFSS data in crafting summer flounder FMPs -- and that because the NAS/NRC report allegedly concludes that the MRFSS data do not support state-by-state conservation equivalency regulations, defendants are in violation of the "best scientific information available" standard. Their argument may be summarized as follows:

> The NAS/NRC report indicates numerous times that MRFSS data are inappropriate for small scale management of coastal fisheries; the NAS/NRC report is the "best available science" with respect to the application of MRFSS data; notwithstanding the indications of this "best available science," ASMFC and NMFS have chosen to nonetheless continue to manage the coastal fluke resource on a small scale (i.e., state-by-state) basis, thereby violating the statutory standard of requiring that fisheries management measures be based upon "the best scientific information available."

Interv. Pl.'s Reply at 9.

In order to analyze intervenor-plaintiffs' claims, I must
first determine what information qualifies as the "best
scientific information available" with regard to defendants'
decision to implement conservation equivalency measures.  Neither
the MSA nor the ACFMCA defines the term "best scientific
information available," and accordingly, because the relevant
statutes are silent on the issue, I must ultimately determine
whether defendants' interpretation of that standard was
reasonable.  The Second Circuit has not offered any guidance on
what may reasonably be construed as the best scientific
information available in the MSA and ACFCMA context.  However,
court decisions from other jurisdictions and federal regulations
are of some help.  Under the national standard guidelines
articulated in the Code of Federal Regulations, "[s]cientific
information includes, but is not limited to, information of a
biological, ecological, economic or social nature."  *See Ocean
Conservancy v. Evans*, 260 F.Supp. 1162, 1181 (M.D. Fla. 2003)
(quoting 50 C.F.R. § 600.315(b)(1)).  In addition, "[i]f there
are conflicting facts or opinions relevant to a particular point,
a Council may choose among them, but should justify the choice."
50 C.F.R. § 600.315(b)(1).  Further, "[t]he fact that scientific
information concerning a fishery is incomplete does not prevent
the preparation and implementation of an FMP."  50 C.F.R. §

600.315(b). "By specifying that decisions be based on the best scientific information *available*, the Magnuson-Stevens Act recognizes that such information may not be exact or totally complete." *Midwater Trawlers Coop. v. Dep't of Commerce*, 393 F.3d 994, 1003 (9th Cir. 2004) (emphasis in original).

As set forth above, intervenor-plaintiffs argue that the NAS/NRC report is the best scientific information available because it is the most recent report addressing the proper application of MRFSS data. Defendant ASMFC opposes this argument, asserting that because the "relevant area of scientific inquiry is assessing recreational fishing effort and catch . . . [and because] MRFSS remains the best -- and only -- scientifically reviewed methodology that is available to assess recreational catch[,]" MRFSS data is the best scientific information available. Def. ASMFC Mem. In Opp. at 23. ASMFC's argument is understandable in that any summer flounder management regime, whether state-by-state or coastwide, must necessarily be based on MRFSS data. However, the question here is whether defendants used the best scientific information available relevant to determining which management regime to employ, not to developing precise regulations under that regime. The NAS/NRC report does speak to the relative merits of applying MRFSS data on a small scale (*e.g.*, state-by state) versus a large scale (*e.g.*, coastwide) basis. Assuming without deciding that the

NAS/NRC report must be considered the "best scientific
information available" with regard to application of MRFSS data,
however, as set forth in more detail below, I conclude that
intervenor-plaintiffs have not shown a substantial likelihood
that defendants violated the "best scientific information
available" standard by adopting state-by-state conservation
equivalency measures.

In support of their argument, intervenor-plaintiffs point to
three short passages of the 131-page NAS/NRC report, which, they
argue, show that MRFSS data do not support the use of state-by-
state management measures. The passages consist of the
following: "[c]urrent users require data with higher resolution -
- spatially, temporally, and taxonomically -- than the current
MRFSS can deliver," FAR at 1181; "[c]urrently, many fisheries
are monitored at the state level, which is a finer stratification
than intended originally for the data collected," id.; and "[a]s
managers use recreational data on finer temporal and spatial
scales, issues of precision and bias become more pronounced.
Existing spatial and temporal sampling strata may be of too
coarse a resolution to generate estimates that are adequate for
the management requirements." Id. at 1184.

The administrative record reflects that both the federal
defendants and ASMFC deliberately and carefully took the NAS/NRC
critique of the MRFSS data into account in crafting their 2008

summer flounder regulations. The issue was discussed at length at the December 11-13, 2007 meeting of the MAMFC and the Board, during which defendants voted to adopt state-by-state conservation equivalency measures for 2008. *See, e.g.*, FAR at 315-17, 318-19, 321 (transcript of discussion before the ASMFC Board and the federal Council, at their meeting of December 11, 2007, concerning whether the NAS/NRC report shows that MRFSS data does not support conservation equivalency management measures, including comments from intervenor-plaintiff United Boatmen of New York); *id.* at 305-06 (transcript of the Board and the Council's votes, after hearing all comments, to adopt conservation equivalency approach for 2008). In a memorandum summarizing the actions taken at the December 11-13, 2007 meeting, the following was reported:

> For the 2008 recreational summer flounder fishery, the Council and Board adopted conservation equivalency . . . [and] directed the Commission's Technical Committee to provide new guidance to states so that conservation equivalency proposals will evaluate increases in angler effort and stock size, *the percent standard error around [MRFSS] harvest estimates* and noncompliance with 2007 regulations as a means of providing additional precaution to account for uncertainty in the approaches utilized to evaluate management measure effectiveness.

FAR at 361-62 (emphasis added). In its publication of the final rule for 2008, NMFS makes clear that the direction to the Technical Committee to provide additional guidance was inspired, in part, by the NAS/NRC report's criticism of the MRFSS data as applied to state-level monitoring. Specifically, in the

"Comments and Responses" section of the publication of its final

rule for 2008, NMFS included the following lengthy response to

intervenor-plaintiffs' argument here:

> *Comment 1*:  Some of the comments received allege that state-
> by-state conservation equivalency violates National Standard
> 2 of the Magunson Stevens Act, which requires that
> conservation and management actions to be based [sic] upon
> the best available scientific information.  The argument
> presented by the commenters is that the Marine Recreational
> Fishery Statistical Survey (MRFSS) used to develop state-by-
> state conservation equivalency measures has inadequate
> resolution for state-level monitoring and management.  These
> commenters cite the 2006 NOAA-commissioned National Academy
> of Sciences independent review of MRFSS that stated
> monitoring fisheries at a state level is a finer
> stratification than intended originally for the data
> collected and that the existing sampling strata may be too
> coarse a resolution to generate estimates that are adequate
> for management requirements.  Further, these commenters cite
> a quotation from the National Academy of Science review
> committee chair wherein it was stated that MRFSS is better
> suited to monitor and manage on larger spatial scales rather
> than on smaller spatial scales.
> *Response*:  NMFS disagrees that managing the summer flounder
> recreational fishery using state-by-state conservation
> equivalency is a violation of National Standard 2.  NMFS has
> been aware of limitations in the MRFSS design and data for
> some time.  It is, in fact, why the National Academy of
> Science peer-review was commissioned by NOAA.  While the
> review did, as expected, point out numerous areas for
> improvement of the MRFSS sampling design, nowhere did the
> National Academy of Science reviewers indicate that use of
> the MRFSS data at smaller spatial scales (i.e., state-by-
> state) was an inappropriate use of the data.  Moreover, the
> National Academy of Science review indicated that the level
> of precision available from MRFSS may require the
> modification of management objectives or management tools.
> This reason, along with poor performance of conservation
> equivalency in recent years, led NMFS to send letters early
> in the 2008 recreational management measures development
> process strongly encouraging both the Commission and the
> Council to improve their analysis of how potential
> recreational management measures are evaluated.  In
> addition, NMFS encouraged states to take a more
> precautionary approach to both improve conservation

equivalency's performance and to offset uncertainty in the assessment of potential measures effectiveness [sic]. In response, the Commission's Technical Committee evaluated a number of additional factors that may influence the effectiveness of state-by-state conservation equivalency before recommending the performance-based adjustment factor intended to improve conservation equivalency in 2008. NMFS contends that the information provided by MRFSS, along with additional information provided by individual states and fishery independent surveys, is sufficient and appropriate to manage the recreational summer flounder fishery on a state-by-state basis.

FAR 1548.

In its report, the Technical Committee examined the uncertainty of MRFSS harvest estimates used to compile state quotas, noting that while the range of error (referred to as "percent standard error," or "PSE") was "quite low" with regard to summer flounder harvest estimates on a coastwide basis, the range of error on a state-by-state basis was "considerably higher, averaging 7.2 to 17.9%[.]" FAR at 389. The Committee explored and rejected the option of recommending that MRFSS data ranges of error be taken into account in setting state quotas, reasoning as follows:

The TC examined the possibility of developing more restrictive reduction strategies based on using an upper confidence limit rather than the point estimate of annual harvest in reviewing annual performance. Retrospectively, this tactic would have required many states to account for a harvest reduction in years when no reduction was necessary based on the point estimate alone, resulting in some avoidance of state overages. However, this approach disproportionately penalized states with large PSE values. Anecdotally, states that have increased MRFSS sampling efforts in past years noticed little improvement in PSE

relative to the expense incurred.[9]  Therefore, the TC
decided that the use of an upper confidence limit as the
harvest estimate was infeasible at this time to further
constrain harvest in 2008.

*Id.*

In its publication of the 2008 Final Rule for summer

flounder, NMFS further noted that it is currently developing an

improved angler survey methodology in response to the NAS/NRC

report.  Specifically, it stated as follows:

NMFS is continuing to move forward with implementing the
recommendations of the National Academy of Science regarding
MRFSS . . . [t]he changes under development, when fully
implemented, are expected to incorporate many of the
National Academy of Science's recommendations and
substantially improve the precision and utility of the
recreational fishery information available for fisheries
management.  In the interim, while new measures are being
implemented, the MRFSS supplied data remain the only
available information for recreational fisheries management
at any spatial scale.

FAR at 1548; *see also* Kearns Decl. ¶¶ 25-27.

In crafting summer flounder fishery regulations for 2008,

the administrative record shows that defendants considered the

NAS/NRC report and determined that it did not foreclose adopting

a state-by-state conservation equivalency approach to management

_____

[9] In order to address the concern that MRFSS data are unreliable for
small regions given that the survey's accuracy is a function of sample size,
states have the option of attempting to "improve the precision of its
estimates of catch by increasing the number of sites sampled in the state.
The State of North Carolina, for example, funds additional sampling of
recreational fishing in its waters, in order to provide a richer body of data
on which catch estimates can be made.  All states in the fishery have the
option to provide for such additional funding, [sic] in 2008 the states of
Massachusetts, Delaware, Virginia, and North Carolina increased their sampling
to supplement MRFSS data."  Kearns Decl. ¶ 23.  New York did not choose to
provide for such funding in 2008.

of the fishery.  However, defendants did not ignore the NAS/NRC
report's findings; rather, they took the report's criticism into
account by requiring the Technical Committee to reexamine the
effect of MRFSS data imprecision on state quota management and to
make recommendations in accordance with its findings, as well as
by developing improved survey methodology to be implemented in
future years.  Plaintiffs have not shown a substantial likelihood
that the only reasonable interpretation of the NAS/NRC report is
that state-by-state conservation equivalency measures are
unsupported by MRFSS data, which is the only data currently
available.  Therefore, defendants' decisions to adopt
conservation equivalency measures for 2008 are entitled to
substantial deference under the APA standard.

      In making their choices, defendants considered a broad range
of factors in addition to the NAS/NRC report and MRFSS data
quality issues, including the need to respect other statutory
requirements, equity between the states, the overall impact of
management measures on conservation efforts, the implications for
particular states' fisheries, and other policy considerations.
There is no evidence that defendants failed to examine the data
relevant to their decisions, failed to consider important aspects
of that data, relied on factors which Congress did not intend
them to consider, failed to consider evidence placed before them,
or failed to articulate a satisfactory explanation for their

actions. Accordingly, intervenor-plaintiffs have failed to show a substantial likelihood that defendants acted arbitrarily and capriciously in adopting conservation equivalency management measures for the 2008 summer flounder season, and therefore, they have failed to show a substantial likelihood of success on their "best scientific information available" claims.

3. *Discrimination Claims*

Intervenor-plaintiffs also claim they are substantially likely to succeed on their claims that the federal defendants violated the APA by implementing regulations that discriminate between residents of different states, as prohibited by 16 U.S.C. § 1851(a)(4).[10] That statute, also known as "National Standard 4" of the MSA, provides as follows:

> Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

16 U.S.C. § 1851(a)(4). Intervenor-plaintiffs argue that the federal defendants' decision to implement a conservation

---

[10] Although intervenor-plaintiffs are vague in their moving papers as to which discrimination claims against which defendants they argue are substantially likely to succeed, they only discuss a violation of National Standard 4 of the MSA. As defendant ASMFC points out, Congress specifically chose not to apply the MSA National Standards to ASMFC. *See* House Report on ACFMCA, H.R. Rep. No. 202, 103rd Cong., 1st Sess. 1993, 1993 WL 329913, at *9. Accordingly, I construe intervenor-plaintiffs' argument here only as it relates to the federal defendants, whose actions are governed by the MSA.

equivalency regime in 2008 based on the 1998 MRFSS proxy year violates National Standard 4 because it discriminates against New York fishermen. According to the intervenor-plaintiffs, the 1998 data is both inaccurate and outdated, and its use as a baseline in calculating state-by-state quotas discriminates against New York fishermen because it results in a reduction of New York's quota and an increase in other states' quotas at New York's expense, and assigns New York "the most stringent conservation measures in the history of the fishery." Interv. Cplt. § 88.

The administrative record shows that the choice of 1998 as the baseline year for state allocations was the product of extensive research and debate. CAR at 10-70 (memoranda and transcripts discussing Board and Council's deliberations concerning the choice of 1998 as a proxy year); FAR at 1549. Different perspectives were considered, and in fact, New York delegates to the ACFCMA supported the use of 1998 as the baseline year. *Id.*; Kearns Decl. ¶ 17. The summer flounder Technical Committee and the Board reevaluated the use of 1998 as the proxy year as recently as 2007 and 2008, and decided to retain the use of 1998 as the proxy year. Kearns Decl. ¶ 19. The justification advanced for selection of 1998 as the baseline year is that it provides a measure of flounder harvest at the most recent time when all states were subject to uniform regulations, since an approach based on more recent catch data could effectively punish

states that have done the most to promote conservation.  *See* CAR
at 73; FAR at 1549.

Intervenor-plaintiffs have not identified how, in light of
the justification cited above, a conservation equivalency regime
employing a 1998 baseline nevertheless violates National Standard
4's directive that any necessary allocations must be "fair and
equitable" to all fishermen without regard to their state of
residence.  Indeed, in light of National Standard 4's parallel
requirement that necessary allocations must be "reasonably
calculated to promote conservation," an argument exists that
using a different baseline year would not result in fair and
equitable treatment of fishermen residing in states having
engaged in the most vigorous conservation efforts.  Intervenor-
plaintiffs have offered no evidence that the federal defendants
failed to examine the data relevant to choosing 1998 as a
baseline, failed to consider important aspects of that data,
relied on factors which Congress did not intend them to consider,
failed to consider evidence placed before them, or failed to
articulate a satisfactory explanation for their choice.
Accordingly, intervenor-plaintiffs have failed to show a
substantial likelihood that defendants acted arbitrarily and
capriciously in adopting conservation equivalency management
measures based on a proxy year of 1998 for the 2008 summer

flounder season, and therefore, they have failed to show a
substantial likelihood of success on their discrimination claims.

B.    *Irreparable Harm and Balance of Interests*

Because I conclude that intervenor-plaintiffs have failed to
show a substantial likelihood of success on the merits of their
claims, I need not consider whether they have demonstrated
irreparable harm in the absence of a preliminary injunction or a
balance of public interests weighing in favor of granting the
injunction.  Accordingly, even if I were with jurisdiction to
grant the requested relief, I would decline to do so.

## CONCLUSION

For the reasons set forth above, intervenor-plaintiffs'
motion for a preliminary injunction is denied.  In light of my
broad discretion to permit or deny the appearance of *amici curiae*
in a given case, *see Jamaica Hosp. Medical Center, Inc. v. United
Health Group, Inc*., 584 F.Supp.2d 489, 497 (E.D.N.Y. 2008),
amici's requests to appear in this matter are denied because
their appearances would not assist this Court.  The clerk is
directed to transmit a filed copy of the within to all parties
and the magistrate judge.

SO ORDERED.

Dated :    Brooklyn, New York
           April 30, 2009

                    By: /s/ Charles P. Sifton (electronically signed)
                        United States District Judge

**APPENDIX A**

Glossary of agencies, laws, and terminology related to the summer flounder fishery as used in the above memorandum and opinion.

ACFCMA:     Atlantic Coastal Fisheries Cooperative Management Act, 16 U.S.C. § 5101, et seq., (the "ACFCMA") addressees the problem of fishery stocks common to waters under exclusive state jurisdiction, i.e., within 3 miles of the coast, and waters in the EEZ, which is under exclusive federal jurisdiction.  The ACFCMA was enacted to "support and encourage the development, implementation, and enforcement of effective interstate conservation and management of Atlantic coastal fishery resources."  16 U.S.C. § 5101(b).

APA:        Administrative Procedures Act, 5 U.S.C. § 701, et seq., requires federal agencies to consider the public comments it has received.

ASMFC:      Atlantic States Marine Fisheries Commission ("Commission"), an interstate compact consisting of all East Coast states from Maine to Florida, as well as the District of Columbia, Potomac River Fishery Commission, the NMFS, and the USDFW.  The commission prepares coastal fishery management plans for fisheries located in state waters.  16 U.S.C. § 5104(a).

Board:      Summer Flounder, Scup, and Black Sea Bass Management Board of the ASMFC, responsible for preparing the FMP for summer flounder applicable to state waters.

EEZ:        Exclusive Economic Zone, established by the MSA extending from 3 miles seaward of the states' coast to 200 nautical miles offshore. 16 U.S.C. §§ 1802(11), 1811.

FCA:        Fishermen's Conservation Association, a non-profit public interest organization whose membership is comprised of individual recreational anglers throughout the New York Marine District, who target summer flounder (among other species) in both state and federal waters contiguous to New York State.

Fluke:      See Summer flounder.

FMP:        Fishery Management Plan: a plan prepared by each

federal Regional Fishery Management Council and each ASMFC Board for each fishery under its authority that requires conservation and management. *See* 16 U.S.C. § 1852(h); 16 U.S.C.A. § 5102(1).

ISFMP:  ASMFC's Interstate Fisheries Management Program. In cooperation with the NMFS, the ISFMP determines priorities for interjurisdictional fisheries management in coastal state waters and recommends to states, RFMCs, and the federal government management measures to benefit these fisheries.

MAFMC:  Mid-Atlantic Fishery Management Council ("Mid-Atlantic Council", "Council") one of the eight RFMCs established by the MSA, which prepares the federal FMP for summer flounder. 16 U.S.C. § 1852(a)(1)(B).

MRFSS:  Marine Recreational Fishing Statistical Survey: an angler survey that generates estimates of recreational summer flounder catch and landings.

MRIP:  Marine Recreational Information Program: an updated angler survey designed to address timeliness and accuracy problems with MRFSS data (not yet available).

MSA:  Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1801, *et seq.*, passed to "conserve and manage the fishery resources found off the coasts of the United States" and "promote domestic commercial and recreational fishing under sound conservation and management principles[.]" 17 U.S.C. § 1801(b)(1), (3). The MSA establishes eight RFMCs, see 16 U.S.C. § 1852, and also requires that any federal FMP and any regulation promulgated to implement a federal FMP be consistent with ten "national standards" set forth. 16 U.S.C. § 1851(a).

NAS/NRC:  National Academy of Scineces / National Research Council.

NMFS:  National Marine Fisheries Service: the federal agency, a division of the Department of Commerce, responsible for the stewardship of the nation's living marine resources and their habitat. NMFS is responsible for the management, conservation, and protection of living marine resources within the EEZ.

NOAA:  National Oceanic and Atomospheric Administration: a

federal agency focused on the condition of the oceans and the atmosphere.

NYFTTA:    New York Fishing Tackle Trade Association, Inc., a professional trade organization representing the wholesale and retail bait and tackle dealer industry in New York.

NYSDEC:    New York State Department of Environmental Conservation.

RFMC:      Regional Fishery Management Council: established by the MSA, and responsible for developing and recommending to the Secretary FMPs governing each fishery within its geographic area. 16 U.S.C. § 1852.

Sec-
retary:    Secretary of Commerce, who possesses final authority to approve federal FMPs under the MSA.  16 U.S.C. § 1854.

Summer
flounder:  Paralichthys dentatus, popularly known as fluke.

TAL:       Total Allowable Landings: summer flounder quotas that fix the total weight of summer flounder that may be harvested by commercial and recreational fishermen (sometimes referred to as "quotas" or "specifications").

UBNY:      United Boatmen of New York, Inc., a professional trade organization representing the for-hire fishing vessel industry in the New York Marine District.

USFWS:     United States Fishing and Wildlife Service.