UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x
The STATE OF NEW YORK, ALEXANDER B. GRANNIS,   :
as Commissioner of the New York State Department of   :     08-CV-2503
Environmental Conservation, and the NEW YORK STATE   :     (CPS) (RLM)
DEPARTMENT OF ENVIRONMENTAL CONSERVATION,   :
                  :
             Plaintiffs,   :
                  :
UNITED BOATMEN OF NEW YORK, INC., NEW YORK   :
FISHING TACKLE TRADE ASSOCIATION, INC., and THE   :
FISHERMEN'S CONSERVATION ASSOCIATION,   :
                  :
         Intervenor-Plaintiffs   :
                  :
      -against-   :
                  :
GARY LOCKE, in his official capacity as Secretary of the   :
United State Department of Commerce, the UNITED STATES   :
DEPARTMENT OF COMMERCE, JANE LUBCHENCO, in   :
her Official Capacity as Under Secretary of Commerce and   :
Administrator for the National Oceanic and Atmospheric   :
Administration, the NATIONAL OCEANIC AND   :
ATMOSPHERIC ADMINISTRATION, JAMES W.   :
BALSIGER, in his Official Capacity as the Acting Assistant   :
Administrator for the NATIONAL MARINE FISHERIES   :
SERVICE, and the NATIONAL MARINE FISHERIES   :
SERVICE,   :
                  :
         Defendants,   :
                  :
ATLANTIC STATES MARINE FISHERIES COMMISSION,   :
                  :
         Intervenor-Defendant.   :
-------------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

        **ANDREW M. CUOMO**
        Attorney General of the State of New York
        *Attorney for Plaintiffs State of New York, Alexander B.*
        *Grannis, as Commissioner of the New York State*
        *Department of Environmental Conservation and*
        *New York State Department of Environmental*
        *Conservation*
        New York State Department of Law
        Environmental Protection Bureau
        120 Broadway, 26th Floor
        New York, New York  10271
        (212) 416-8474

*Of Counsel*
  ANDREW J. GERSHON
  Assistant Attorney General

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

INTRODUCTION ..................................................................................... 1

SUMMARY OF NEW YORK'S ARGUMENT .......................................... 1

STATUTORY, REGULATORY AND PROCEDURAL BACKGROUND ............................. 11

STATEMENT OF FACTS ........................................................................ 11

    A. The Summer Flounder ................................................................ 11

    B. Management of the Recreational Summer Flounder Fishery ................... 14

        1. The Summer Flounder FMP .......................................... 14

        2. State Recreational Allocations For Conservation Equivalency ......... 15

    C. Development of The 2008 Summer Flounder Management Measures ............ 18

    D. DEC Comments On NMFS' Proposed Rule ........................................ 28

    E. Reversing Its Earlier Support For Coastwide Regulation, NMFS
       Issues The Final Rule Adopting The Commission's State-By
       State Conservation Equivalency Measures For The EEZ and
       Federally Permitted Vessels ........................................................ 31

    F. Procedural History Of This Action ................................................ 33

    G. The Rulemaking For The 2009 Recreational Summer flounder
       Management Measures .............................................................. 35

ARGUMENT ......................................................................................... 36

I.    STANDARDS GOVERNING THIS MOTION ....................................... 36

II.   THE FEDERAL DEFENDANTS VIOLATED THE MAGNUSON-STEVENS
    ACT IN ISSUING THE 2008 RULE ................................................. 37

    A.    The 2008 Rule Was Based On The 1998 Allocations That Undisputed
        Changes To The Fishery Had Rendered Obsolete, And Was Therefore
        Not Based On The Best Scientific Information Available, Violating
        National Standard 2 ............................................................. 38

    B.    The 2008 Rule Discriminated Against Summer Flounder
        Anglers Based In New York, In Violation Of NS 4 ......................... 42

    C.    In Issuing the 2008 Rule Based On The Scientifically Obsolete 1998 State
        Allocations, The Federal Defendants Violated National Standard 6 By Failing
        To Take Into Account and Allow for Variations Among, and Contingencies
        In the Summer Flounder Fishery ............................................. 49

III.    THE COURT SHOULD DECLARE THAT ANY STATE-BY-STATE
        CONSERVATION EQUIVALENCY MANAGEMENT MEASURES
        BASED ON THE 1998 ALLOCATIONS VIOLATE THE MAGNUSON-STEVENS
        ACT, AND ORDER THAT THE NON-PREFERRED  COASTWIDE
        ALTERNATIVE MANAGEMENT MEASURES ISSUED BY THE FEDERAL
        DEFENDANTS FOR 2009 BE IN EFFECT .................................................................. 52

CONCLUSION ........................................................................................................................ 54

## TABLE OF AUTHORITIES

*Ace Lobster Co., Inc. v. Evans*, 165 F.Supp.2d 148 (D.R.I. 2001)  ............................................. 49

*Alaska Factory Trawler Association v. Baldridge*, 831 F.2d 1456 (9th Cir. 1987)  ..................... 36

*Blue Ocean Institute v. Gutierrez*, 585 F.Supp.2d 36 (D.D.C. 2008)  ........................................ 36

*J.H. Miles & Co., Inc. v. Brown*, 910 F.Supp. 1138 (E.D. Va. 1995)  ......................................... 49

*Massachusetts v. Daley*, 170 F.3d 23 (1st Cir. 1999)  ............................................................. 40, 44

*Midwater Trawlers Cooperative v. Department of Commerce*, *393* F.3d *994* (9th Cir. 2004) ..... 38

*North Carolina Fisheries Association, Inc. v. Gutierrez*, 518 F.Supp.2d 62 (D.D.C. 2007)  ...... 36

*Ocean Conservancy v. Evans*, *260* F.Supp.2d *1162* (M.D.Fla. 2003)  ........................................ 38

*Roe v. Wade,* 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973)  .......................................... 53

*Southern Pacific Terminal Co. v. Interstate Commerce Comm'n*
219 U.S. 498, 515, 31 S. Ct. 279, 55 L. Ed. 310 (1911)  ......................................................... 53

*State of New York v. Locke,*2009 U.S. Dist. LEXIS 37091 *(E.D.N.Y. April 30, 2009)* ....... *passim*

*United Boatmen v. Gutierrez*, 429 F.Supp.2d 543 (E.D.N.Y. 2006)  ..................................... 36, 53

**FEDERAL STATUTES**

Magnuson-Stevens Act, §§ 1801, *et seq.* .............................................................................. *passim*

16 U.S.C. § 1851(a)  ........................................................................................................ *passim*

16 U.S.C. § 1852(h)  ................................................................................................................ 12

Atlantic Coastal Fisheries Cooperative Management Act, 16 U.S.C. §§ 5101-5108  ............... 3, 9

Pub. L. 109-479, § 120(a) (Jan. 12, 2007); 72 Fed.Reg. 32813  .................................................. 14

Fed. R. Civ. P. § 54  ................................................................................................................... 54

Fed. R. Civ. P. § 56  ................................................................................................................... 36

**FEDERAL REGULATIONS**

*50* C.F.R. *§ 600.315*  .................................................................................................................. 38

50 C.F.R. § 600.335  .................................................................................................................. 51

73 Fed. Reg. 15111, No. 56 (March 21, 2008)  ........................................................................ 28

73 Fed. Reg. 29990, No. 101 (May 23, 2008)  ................................................................... *passim*

74 Fed.Reg. 14760, No. 61 (April 1, 2009)  .............................................................. 10, 35, 52

74 Fed.Reg. 14760, No. 61  ...................................................................................................... 55

## INTRODUCTION

Plaintiffs State of New York, Alexander B. Grannis, as Commissioner of the New York State Department of Environmental Conservation, and New York State Department of Environmental Conservation (collectively "New York") submit this memorandum of law in support of their motion for summary judgment on their first three claims against defendants Gary Locke, as Secretary of the United State Department of Commerce, the United States Department of Commerce, Jane Lubchenco, as under Secretary of Commerce and Administrator for the National Oceanic and Atmospheric Administration, the National Oceanic and Atmospheric Administration, James W. Balsiger, in His Official Capacity as the Acting Assistant Administrator for the National Marine Fisheries Service ("NMFS"), and the NMFS (collectively the "Federal Defendants").[1]

## SUMMARY OF NEW YORK'S ARGUMENT

In this action the State of New York challenges NMFS' issuance of a rule for the management of the recreational summer flounder fishery in federal waters during 2008. Although the federal Magnuson-Stevens Act[2] requires that any fishery rule issued by NMFS be based on "the best scientific information available," NMFS chose instead to adopt a suite of state-specific "conservation equivalency" management measures previously approved by the Atlantic States Fisheries Management Commission ("Commission") for state marine waters in

---

[1]  The other parties to this action are intervenor-plaintiffs United Boatmen of New York, Inc., a professional trade organization representing the for-hire fishing vessel industry in the New York Marine District, New York Fishing Tackle Trade Association, Inc., a professional trade organization representing the wholesale and retail bait and tackle dealer industry in New York, and Fishermen's Conservation Association (collectively "Intervenor-Plaintiffs" or the "United Boatmen"), and intervenor-defendant Atlantic States Marine Fisheries Commission ("Intervenor-Defendant" or "Commission").

[2]  More fully the Magnuson-Stevens Fishery Conservation and Management Act, as amended in 1996 by the Sustainable Fisheries Act, 16 U.S.C. §§ 1801, *et seq.* ("Magnuson-Stevens Act").

2008.  These state-specific management measures were based on state allocations of the fishery based on a single year of stale landings data from 1998, over a decade ago, despite uncontroverted evidence that the distribution of the summer flounder fishery has changed significantly since then.  In particular, uncontroverted scientific evidence demonstrates that the percentage of the summer flounder stock has increased substantially in New York waters, but New York's allocation has not changed to reflect this.  The 2008 management measures, both federal and state, arbitrarily discriminated against recreational fishermen based in New York without benefitting the recovery of the summer flounder fishery.  Accordingly, New York asks this court to declare that any current or future state-by-state management measures based on the 1998 allocations violate the Magnuson-Stevens Act.

More particularly, NMFS regulates fishing in the ocean from 3 to 200 miles out, also known as the Exclusive Economic Zone, or EEZ, as well as from vessels holding federal fisheries permits.  Each year NMFS issues management measures consisting of limits on size, possession and season for recreational summer flounder angling in the EEZ or from such vessels.  According to NMFS' data, approximately 10% of recreational summer flounder landings occur in the EEZ.  (Federal Administrative Record ("FAR"), 550.[3])  Pursuant to the joint federal-state fishery management plan covering the recreational summer flounder fishery (the "FMP"), NMFS annually decides whether to issue one set of coastwide management measures for the entire federal fishery, or a suite of regional or state-specific "conservation equivalency" measures.  This latter option is available in the event the Commission, an interstate compact that

---

[3]  There are two administrative records in this case, one for the Federal Defendants, and one for the Commission ("CAR").  The Commission filed a supplement to its initial record, which will be referred to as "CSAR."  New York only has claims against the Federal Defendants.  However, the federal actions New York is challenging arose from a joint federal-state rulemaking, the federal regulations at issue were adopted after they were approved by the Commission, and in its previous decision in this action the Court looked to both records in evaluating the Federal Defendants' actions during the 2008 Rulemaking.  Consequently New York is citing to both administrative records in this motion.

regulates fishing in state marine waters, through its Summer Flounder Management Board (the "Management Board") – on which NMFS sits –  has opted for conservation equivalency for those waters and NMFS decides to adopt the management measures approved by the Commission.

If the Management Board chooses state-by-state conservation equivalency, the individual states within it must develop management measures designed to limit the annual recreational harvest from a state's waters to that state's allocation of the total allowable landings ("TAL") for the entire fishery, which is determined for each year by the federal and state fishery managers. The respective state allocations are based on estimates of their respective 1998 recreational summer flounder landings (the "1998 Allocations").  These percentages have been used since 1999 and were incorporated into the FMP in 2003.

Before adopting any conservation equivalency management measures approved by the Commission, NMFS must determine that the measures comply with the Magnuson-Stevens Act. The Magnuson Stevens Act requires that all fishery regulations comply with certain "National Standards."  Among other things, fishery regulations must be based on the best scientific information available, not discriminate against any particular state unless necessary to serve a rational conservation purpose, and take into account variations in fisheries, fishery resources, and catches.[4]

---

[4]  There are 10 overlapping "National Standards" under the Magnuson-Stevens Act to which all federal fishery regulations and management plans must adhere.  National Standard 2 requires that regulations and plans be based on the "best scientific information available," broadly defined by the courts to encompass information of a biological, ecological, economic or social nature.  (Under the Atlantic Coastal Fisheries Conservation and Management Act of 1993, 16 U.S.C. §§ 5101-5108 (the "ACFCMA"), state regulations must also meet this standard.) National Standard 4 provides that:

> Conservation and management measures shall not discriminate between residents of different States.  If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in

On May 23, 2008, NMFS published the final rule for management of the recreational summer flounder in the EEZ and from federally permitted vessels for 2008, as part of the final recreational management measures for the 2008 summer flounder, scup and black sea bass fisheries.  73 Fed. Reg. 29990, No. 101 (FAR 1546-55[5]) (the "2008 Rule").  In the 2008 Rule the Federal Defendants adopted the suite of state-by-state conservation equivalent management measures previously approved by the Commission for the state marine waters of the fishery for 2008.

During the 2008 Rulemaking New York had urged NMFS to adopt one set of coastwide management measures for 2008, not state-by-state conservation equivalent measures, arguing that the latter violated several of the Magnuson Stevens Act's National Standards.

As New York argued then, the state-specific measures included in the 2008 Rule were driven by the 1998 Allocations, but those allocations have been rendered obsolete by substantial changes to the fishery over the last decade.  These changes have made New York's 17.63% 1998 Allocation too low to reflect its fair share of the transformed fishery.  It is undisputed in the administrative record that substantial changes in the summer flounder fishery since 1998 have resulted in a significant increase in the percentage of the summer flounder stock and summer

---

such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

16 U.S.C. § 1851(a)(4). National Standard 6 requires that "[c]onservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches."  16 U.S.C. § 1851(a)(6).

[5]  There are two administrative records in this case, one for the Federal Defendants, and one for the Commission ("CAR").  The Commission filed a supplement to its initial record, which will be referred to as "CSAR."  New York only has claims against the Federal Defendants.  However, the federal actions New York is challenging arose from a joint federal-state rulemaking, the federal regulations at issue were adopted after they were approved by the Commission, and in its previous decision in this action the Court looked to both records in evaluating the Federal Defendants' actions during the 2008 Rulemaking.  Consequently New York is citing to both administrative records in this motion.

flounder anglers in New York waters, rendering its 17.63% 1998 Allocation scientifically obsolete.  As described below, the best available scientific information shows that during the late 1990's, summer flounder populations were at a relatively low level of biomass, and the size and age structure of the summer flounder population was truncated, with very few older or larger fish available.  In the last few years, stock biomass has grown 50% larger than it was in 1998, and age structure has expanded considerably.  Studies conducted in New York, New Jersey and Southern New England have shown that the typical pattern of summer flounder movement reflects an eastward and northward shift in distribution over time.  As a result of this movement to the north and east, older and larger summer flounder tend to be found in northern areas, which has been confirmed by NMFS' surveys.  This has resulted in a greater, and increasing percentage of the species' biomass in New York waters in recent years as the average age in the population has increased.

These substantial changes to the summer flounder population were accompanied by significant changes in recreational angling for this resource.  According to data from the Marine Fisheries Statistic Survey ("MRFSS") in the administrative record, since the 1990's directed trips pursuing summer flounder have increased in New York and states to its north, while remaining steady from New Jersey southward.  Although New Jersey has by far the largest baseline allocation at 39.09%, in 2007 New York had the highest proportion of fishing trips directed at summer flounder at 36%, followed by New Jersey's 33%, while the remaining 31% was shared by the other states operating under the FMP.  The best scientific information available thus shows that a greater number of recreational fishermen are pursuing more large summer flounder from a very different population of fish in New York waters than in 1998, or 2003.  This science is undisputed in the administrative record.

5

During the initial phase of the 2008 Rulemaking, NMFS asserted a strong preference for uniform coastwide measures.  NMFS cited the repeated failure of state-by-state conservation equivalency, which had been chosen to manage the recreational summer flounder fishery every year since 2001, to constrain harvest to conservation targets.  Prompted by NMFS' demand for added caution, the Commission implemented a "Performance Factor" for 2008's state-by-state conservation equivalency measures which further reduced each state's harvest target by its average overages over the preceding seven years.  New York had reported overages for five of those seven years, which was to be expected given the increase in the percentage of the summer flounder stock and recreational anglers in its waters during that period.  The Performance Factor effectively reduced New York's target from its already obsolete 17.63% 1998 Allocation to 12.94% of the TAL.  New York was therefore constrained to develop management measures for its waters for 2008 that were the most stringent in the history of the summer flounder recreational fishery.  New York or federally regulated anglers landing in New York were subject to limits far more stringent than those applicable to anglers from neighboring states who were, quite literally, pursuing the same fish.

Thus, under the recreational summer flounder fishing regime approved by NMFS for 2008, a recreational angler based in Sheepshead Bay Brooklyn, fishing for summer flounder just over three miles out in the waters of Raritan Bay, between New York and New Jersey, could take only four fish per day, and only if they had reached 20.5 inches.  A New Jersey-based angler, fishing in the same spot, for the same fish, with the same tackle, could keep eight fish per day, which only had to be 18 inches long.  This disparate treatment based solely on port of landing was unfair, irrational, and discriminatory.  All of the New York overages that reduced its 2008 target and therefore increased its limits occurred when it was fishing under conservation

6

equivalency management measures that were actually adopted by NMFS, after review and approval by the Commission.  There is nothing in the administrative record indicating that New York's overages resulted from lax regulating or shirking of conservation responsibilities. Indeed, in 2007 New York took the unprecedented and controversial step of closing its recreational summer flounder fishery before the scheduled close of the season, when it appeared landings were on the way to exceeding its quota.  To the extent the administrative record provides any explanation for New York's overages, it is that they resulted from inflexible management of a substantially changed fishery based on obsolete science.  Imposing far more stringent size and possession limits on New Yorkers than on anglers based in neighboring states, particularly New Jersey, who in many instances then literally pursued the same fish, served no reasonable conservation purpose.

 New York was joined in its advocacy for a return to coastwide management measures during the 2008 Rulemaking by objective and independent fishery management professionals who work on summer flounder.  Indeed, for much of the 2008 Rulemaking NMFS too, through its Northeast Regional Director Patricia Kurkul, supported one set of coastwide measures for 2008.  But NMFS ultimately reversed its position, ignoring the recommendations of the neutral fishery professionals, and issued the 2008 Rule adopting the Commission-approved state-by-state conservation equivalency regime based on obsolete 1998 data.

New York and others placed the scientific information concerning the substantial changes to the fishery that had rendered New York's 1998 Allocation obsolete squarely before NMFS during the 2008 Rulemaking.  Nowhere in the record does NMFS, or any other participant in the Rulemaking dispute this information, or the substantial changes to the summer flounder fishery it describes.  Nor does NMFS explain in the administrative record how issuing

7

management measures based on data rendered obsolete by substantial changes in the fishery, which imposed significantly different limits on neighboring states pursuing the same fish, fulfilled its legal obligation under the Magnuson-Stevens Act to ensure that its fishery regulations are based on the best scientific information available, do not discriminate, and account for variations among fisheries and fishery resources.

The Court recently addressed the allocation issue in its April 30, 2009 decision denying intervenor-plaintiffs United Boatmen's motion for a preliminary injunction (the "PI Order," 2009 U.S. Dist. LEXIS 37091), Preliminary Injunction Order, finding that the United Boatmen had failed to demonstrate a likelihood of success on the merits of their claim that use of the 1998 Allocations for 2008 discriminated against New York in violation of the Magnuson-Stevens Act's National Standard 4.  New York did not file papers on the motion, and the Court did not directly address New York's straightforward claim that NMFS' 2008 conservation equivalency management measures based on allocations that undisputedly do not reflect the current fishery violated National Standard 2's mandate that the best available scientific information be used.

New York is also moving for summary judgment on its third, related claim that by refusing to update the state-by-state conservation management regime to reflect the current fishery, NMFS violated National Standard 6, which provides that "[c]onservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches."  16 U.S.C. § 1851(a)(6).  By adopting a state-by-state conservation equivalency regime based on the obsolete 1998 Allocations, the Federal Defendants clearly failed to take into account the undisputed and substantial variations to the summer flounder fishery and fishery resource.  The Court's PI Order did not address this claim.

In its published responses NMFS distanced itself from responsibility for doing something

8

about the scientifically obsolete 1998 Allocations, noting that they are decided by the Commission, which is always at liberty to change them. (FAR 1549.) But NMFS does not have to passively accept whatever management rules are submitted to it for federal waters, abnegating its responsibility and oversight role under the Magnuson-Stevens Act and the ACFCMA. The agency's responsibilities under those laws do not allow it to simply defer to the Commission, the decisions of which are subject to control by state representatives with an inherent interest in maximizing fishery share. NMFS is legally obligated, if it adopts state-by-state conservation equivalency measures, to make sure that the underlying science driving the management regime – such as the critical state allocations – indeed reflect the best scientific information available, and that those measures do not result in discrimination against any state, and account for variations to the fishery. The Magnuson-Stevens Act and related statutes governing interstate fisheries were passed precisely so that the inherent interest of individual states in maximizing their own harvests, which has often spurred overexploitation of fisheries, would be checked by an agreed upon set of neutral principles.

In sum, in issuing the 2008 Rule, NMFS ignored undisputed evidence in the administrative record that demonstrated that the substantial changes to the summer flounder fishery had rendered the state-by-state management measures it was adopting for federal waters and federally regulated vessels scientifically obsolete, unfair to New York-based anglers, and unreasonably inflexible. The administrative record demonstrates that NMFS either failed to examine the data, or did so and failed to articulate any satisfactory explanation for ignoring the undisputed, available science demonstrating that the 2008 recreational conservation equivalency management regime it was approving did not fit the fishery as it currently exists.

9

The 2008 Rule has now been superseded by 2009 management measures.  *See* the Proposed Recreational Management Measures for the Summer Flounder, Scup, and Black Sea Bass Fisheries; Fishing Year 2009. 74 Fed. Reg. 14760, No. 61 (April 1, 2009).[6]  The Federal Defendants have once again rejected coastwide measures in favor of a Commission-approved regime of state-by-state-conservation equivalency management measures, based on the same 1998 Allocations, now one more year out of date, and with one more year of missed conservation targets in their past.  Thus, the controversy underlying New York's challenge to the 2008 Rule remains, remains capable of repetition in future years, and remains a live controversy requiring resolution.  This Court should, accordingly, issue a declaratory judgment that the Federal Defendants violated the Magnuson-Stevens Act in issuing state-by-state conservation equivalency management measures in 2008 for the EEZ and federally permitted vessels.  The Court should further declare that any current or future state-by-state conservation equivalency management measures based on the 1998 Allocations violate the Magnuson-Stevens Act.  Because that declaration would render the federal conservation equivalency regulations for 2009 unlawful, the Court should additionally direct that the alternative coastwide measures approved by the Federal Defendants for 2009 are in effect.

_____

[6]  As of the date this motion is being filed the Federal Defendants have not published the final rules for 2009, although publication should be imminent.  New York has no reason to believe that the final rules will include management measures for the federal summer flounder fishery that are substantively any different from those in the proposed rule.

10

<u>STATUTORY, REGULATORY AND PROCEDURAL BACKGROUND</u>

The Court's prior decisions in this action have summarized the relevant background concerning the statutory and regulatory framework applicable to United States marine fisheries, the summer flounder fishery, and the joint federal and state regulation of that fishery in its several prior decisions in this action.  *See, e.g.,* the PI Order.  That discussion will not be repeated here.

<u>STATEMENT OF FACTS</u>

A.  <u>The Summer Flounder</u>

Summer flounder, or summer flounder (*Paralichthys dentatus*), is a demersal (bottom-dwelling) flatfish distributed from the southern Gulf of Maine to South Carolina.  Important commercial and recreational fisheries exist from Cape Cod to Cape Hatteras.  Summer flounder are concentrated in bays and estuaries from late spring through early autumn, when the fish migrate to the outer continental shelf.  Spawning occurs during autumn and early winter, and the larvae are transported toward coastal areas by prevailing water currents.  Development of post larvae and juveniles occurs primarily within bays and estuarine areas, notably Pamlico Sound and Chesapeake Bay.  Summer flounder are excellent food fish and one of the most sought after species by recreational anglers on the East Coast.  They are also a very valuable species to the commercial fishing industry and to those in the business of serving recreational anglers, notably party boat operators.  *See, e.g.,* PI Order, at 8, 17, 2009 U.S. Dist. LEXIS 37091 *10-11, 21; FAR 449-50, 455.

By the early 1980s the summer flounder population had been overfished and was severely depleted.  The overall biomass of the species was lower than it would have been in a non-overfished, non-depleted state, and average age and size truncated.  To address this

11

overfishing, in 1982 the Commission promulgated its first FMP for summer flounder.  In 1988 the Mid-Atlantic Fishery Management Council (the "Mid-Atlantic Council")[7] adopted a federal FMP for the species, which NMFS approved.  Since then the Mid-Atlantic Council and Commission, in consultation with the New England and South Atlantic Fishery Management Councils, have cooperatively managed the fishery through the FMP, which was subsequently expanded to include scup and black sea bass.  (FAR 7-8; 750.)

Overall summer flounder biomass has generally been increasing since 1993, along with average summer flounder age and size.  (FAR 801-931.)  With this recovery the distribution of the summer flounder stock has changed, resulting in increasing populations in northern areas, including New York, a shift in the fishery confirmed by both anecdotal evidence and scientific studies.  "[T]hese fish are definitely migrating further north."  (CAR 229; statement by James Ruhle, Mid-Atlantic Council member from North Carolina, at the August 2007 Mid-Atlantic Council meeting.)  As the Technical Committee explained to the Summer Flounder Management Board during the 2008 Rulemaking:

> Our current efforts at modeling summer flounder stock dynamics reveal a steady and considerable increase in ages 3 and older fish since the mid-90s.  Since it is well documented that summer flounder migrate northward as they age, the increase in abundance of these larger fish may result in a shift in stock distribution, increasing abundance and availability particularly in northern areas.

---

[7]   The Mid-Atlantic Council is one of eight regional fishery management councils created pursuant to the Magnuson-Stevens Act, whose responsibilities include the drafting of FMPs for each fishery within their respective jurisdictions.  16 U.S.C. § 1852(h)(1).  The Mid-Atlantic Council is composed of voting representatives from the states of New York, New Jersey, Delaware, Pennsylvania, Maryland, Virginia and North Carolina, and NMFS.

(FAR 389.)[8]  Reflecting the increase in summer flounder abundance and size in New York

waters, NMFS data shows that angler effort and distribution have dramatically increased in New

York in recent years.  (FAR 795-800; 391.)  Data collected as part of the MRFSS shows that in

2007 New York had the most (36%) directed trips for summer flounder on the entire East Coast,

New Jersey had 33% of the directed summer flounder trips and the remaining 31% divided among

the other seven states.  As the Technical Committee noted during the 2008 Rulemaking, NMFS

data shows that since the 1990s the annual number of directed trips for summer flounder has varied

without trend for states from New Jersey south, while increasing in the states from New York

north.  (FAR 386.)  The MRFSS data indicated that there were 24.7 million marine recreational

fishing trips taken in the Southern New England-Mid Atlantic region in 1998, while in 2006

there were 36.5 million trips, an increase in effort of almost 48%.  (FAR 795-800.)  Thus, the

_____

        [8]  During the late 1990's, summer flounder populations were at a relatively low level of
biomass and the size and age structure of the summer flounder population was truncated, with
very few older or larger fish available.  In the last few years, stock  biomass has grown 50%
larger than it was in 1998, and age structure has expanded considerably.  (FAR 801-931:
Terceiro, M., "Stock Assessment of Summer Flounder for 2006." U.S. Dept. Of Commerce
Northeast Fish Science Center.)  As summer flounder age their distribution generally shifts in an
eastward and northward direction.  (FAR 1032-1045: Poole, J.P., "The Summer Flounder
Population of Great South Bay in Relation to the Sport Fishery."  New York Fish & Game
Journal, 1962  9(2): 93-117; FAR 976-1003: Murawski, W.S., "Results of Tagging Experiments
of Summer Flounder, *Paralichthys Dentatus* Conducted in New Jersey Waters from 1960 to
1967," 1972 New Jersey Department of Environmental Protection Division of Fish, Game and
Shellfish, Misc. Report No. 5M (1970); FAR 932-947; Lux, F.E. and  F.E. Nichy, "Movements
of Tagged Summer Flounder, *Paralichthys Dentatus*, Off Southern New England," National
Marine Fisheries Service, Woods Hole Lab 1980; FAR 1004-1031: Weber, A.M., "Summer
Flounder in Great South Bay: Preliminary Results of the 1981-1983 Tagging Projects," New
York State DEC (1984).)  As a result of this movement to the north and east, older and larger
summer flounder tend to be found in northern areas.  (FAR 948-975: Henderson, E.M., "Summer
Flounder (*Paralichthys Dentatus*) in the Northwest Atlantic," NMFS Woods Hole Laboratory
(1979); FAR 1046-1149; Sissenwine, M.P., R.R. Lewis and R.K. Mayo, "The Spatial and
Seasonal Distribution of Summer Flounder (*Paralichthys Dentatus*) Based on Research Vessel
Bottom Trawl Surveys, NMFS Woods Hole Laboratory (1979.)

best scientific information available demonstrates that by 2008 there were substantially more, and larger, summer flounder in New York waters than in 1998, or 2003, and more recreational anglers targeting them.

Congress has specified January 1, 2013 as the recovery date for the summer flounder fishery.  Pub. L. 109-479, § 120(a) (Jan. 12, 2007); 72 Fed. Reg. 32813 (June 14, 2007).

B.  Management of the Recreational Summer Flounder Fishery

1.  The Summer Flounder FMP

The process by which annual recreational management measures are developed under the Summer Flounder FMP is diagramed in FMP Framework Adjustment 2 (FAR 124), and described in NMFS's proposed Rule for 2008 (FAR 750-752), as well as the PI Order, at pp. 9-11, 2009 U.S. Dist. LEXIS 37091 *11-13.  Under the FMP, each year the Mid-Atlantic Council and Commission's Board establish the number of pounds of summer flounder that can be landed during that year, known as total allowable landings ("TAL").  Consistent with the mandates of both the Magnuson Stevens Act and ACFCMA to utilize the best science available, those bodies base the TAL on an annually updated summer flounder stock assessment of the current state of the fishery, which is based on a suite of the most current relevant and available data, including data from fishery independent surveys, commercial summer flounder landings and discards, and the MRFSS estimate of recreational summer flounder harvest and discards.  PI Order, at pp. 9-10, 2009 U.S. Dist. LEXIS 37091 *11-12; FAR 365, 1550.  A small portion of the TAL (3%) is set aside to fund research, with the remainder divided between commercial (60%) and recreational landings (40%).  (FAR 365, 1550.)

After the TAL is established, the managers decide whether the entire recreational fishery will be subject to one set of coastwide measures, or whether the fishery will be managed under a

14

suite of regional or state-by-state measures designed to provide equivalent conservation benefit, known as "conservation equivalency" measures.  PI Order, p. 9, 2009 U.S. Dist. LEXIS 37091 *11-12 .  The FMP provides an option for the states to form voluntary regions.  (FAR 264.)

      2.  <u>State Recreational Allocations For Conservation Equivalency</u>

If state-by-state conservation equivalency is chosen, as it has every year since the current process was added to the FMP in 2001, then the recreational quota is allocated among the states in the fishery by fixed percentages.  These percentages (the 1998 Allocations) have been utilized since 1999 and were based on the states' respective recreational landings in 1998 according to the MRFSS data for that baseline year.  (FAR 387.)  The 1998 Allocations are: New Jersey, 39.09%; New York,17.63%; Virginia, 16.69%; Rhode Island, 5.66%; North Carolina, 5.60%; Massachusetts, 5.49%; Connecticut, 3.75%; Delaware, 3.14%; Maryland, 2.95%.  (CAR 70.)

Framework Adjustment 2 to the FMP, dated July 11, 2001, established the current conservation equivalency management system, replacing an interim system of conservation equivalency in effect for 1999 and 2000.  (CAR 1-9.)  Framework Adjustment 2 did not formally incorporate the 1998 Allocations into the FMP (*id.*), although under the interim system, and then in 2001 and 2002, the managers chose to maintain the "status quo" and use those allocations. (See CSAR 2; CAR 73.)  The Technical Committee did analyze two other options around the time Framework Adjustment 2 was adopted:

> The Technical Committee considered the idea of using a year other than 1998 as the basis for conservation equivalency in the summer flounder recreational fishery.  1998 has been used as the base year because it was the most recent year that coastline management measures were in place.  Chris Moore presented several options to consider for alternative base years.  These included average landings for various years from 1981 through 2000 and state landings for 1992.  It was decided that using the average landings for 1981-2000 was not appropriate because the earlier years in the fishery did not reflect it's current status.  State landings for 1992 were proposed as this was the year before

15

Amendment 2 went into effect, but again, 1992 landings do not reflect the current fishery.

(CAR 73; CSA 2, 9.)  Thus, the Technical Committee rejected using the nine-year-old 1992 data as a basis for allocation because it was too old to reflect the current fishery, which had been undergoing recovery efforts during the intervening years.  The Technical Committee recommended the continued use of the 1998 Allocations to reflect each state's fair share of the recreational fishery because that was the last year all the states were subject to the same set of uniform coastwide management measures.  (CSAR 2.)

In 2003 the fishery managers voted to formally adopt the status quo and add the 1998 Allocations to the FMP through Addendum VIII to the FMP.  In the discussion leading up to the Commission's Summer Flounder, Black Bass and Scup Management Board vote, Gordon Colvin, then DEC's Chief of Marine Resources, and a New York delegate to the Board, noted that New York's preference had been and remained coastwide management measures for summer flounder:

I would remind the board that New York did not support that, still doesn't, and would be happy to support a return to a single coast-wide recreational management regime.  I assume we're still in the minority, so I won't go any farther with it.

(CAR 23.)  However, in light of the majority support for conservation equivalency, Colvin ultimately supported Addendum VIII to streamline the annual process of developing conservation equivalency measures, noting the allocations could always be changed.  (CAR 25-29.)

[Adding the 1998 Allocations to the FMP] is intended to make this decision permanent so that we don't have to keep making it every year.  We always have the option of adopting another addendum to change it if we want to in the future.

(*Id.* at 29.)

16

As the summer flounder fishery changed after 2003, fishery managers' concerns prompted the Technical Committee to look at options concerning the summer flounder recreational allocation issue, in 2007.  (CAR 85.)  One of the options it looked at was revising the allocations based on different landings data than 1998.  Acknowledging that the 1998 landings data were no longer reflective of the current fishery, the Technical Committee recommended that:

> If the Board wants to implement a management strategy that is reflective of the current summer flounder fishing population . . . [it] should set coastline regulations for two or three years.  The TC would then use the catch and harvest data collected in that time period to determine coastwide shares.  This methodology would establish a new baseline.

(CAR 90.)

After its 2003 vote for Addendum VIII, New York's opposition to the state-by-state conservation measures based on the increasingly obsolete 1998 Allocations grew increasingly strong.  During the 2008 Rulemaking New York's representatives on the Management Board wrote:

> Since conservation equivalency replaced coastwide management, New York has developed opposition to this approach.  It has become increasingly apparent that an inequitable distribution of the fluke harvest has developed.  New York questions whether the 1998 data used to develop the original distribution is currently valid.  It appears that, as the fishery rebounds, the distribution of the fluke stock has changed, resulting in increased availability in northern areas.  Additionally, we believe angler effort and distribution has changed, being much higher in New York than ever before.  These factors alone require an updated approach with management of fluke. . . .

> The primary issue that must be addressed is allocation. . . .

17

(CAR 313.)[9]  New York is not alone in this view.  During the 2008 Rulemaking biologist David Simpson, then Outgoing Technical Committee Chair (and now Director of the Division of Marine Fisheries at the Connecticut Department of Environmental Protection),[10] deemed the continuing management of the recreational summer flounder fishery based on the obsolete 1998 Allocations "absurd."  (CAR 370.)

C.  Development of The 2008 Summer Flounder Management Measures

In August 2007, the Mid-Atlantic Council and the Board approved a coastwide TAL for summer flounder for 2008 of 15,770,000 pounds, the lowest TAL since those bodies began to set them. The 2008 coastwide recreational harvest limit, after adjusting for removal of a 3% research set-aside, was 6,215,800 pounds.  (FAR 366.)

On October 29, 2007, NMFS Assistant Regional Administrator For Fisheries Dr. William T. Hogarth wrote to Commission Chair George LaPointe, copying the Executive Directors of the Commission and Mid-Atlantic Council, in advance of the upcoming meetings of the Mid-Atlantic Council and Commission's Summer Flounder Management Board to decide on preferred 2008 recreational management measures.  Dr. Hogarth expressed his "concern" with the fishery managers' ability to control and prevent overfishing, given that the recreational fishery had exceeded the established recreational harvest limit in all but three years of the

_____

[9]  *See also* CAR 383: statement by New York Management Board representative Pat Augustine at the February 7, 2008 Management Board meeting noting that New York's representatives had vocally advocated coastwide for several years.

[10]  Simpson is identified in the record only by name, but not the position he held with respect to the Technical Committee at the time of this meeting.  New York adds this information as a matter of public record that was know to all involved in the 2008 Rulemaking.  Simpson's professional background and current position with the Connecticut Department of Environmental Protection are described on that agency's website at http://www.ct.gov/dep/cwp/view.asp?A=2711&Q=429078.

rebuilding program.  After observing that the most recent MRFSS data indicated that as of

August, 2007, all but two states had exceeded their 2007 targets, he noted the repeated failure of

conservation equivalency to meet the annual targets under the FMP, and encouraged

consideration of "new approaches," including coastwide limits and regional conservation

equivalency.

> Since 2001, the Mid-Atlantic Fishery Management Council (Council) and Atlantic States
> Marine Fisheries Commission's (Commission) Summer Flounder Management Board
> (Board) has recommended, and NOAA's National Marine Fisheries Service (NMFS) has
> implemented, state-by-state conservation equivalency to mange the summer flounder
> recreational fishery.  While the concept of allowing states to craft management measures
> designed to achieve the necessary recreational harvest reduction to be equivalent to
> Federal measures is both appealing and has strong merits, it has not served the rebuilding
> efforts well, as evident by the fact that the annually established management targets have
> been exceeded in most years.
>
> I urge you to consider new approaches for 2008 that will better ensure that the
> recreational targets will not be exceeded.  Regional conservation equivalency
> approaches; coastwide measures; and building more precaution into the analysis to
> mitigate uncertainty and to account for increases in fish size, angler participation, and
> fish availability due to stock increases are all examples of tools available to craft
> measures that have a higher likelihood of success in 2008.

(FAR 148.)

On November 15, 2007, the Summer Flounder Monitoring Committee, which consists of

representatives of the Mid-Atlantic Council, Commission, Northeast and South Atlantic

Fisheries Management Councils, the Northeast Regional Office of NMFS, and the Northeast and

Southeast Fisheries Center (FAR 592) met to "consider and recommend whether coastwide

measures or conservation equivalency (state-by-state or regional) [were] appropriate for 2008...."

(FAR 152-153.)  In advance of the meeting, Jessica Coakley, a Fishery Management Specialist

with the Mid-Atlantic Council who serves as Chair of its Summer Flounder Monitoring

Committee ("Monitoring Committe") recommended that the Commission and Mid-Atlantic

Council use coastwide measures, with regional conservation equivalency measures as the second option.  (FAR 152-153.)

Notwithstanding the Mid-Atlantic Council staff's recommendation, neither the Monitoring Committee nor the Advisory Panel reached consensus on whether to recommend coastwide or conservation equivalency measures to constrain landings to meet targets in 2008. (FAR 187.)[11]

On November 28, 2007, NMFS Northeast Regional Director Patricia Kurkul wrote to Mid-Atlantic Council Chairman W. Peter Jensen, copying the Mid-Atlantic Council and Commission Executive Directors, to express NMFS' concerns about the 2008 recreational measures under development.  After reciting the states' history of repeatedly exceeding their recreational harvest targets in the years since conservation equivalency had been used, Kurkul stressed the need to revisit the assumptions about "angler effort, anticipated stock size increases, fish availability, average weight of individual fish, and compliance with regulations" upon which the annual rules had been based.  (FAR 194.)  Kurkul criticized the Monitoring Committee for failing to "even provide a specific recommendation for the Mid-Atlantic Council to consider coastwide management measures or conservation equivalency, either regional or state-by-state based, in 2008."  She directed the Mid-Atlantic Council to "ensure that increasing recreational angler effort, anticipated stock size increases and resultant fish availability, angler noncompliance and the percent standard error around point estimates . . . are adequately compensated for, in order to increase the likelihood that 2008 measures will effectively constrain

_____

[11]  Also in attendance at the November 15, 2007 meeting was a panel of Summer Flounder Industry Advisors.  Although unable to reach consensus on whether coastwide or conservation equivalency measures should be utilized in 2008, the majority of the advisors favored either coastwide or regional conservation equivalency.  (FAR 200.)

harvest within the target." (FAR 195.) Kurkul then expressed her "support [for] the use of coastwide management measures as a means to ensure that the 2008 recreational fishery does not exceed its target." (FAR 196.)

In December, 2007, the Mid-Atlantic Council and the Board met to decide on summer flounder management measures. In advance of the meeting Kurkul advised Assistant Administrator for Fisheries Hogarth that she intended to "urge the Council and Board to adopt a set of coastwide measures that will ensure the necessary reduction in 2008 not exceed the recreation harvest limit," and alternatively would encourage regional, not state-by-state conservation equivalency over state-by-state conservation equivalency. (FAR 201.)

At the meeting Monitoring Committee Chair Coakley reiterated her recommendation that coastwide measures be adopted. (FAR 350, 357.) Among other reasons, Coakley based her recommendation on the fact that coastwide management measures would yield a new set of data for the whole coast that would be current and could be used in subsequent years to manage the fishery as it currently exists – echoing the Technical Committee's recent recommendation concerning how to update the state allocations if the Managing Board wished the management regime to be based on current conditions. (FAR 350.) Speaking as NMFS' representative, Kurkul stated that the agency "continue[d] to support the coastwide measures for all the reasons that the Monitoring Committee laid out, for all the reasons that we've laid out in our letters." (FAR 336.)

Notwithstanding Coakley and Kurkul's recommendations, the Mid-Atlantic Council and Board voted to adopt conservation equivalency. The Mid-Atlantic Council and Board made separate motions and voted separately. When the Mid-Atlantic Council voted, the tally was 11 in favor of conservation equivalency, and seven opposed, including New York. NMFS was the

one abstention.  (FAR 304.)  In the vote by the Board, New York, Delaware, Connecticut and

Rhode Island voted against conservation equivalency, and North Carolina, Virginia, Maryland,

New Jersey, Rhode Island, Massachusetts and the Potomac River Fisheries Commission voted

for conservation equivalency.  (FAR 304.)

Analysis of the administrative record shows that every state representative voted for the

option that would give his state the larger share of the recreational TAL.[12]

The motion in favor of conservation equivalency contained language requiring that the

conservation equivalency measures account for trends in increasing angling effort, increasing

stock size, and rates of compliance, and consider the percentage standard error in the estimates.

(FAR 361-62.)  Following the vote, the Board charged the Commission's Technical Committee

to analyze the issues covered in the motion to guide the states in developing their respective

management measures.  (FAR 376.)

In response to this charge, the Technical Committee developed additional guidance for

states to utilize in developing their conservation equivalency measures.  The Technical

Committee ultimately came up with the "performance-based reduction factor" (the "Performance

Factor") for each state based on its average overage during the years 2001-2007, which required

the states to design management measures intended to meet a landing target reduced by that

additional amount.  (*See* FAR 384-93; CAR 298-301.)  Under this approach, any state with an

overage in 2007 had to reduce its target based on that overage, as provided for in the FMP (the

---

[12]  Review of the information available to the members of the Council and Commission at
the time of the vote on coastwise versus conservation equivalency measures (FAR 261, 266,
269) demonstrates that each member voted in the role-call vote (FAR 304) for the option that
would result in his state getting a larger portion of the 2008 TAL than if he had voted the other
way.

"standard conservation equivalency reduction"), then additionally had to reduce its target allocation by its average overage for all the years since 2001 – a reduction not provided for in the FMP.  (FAR 392, 396; FAR 751.)  The Technical Committee did not reach consensus on using the Performance Factor, which, in addition to being extrinsic to the FMP (see FAR 1-147), has not been independently peer-reviewed, and was not adopted by the Commission through a formal vote.

The Technical Committee considered, but rejected, applying the factors NMFS  had asked be factored into the 2008 conservation equivalency measures – increasing recreational angler effort, anticipated stock size increases and resultant fish availability, angler noncompliance and the percent standard error around point estimates – notwithstanding that the motion pursuant to which conservation equivalency was chosen for 2008 required that these factors be applied.  (See FAR 384-93; FAR 647.)  The Technical Committee's analysis of state performance did not identify or account for the potential cause or causes of the past years' overages (see FAR 393), but simply calculated each state's performance-based reduction factor and directed states to design their measures accordingly.  (CAR 298-301.)

The states applied the standard reduction and then the new, performance-factor reduction to their allocation targets.  This resulted in targets reflecting the following *de facto* re-allocations: New Jersey, 41.36% (up from 39.09% of the TAL); New York, 12.94% (down from 17.63%); Virginia, 16.82 (up from 16.69%); Rhode Island, 5.77% (up from 5.66%); North Carolina, 6.2% (up from 5.60%); Massachusetts, 6.10% (up from 5.49%); Connecticut, 4.07% (up from 3.75%); Delaware, 3.45% (up from 3.14%); and Maryland, 6.10% (up from 2.95%).  (FAR 376-383; *see* CAR 70-76.)  The total coastwide recreational harvest target was reduced from 2,050,000 fish to 1,853,844 fish, and all of the states other than Massachusetts had their

23

individual harvest targets, expressed in number of fish, reduced to some extent.  (FAR 418.)

However, only New York was assigned a target upon which to base its size, bag and season

limits that represented a reduction from its 1998 Allocation percentage, from 17.63% of the TAL

to12.94%.  (CAR 301.)  The states then developed management measures designed to meet these

harvest targets.  (FAR 376-83.)  New York designed a suite of options designed to constrain its

harvest to 12.94% of the TAL.  (CAR 317.)

The Management Board required that each state submit its conservation equivalency

proposals to the Commission by late January 2008.  (FAR 376-83.)  The Technical Committee

then evaluated the proposals and advised the Board of each proposal's consistency with respect

to achieving the coastwide recreational harvest limit.  (*Id.*)  New York complied with the

Technical Committee's approach and submitted proposed recreational measures that would meet

its required reductions after application of the Performance Factor.  (FAR 378-79.)

The Board met on February 7, 2008, and approved the management proposals for each

state designed to meet its adjusted target.  Although submitting its proposed management

measures, New York's representatives on the Board spoke out against application of the

Performance Factor at this meeting.  (CAR 369-370.)  NMFS' representative, Kurkul, reiterated

that it was necessary and possible to apply the factors that the Technical Committee had looked

at and rejected – increasing recreational angler effort, anticipated stock size increases and

resultant fish availability, angler noncompliance and the percent standard error around point

estimates – and encouraged continued effort to integrate those factors into the 2008 management

measures.  (CAR 370.)  She reiterated NMFS' support for a return to coastwide measures, citing

in particular the Technical Committee's 2007 recommendation that a new set of data from

uniform regulations could be used to update the states' allocations to reflect the current fishery:

24

> [W]e continue to believe that it's both necessary and possible to apply the factors that the technical committee was asked to look at on a state-by-state basis and would like to encourage continued consideration of those factors over the next year as we move into setting measures for 2009.
>
> I also want to say that we agree with the technical committee's assessment that this would be perhaps a more effective system if we went with a coast-wide program versus the state-by-state management programs.

(CAR 370-71.)  Outgoing Technical Committee Chair David Simpson, also citing the

Committee's recommendation, reiterated his support for using coastwide over state-by-state

conservation equivalency measures.  Simpson deemed it "absurd" to continue a management

regime based on the obsolete 1998 Allocations.  (CAR 370-371.)

> I just wanted to say that this is exactly why I think the technical committee has encouraged coast-wide management or at least regional management because I think it's the subject of Amendment 15.  I lost track because of which is which, but the whole issue of what would you use for the for the basis of allocation when you look at times changing.  Right now with summer flounder, the allocation is based on one year to the states, 1998.  That was a decade ago.  And how do you incorporate things like changes in demographics within states, changes in population size within states, changes in availability of the resource as it grows?  And if you believe there are trends in climate and temperature, certainly it's viewed as fact among fishermen that fluke are moving north and east, and yet our allocations is based on a condition a decade ago.  So, the only way out I see from technical view is to get away from allocation on a very small spatial basis that is established on yesterday.  Ten years from now it will be even more absurd.

(CAR 370.)

By memorandum dated February 19, 2008, Kurkul advised NMFS Acting Assistant

Administrator Dr. James Balsiger, who had replaced Dr. Hogarth, as to the issues concerning

NMFS' soon-to-be-issued Proposed Rule for the Summer Flounder, Scup, and Black Sea Bass

Recreational Fisheries.  (FAR 644-48.)  With respect to summer flounder, among other issues,

Kurkul identified the Technical Committee's failure to "fully address the issues raised by Dr.

Hogarth, me, and the joint Mid-Atlantic Council and Commission motion to address the

effectiveness of analyzing recreational harvest measures." (FAR 647.)  She additionally noted that:

> The performance-based adjustment would have resulted in conservation equivalency effectively constraining harvest in most years, but would not have worked in 2007.  The TC's performance-based adjustment impacts NY more significantly than any other state; the director of NY's Department of Environmental Conservation has voiced strong opposition to continued use of conservation equivalency, favoring coastwide measures or regional equivalency programs instead.

(*Id.*)

However, Kurkul's memorandum nowhere mentioned to Dr. Balsiger that she and Dr. Balsiger's predecessor, Dr. Hogarth (as well as the Mid-Atlantic Council's Coakley and outgoing Technical Committee Chair) had consistently advocated a return to coastwide management measures for 2008, or the reasons for favoring coastwide – the repeated failure of state-by-state conservation equivalency measures to constrain landings to meet quotas, the scientific inadequacy of MRFSS as a basis for state-by-state regulation, and the fact that returning to coastwide would yield updated data to better manage the fishery in future years. (See FAR 644-48.)

By memorandum dated February 29, 2008, Kurkul requested Dr. Balsiger's concurrence that the following proposed management measures for summer flounder complied with the Magnuson-Stevens Act and other federal laws: (1) the preliminary conservation equivalency management measures submitted to the Board on February 7, 2008; (2) the NMFS coastwide management measures consisting of a 19-inch minimum fish size, 2-fish possession limit and season of May 23 - September 1 to be implemented if NMFS did not choose conservation equivalency; and (3) the Commission's precautionary default alternative consisting of a 20-inch minimum fish size, 2-fish possession limit, and season of July 4 - September 1 to be assigned by

the Commission to any state whose final conservation equivalency measures were not approved.
(FAR 699-706.)  Dr. Balsiger accepted her recommendation and signed the concurrence on
March 3, 2008, clearing the various management measures for publication in the Federal
Register.  (FAR 703.)  Kurkul's memorandum again failed to mention NMFS' initial, but
recently abandoned, support for coastwide management measures.  (FAR 703.)

On March 11, 2008, DEC Commissioner Pete Grannis sent NMFS' Acting Assistant
Administrator for Fisheries Balsiger a letter urging the agency to adopt coastwide management
measures for the federally regulated recreational summer flounder fishery for 2008.
Commissioner Grannis noted that the state-by-state conservation equivalency regime proposed
again for 2008 was scientifically flawed because it was based on the decade-old, obsolete 1998
allocations:

> In addition to being inherently unfair, the current allocation system is scientifically
> flawed.  As noted above, allocation continues to be based on a single year of data - data
> which is now ten years out of date. Consequently, the fishery is being managed using
> obsolete data regarding a fish population that is dramatically different that it was ten
> years ago.  All indications are that the distribution of the summer flounder stock has
> changed, resulting in increasing populations in northern areas including New York.
> Additionally, we believe angler effort and distribution have changed, being much higher
> in New York than ever before.  This assertion is supported by data collected as part of the
> . . . MRFSS, which shows that in 2007 New York had the most (36%) directed trips for
> summer flounder on the entire East Coast, New Jersey had 33% and the remainder (31%)
> was divided among the other seven states.  These significant changes in population
> distribution and angler effort are not reflected in the current conservation equivalency
> approach to management.

(FAR 707.)  Commissioner Grannis additionally pointed to the repeated failure of conservation
equivalent management measures to meet conservation goals:

> [T]here is growing recognition that conservation equivalency is seriously flawed and is
> not achieving necessary conservation goals.  For example, the Technical Committee's
> report to the ASMFC Summer Founder Management Board stated "Conservation
> equivalency measures failed unequivocally in 2007 as seven of nine states exceeded their
> targets resulting in a 32% coastwide overage."  In addition, representatives from the

NMFS Northeast Region have voiced their support for a coastwide management approach at recent meetings of the MAFMC and ASMFC.  Further, Regional Administrator Patricia Kurkul and former Deputy Administrator Dr. William Hogarth have publicly stated that conservation equivalency has not been effective and voiced support for a coastwide or regional approach to managing the summer flounder fishery.

(FAR 707-708.)

On March 21, 2008, NMFS published its "proposed rule [and] request for comments" on the "Recreational Management Measures for the Summer Flounder, Scup, and Black Sea Bass Fisheries; Fishing Year 2008."  73 Fed. Reg. 15111, No. 56 (March 21, 2008) (the "Proposed Rule").  (FAR 749-756.)  The Proposed Rule proposed the state-by-state conservation equivalency rules approved by the Commission for recreational summer flounder fishing in the EEZ or on federally permitted vessels, with the management measures for the state of landing applying.  These management  measures applied the Performance Factor, but otherwise did not integrate the factors that the Technical Committee Chair and NMFS's representative had deemed necessary to incorporate.  The Proposed Rule also included the above-described non-preferred coastwide management measures that NMFS would issue in the event it decided not to approve the proposed conservation equivalency measures in its Final Rule, and the precautionary default measures.

D.  <u>DEC Comments On NMFS' Proposed Rule</u>

NMFS received a number of written comments the Proposed Rule.  DEC submitted comments on April 18, 2008, urging NMFS to adopt and issue as final the non-preferred proposed coastwide management measures, and to reject the proposed conservation equivalency rules as violating the Magnuson-Stevens Act's National Standards.  DEC asserted, among other things, that the proposed conservation equivalency measures: (1) violated National Standard 2 in that they are not based on the best scientific information available; (2) violated National

28

Standard 4 by discriminating against New York residents; and (3) violated National Standard 6

by failing to take into account the current status of the fishery, including the size and age of the

population, and the recreational fishing effort that has evolved as the population has changed.

DEC additionally noted that the conservation equivalency approach, which has been utilized

since 1999, did not appear to be meeting the management objectives of the summer flounder

FMP, because of widespread and repeated overages.  DEC finally noted that NMFS was on the

record as agreeing with DEC that the coastwide approach was superior for several reasons that

had evaporated during the rulemaking process, without explanation.  (FAR 795-800.)

DEC made clear that it opposed NMFS' proposed conservation equivalency management

measures because they were based on state allocations that the best scientific information

available demonstrated to be obsolete:

> National Standard 2 requires that the conservation and management measures
> promulgated under Magnuson-Stevens be based on the best scientific information
> available.  Since 1999, when conservation equivalency was first used to set recreational
> summer flounder regulations, each state's allocation has been based on the share of the
> total (among all states) recreational harvest caught by that state's anglers in one year,
> 1998, the last year that everyone fished under the same coastwide regulations.  These
> data were far from perfect ten years ago.  They were based on a single year's fishing
> activity, at a time when the summer flounder population was just beginning to recover
> from overfishing and, therefore, in a far less "natural" state. [footnote omitted] . . . .

> Now, ten years later, those data are obsolete and fail to reflect current fish
> population data or angler effort.  In 1998, the summer flounder population biomass was
> much smaller than it is today, and the age and size structure of the population was
> truncated, with few fish older than age 3.  In recent years, fish age structure has expanded
> out to ages 8+, increasing the availability of larger fish, particularly in northern states.

> In addition to changes in the summer flounder population, there have also been
> considerable changes in the recreational fishery that harvests this resource.  The MRFSS
> shows that there were 24.7 million marine recreational fishing trips taken in the Southern
> New England-Mid Atlantic region in 1998; in 2006, there were 36.5 million trips, an
> increase in effort of almost 48%.  Consequently, the proposed conservation equivalency
> approach manages the summer flounder resource with obsolete data regarding a fish
> population and fishery that are dramatically different than they were ten years ago.

29

      All indications are that the distribution of the summer flounder stock has changed, resulting in increasing populations in northern areas, including New York.  Additionally, we believe angler effort and distribution have changed, being much higher in New York than in previous years. This assertion is supported by data collected as part of the MRFSS, which shows that in 2007 New York had the most (36%) directed trips for summer flounder on the entire East Coast, New Jersey had 33% of the directed summer flounder trips and the remainder (31%) was divided among the other seven states.  New Jersey's annual summer flounder allocation, however is over 39% of the total, more than twice that of New York (17.63%) or any other state.  The current state allocations, therefore, are not supported by current fish population data or angler effort data.  In short, a greater number of recreational fishermen are pursuing more large summer flounder from a very different population today in New York waters than in 1998, when New York's allocation was locked in.

(FAR 795-97.)  DEC then pointed out how managing the recreational summer flounder fishery

based on its obsolete 1998 Allocation unfairly discriminated against New York-based anglers:

      The scientific flaws in relying on one year of stale data are compounded by the "performance factor" approach developed by the Commission's Summer Flounder Technical Committee as a means of applying a precautionary buffer to this year's summer flounder management measures.  The Department fully supports the concept of a precautionary buffer, but the so-called "performance factor" relies so heavily on controlling effort in one state (New York) that it is rendered ineffective at providing a true precautionary buffer along the coast.. . .

      The application of the "performance factor" unfairly penalizes New York for past overages when the actual reasons for those overages are unknown.  Like relying on one year of stale data, this performance factor does not take into account "increasing recreational angler effort, anticipated stock size increases and resultant fish availability, angler noncompliance and the percent standard error around point estimates," as you yourself directed the Council to do in your November 26, 2007 letter.  The "performance factor" simply multiplies whatever flaws have, over the years, rendered conservation equivalency more and more remote from the available science.

*   *   *

      National Standard 4 requires that conservation and management measures not discriminate between residents of different states.  Yet, the proposed conservation equivalency approach clearly discriminates against New York residents.  This approach results in some states receiving much higher allocations than others, even though such higher allocations are not supported by current fish population data or angler effort.  As noted above, based on the 1998 data New Jersey has locked in over 39% of the total summer flounder allocation for the last nine years, whereas New York has been limited to less than 18%, even as New York's percentage of the catch and summer flounder fishing effort has been increasing.  In addition, the Commission's "performance factor"

30

punishes New York for prior quota overages that are attributable not to any form of cheating, but to the rebound and natural changes to the summer flounder population.  It greatly compounds this unfair and discriminatory treatment under the currently proposed conservation equivalency measures, and would result in a 64% overall reduction from last year to New York's share of the NMFS quota.  In contrast, New Jersey, which already has a disproportionately high proportion of the coastal total, would see its *relative* proportion of the quota *increase* from 39% to 41% because of the application of the "performance factor."

(FAR 797-800.)

E.      Reversing Its Earlier Support For Coastwide Regulation, NMFS Issues The Final Rule Adopting The Commission's State-By State Conservation Equivalency Measures For The EEZ and Federally Permitted Vessels

On May 23, 2008, NMFS finalized the proposed conservation equivalency rules for the recreational summer flounder fishery and published the 2008 Rule.  (FAR 1546-56.)  Under the Rule, recreational summer flounder anglers fishing on vessels in the EEZ or vessels holding a federal fisheries permit were subject to the conservation equivalency management measures of the state of landing.  The state-by-state management measures (absent exceptions for certain bays in Maryland and North Carolina) were:

| State | Inches | Possession | Season |
|-------|--------|------------|--------|
| MA | 17.5 | 5 | June 10 through August 15 |
| RI | 20.0 | 7 | January 1 through December 31 |
| CT | 19.5 | 5 | May 24 through September 1 |
| NY | 20.5 | 4 | May 15 through September 1 |
| NJ | 18.0 | 8 | May 24 through September 7 |
| DE | 19.5 | 4 | January 1 through December 31 |
| MD | 17.5 | 3 | January 1 through December 31 |
| VA | 19.0 | 5 | January 1 through July 20 and July 31 through December 31 |
| NC | 15.5 | 8 | January 1 through December 31 |

*Id.* at 1547.  By issuing the Rule, NMFS endorsed the 2008 conservation equivalency rules based on the 1998 Allocations as consistent with the Magnuson-Stevens Act and capable of achieving the FMP's conservation objectives.  (*Id.* at 1551.)

The Rule included NMFS' responses to comments by DEC and others on the Draft Rule.  (*Id.* at 29992-97.)  Nowhere in the responses did NMFS question DEC's assertion that the fishery had changed substantially since 1998, with a northward shift in summer flounder stock distribution and an increase in the percentage of the stock's biomass in New York waters.  (*See id.* at 1550.)  Nor did NMFS dispute DEC's central assertion that the 1998 Allocations were based on scientifically obsolete data, and therefore the entire conservation equivalency scheme could not be based on the best scientific information available.  NMFS merely stated that the Commission remained free to revise the allocations independent of the Mid-Atlantic Council or NMFS, and noted that "the intent of 1998 as the base allocation year was to perpetuate the existing fishing practices in place prior to the onset of regulations which substantially modified the recreational fishery" *id.* at 1549.  NMFS thus acknowledged that since 1998 the summer flounder fishery had been "substantially modified."  This latter statement also seemed to endorse perpetually managing the fishery based on conditions of a fishery that no longer existed, notwithstanding that National Standard 2 mandates management based on the best scientific information available and National Standard 6 directs NMFS to "take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches."  16 U.S.C. § 1851(a)(6).

Additional discussion of NMFS' responses to comments in the Final Rule is included below.

32

F.  <u>Procedural History Of This Action</u>

New York filed its complaint against the Secretary of Commerce, NOAA, NMFS and their respective chief administrators on June 23, 2008, then an amended complaint correcting the caption on July 15, 2009.  The suit, brought in New York's capacity as a sovereign and body politic owner of fishery resources in the State of New York, as well as *parens patriae* on behalf of aggrieved New York citizens, alleged that in issuing the 2008 Rule defendants violated: (1) Magnuson-Stevens Act National Standard 2, by failing to use the best available science; (2) Magnuson-Stevens Act National Standard 4 in that it discriminated against New York's fishermen, with the discriminatory treatment being unnecessary to and not rationally related to the conservation and recovery of the summer flounder stock; (3) Magnuson-Stevens Act National Standard 6 because defendants did not take into account and allow for variations among, and contingencies in, the summer flounder fishery; and (4) the Administrative Procedure Act in that during the rulemaking process, NMFS's representative advocated the use of coastwide management measures as superior to conservation equivalency in achieving the Summer Flounder FMP's conservation goals, but subsequently reversed this position with no explanation for this change.[13]  Plaintiffs sought a declaration that any state-by-state conservation equivalency management measures for the recreational summer flounder fishery that are based on the 1998 Allocations violate the Magnuson-Stevens Act, and an order vacating the conservation equivalency measures for summer flounder in the 2008 Rule, to be replaced by the alternate coastwide measures set forth in the Rule.

---

[13]  Plaintiffs are not moving on this claim and will no longer proceed with it.

On July 16, 2008, intervenor-defendants United Boatmen of New York, Inc., a professional trade organization representing the for-hire fishing vessel industry in the New York Marine District, the New York Fishing Tackle Trade Association, a professional trade organization representing the wholesale and retail bait and tackle dealer industry in New York, and the Fishermen's Conservation Association, a non-profit public interest organization whose membership is comprised of individual recreational anglers throughout the New York Marine District, moved to intervene for the purposes of joining the Commission as a defendant.  In addition to mirroring plaintiffs' claims against the Federal Defendants and asserting an additional claim, intervenor-plaintiffs' proposed complaint asserted claims against the Commission for violations of the ASMFC Compact, the Fisheries Act, the ISFMP Charter, and the APA.

The Federal Defendants filed their answer and record on September 15, 2008.

By order dated November 19, 2008, the Court granted intervenor-plaintiffs' motion to intervene, but allowed intervenor-defendant Commission to move to dismiss.  On December 19, 2008, intervenor-plaintiffs filed their Complaint in Intervention, and on January 2, 2009 the Commission moved to dismiss, on grounds that intervenor-plaintiffs have no private right of action against it.  By order dated March 9, 2009, the Court denied the motion to dismiss.  The Commission filed its answer and record on March 31, 2009.

On March 16, 2009, the Commission moved for reconsideration or, alternatively, certification of the issues for an interlocutory appeal to the Second Circuit.  By order dated April 7, 2009, the Court denied reconsideration, but certified for interlocutory appeal the question of whether "defendant ASFMC is not entitled to the defense of sovereign immunity."  On April 16, 2009 the Commission filed its petition with the Second Circuit.  On or around June 10, 2009, the Second Circuit granted the Commission's petition.

34

On March 3, 2009, 2009, the United Boatmen filed a motion for a preliminary injunction enjoining implementation of the conservation equivalency measures being developed for the New York, and possibly federally regulated vessels landing in New York, for the 2009 season. The United Boatmen sought continuation of the New York 2008 conservation equivalency measures.  By its April 30, 2009 PI Order the Court denied the motion, noting that under the 2008 New York management measures (which the Commission and NMFS approved), New York had a 33% overage.  Keeping those measures in place would therefore undermine the entire 2009 conservation equivalency scheme, including the goal of meeting the overall coastal TAL target.  PI Order, p. 18.

G.  The Rulemaking For The 2009 Recreational Summer flounder Management Measures

On April 1, 2009, the Federal Defendants, through NMFS, published the "Proposed Recreational Management Measures for the Summer Flounder, Scup, and Black Sea Bass Fisheries; Fishing Year 2009."  74 Fed. Reg. 14760, No. 61 (April 1, 2009) (the "2009 Rule").[14] (As noted above, as of the date this motion this rule has not been finalized, but New York has no reason to believe that the final rules will differ in any material way from the proposed rule.) Although noting that under the 2008 state-by-state conservation equivalency regime recreational landing exceeded the TAL by approximately 31%, with six of the nine states in the fishery exceeding their targets by overages as high as 105%, NMFS once again rejected coastwide management measures.  NMFS proposed for federal waters and federally permitted vessels the state-by-state-conservation equivalent management measures previously approved by the

---

[14]  NMFS' proposed 2009 management measures are not part of the administrative record of the 2008 actions that are being challenged in this action.  New York is including them in its statement of facts not for their relevance to NMFS' issuance of the 2008 Rule, but because of their relevance to the relief New York seeks should it prevail on its challenge to the 2008 Rule.

Commission for state waters in 2009.  *Id.* at 14762.  As required under the FMP, NMFS also proposed default management measures and a non-preferred alternative of coastwide measures recommended by the Council and Board, consisting of a 20 inch minimum size, a two fish possession limit, and a season of May 1 to September 30, 2009.  *Id.*

ARGUMENT

I.

STANDARDS GOVERNING THIS MOTION

"Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review."  *Blue Ocean Institute v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008). Consequently challenges to NMFS' regulations under the Magnuson-Stevens Act are typically decided through motions for summary judgment based on the administrative record.  *See Alaska Factory Trawler Association v. Baldridge*, 831 F.2d 1456 (9th Cir. 1987); *North Carolina Fisheries Association, Inc. v. Gutierrez*, 518 F. Supp.2d 62,79 (D.D.C. 2007); *United Boatmen v. Gutierrez*, 429 F. Supp. 2d 543,584 (E.D.N.Y. 2006).  However, in a case such as this involving review of a final agency action under the standards of the Administrative Procedure Act ("APA"), the typical *Rule 56(c)* standard does not apply.  Rather, "[s]ummary judgment ... serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *North Carolina Fisheries Association,* 518 F. Supp.2d at 79.

The Court's description of the APA standard in the PI Order will not be repeated at length here.  As this Court noted, the standard is one of broad deference to the agency, especially "'where the agency's particular technical expertise is involved, as is the case in fishery

36

management'."  However, "courts may not accept . . . counsel's *post hoc* rationalizations for

agency action.  It is well established that an agency's action must be upheld, if at all, on the basis

articulated by the agency itself."  PI Order at 29, 2009 U.S. Dist. LEXIS 37091 *37. (citations

omitted).  Courts must still "conduct 'a thorough, probing, in-depth review,'and may not 'stand

aside and rubberstamp their affirmance of administrative decisions that they deem inconsistent

with a statutory mandate or that frustrate the congressional policy underlying a statute.'"  PI

Order at 28-30, 2009 U.S. Dist. LEXIS 37091 *38 (citations omitted).

Review of the administrative record demonstrates that in promulgating the 2008 Rule, the

Federal Defendants failed to examine data relevant to their adoption of conservation equivalency

based on the obsolete 1998 Allocations under the Magnuson-Stevens Act, failed to consider

important aspects of that data, failed to consider evidence placed before them, and/or failed to

articulate a satisfactory explanation for their actions.

II.

THE FEDERAL DEFENDANTS VIOLATED THE<br>MAGNUSON-STEVENS ACT IN ISSUING THE 2008 RULE

Under the Magnuson-Stevens Act, an FMP, and any regulation promulgated to

implement an FMP, must be consistent with ten national standards specified at 16 U.S.C. §1851.

Reflecting the Act's goal of maximizing use of our marine resources to the extent consistent with

keeping our fisheries healthy and sustainable, National Standard 1 provides that "[c]onservation

and management measures shall prevent overfishing while achieving, on a continuing basis, the

optimum yield from each fishery for the United States fishing industry."  16 U.S.C. §1851(a)(1).

New York alleges interrelated violations of National Standards 2, 4 and 6, discussed below.

37

Even under the broad deference afforded under the Administrative Procedure Act, the administrative record demonstrates that in approving the state-by-state conservation equivalency management measures for 2008 the Federal Defendants violated these National Standards.

A.   The 2008 Rule Was Based On The 1998 Allocations That Undisputed Changes To The Fishery Had Rendered Obsolete, And Was Therefore Not Based On The Best Scientific <u>Information Available, Violating National Standard 2</u>

National Standard 2 provides that "[c]onservation and management measures shall be based upon the best scientific information available."  16 U.S.C. § 1851(a)(2).  As this Court noted in the PI Order:

> Neither the Magnuson-Stevens Act nor the ACFMCA defines the term "best scientific information available," and accordingly, because the relevant statutes are silent on the issue, I must ultimately determine whether defendants' interpretation of that standard was reasonable. The Second Circuit has not offered any guidance on what may reasonably be construed as the best scientific information available in the Magnuson-Stevens Act and ACFCMA context.  However, court decisions from other jurisdictions and federal regulations are of some help. Under the national standard guidelines articulated in the Code of Federal Regulations, "[s]cientific information includes, but is not limited to, information of a biological, ecological, economic or social nature." *See Ocean Conservancy v. Evans, 260 F. Supp. 2d 1162, 1181 (M.D. Fla. 2003)* (quoting *50 C.F.R. § 600.315(b)(1)*). In addition, "[i]f there are conflicting facts or opinions relevant to a particular point, a Council may choose among them, but should justify the choice." *50 C.F.R. § 600.315(b)(1).* Further, "[t]he fact that scientific information concerning a fishery is incomplete does not prevent the preparation and implementation of an FMP." *50 C.F.R. § 600.315(b).* "By specifying that decisions be based on the best scientific information *available*, the Magnuson-Stevens  Act recognizes that such information may not be exact or totally complete." *Midwater Trawlers Coop. v. Dep't of Commerce, 393 F.3d 994, 1003 (9th Cir. 2004)* (emphasis in original).

PI Order at 32-33, 2009 U.S. Dist. LEXIS 37091 *40-42.

In the PI Order this Court held that the United Boatmen had failed to demonstrate a substantial likelihood of success on their claim that defendants failed to use the best scientific information available in issuing the 2008 Rule.  The claim by the United Boatmen that the Court found insufficient contended that the NAS/NRC Report represented the best science available,

and its conclusions precluded use of MRFSS for state level fishery management.  *Id.* at 38-40,

2009 U.S. Dist. LEXIS 37091 *50-52.[15]

New York's argument that the Federal Defendants ignored the best scientific information

available is different.  The best available information of a biological, ecological, economic or

social nature demonstrates that since 1998, or 2003, when the 1998 Allocations were added to

the FMP, the summer flounder fishery has changed substantially.  The administrative record

reflects no dispute that the summer flounder population has shifted significantly to the north,

increasing the percentage of the stock's biomass in New York waters.  There are more and larger

summer flounder in New York waters.  There are more recreational anglers pursuing summer

flounder in New York waters. *See above* at pp. 12-15.   These undisputed changes to the fishery

have rendered New York's allocation increasingly obsolete and too small to reflect its fair share.

The comment responses NMFS published with the 2008 Rule did not address, let alone

take issue with this science, which was detailed in DEC's comment letter.  (*See* FAR 1548-52.)

---

[15]   The Court summarized the National Standard 2 argument advanced by the United Boatmen as follows:

> [I]ntervenor-plaintiffs contend that the NAS/NRC report, which the NOAA commissioned to explore the weaknesses of the MRFSS data, is the "best scientific information available" with regard to the use of MRFSS data in crafting summer flounder FMPs -- and that because the NAS/NRC report allegedly concludes that the MRFSS data do not support state-by-state conservation equivalency regulations, defendants are in violation of the "best scientific information available" standard.

*Id.* at 31, 2009, U.S. Dist. LEXIS 37091 *39.  The Court acknowledged that MRFSS is universally considered a flawed management tool.  However, it concluded that the criticisms in the NAS/NRC Report did not foreclose the use of state-by-state conservation measures based on MRFSS data under National Standard 2, and that the defendants had sufficiently addressed the concerns about MRFSS' accuracy during the 2008 Rulemaking.  *Id.* at 38-40, 2009, U.S. Dist. LEXIS 37091 *50-52.

NMFS addressed compliance with National Standard 2 in its responses to Comments 1 and 3. The response to Comment 1 addressed the criticism that the NAS/NRC Report now constituted the best scientific information available on the use of MRFSS in fishery management, and that information precluded state-level regulation based on MRFSS.  This response did not address the obsolescence of New York's 1998 Allocation.  (FAR 1548.)  NMFS' response to Comment 3 addressed the allocation issue primarily in the context of the charge that use of the 1998 Allocations discriminated against New York in violation of National Standard 4, although NMFS did mention National Standard 2 at the end.  (FAR 1549.)   Nothing in this response addressed or took issue with New York's straightforward assertion that the best scientific information available demonstrated that its allocation is obsolete.  (*Id.*)   The response merely described the process of how conservation equivalency was chosen under the FMP for 2008, and asserted that the 1998 was originally chosen as the baseline because it was the last year the whole coast was fishing under the same regulations, and the purported "intent of 1998 as the base allocation year was to perpetuate the existing fishing practices in place prior to the onset of regulations which substantially modified the recreational fishery."  (*Id.*)

In the context of National Standard 2 this statement is interesting, because it provides still more affirmation that the summery flounder fishery had been "substantially modified" since the 1998 baseline year.  But more to the point, from the standpoint of the scientific rigor, fairness and flexibility demanded by the Magnuson-Stevens Act, it would make no sense to freeze the state allocations for all time no matter how a fishery composed of migratory fish changes.  *See Massachusetts v. Daley*, 170 F.3d 23, 30 (1ˢᵗ Cir. 1999) (under National Standard 2 state-by-state quotas must be based on "the best data <u>currently</u> available" [emphasis added]).  Moreover, the documentation in the administrative record that was part of the actual process through which

1998 was selected, which does indeed state that 1998 was selected because it was the last year that all states were fishing under one set of coastwide rules, does not support the idea that the 1998 landings were to perpetually dictate how the fishery would be allocated. For example, the Technical Committee report dated October 24, 2001 describing the process simply noted that "1998 has been used as the baseline year because it was the most recent year that coastwide management measures were in place." (CAR 73.)

NMFS' response also seemed to disown any responsibility for assuring that the state allocations driving the conservation equivalency regime – which it had just adopted and issued as a federal regulation – were based on the best scientific information available: "[T]he Commission is at liberty to revise or amend these allocation percentages independently of the Council and/or NMFS as specific state recreational fishery percent allocations are not specified in the Federal regulations that implement the conservation equivalency program." (*Id.*)

NMFS may be correct that the Commission determines the state allocations, but that is besides the point. NMFS is obligated under the Magnuson-Stevens Act not to approve and issue management measures that violate the National Standards. NMFS had a choice for 2008: either issue the set of coastwide management measures it had vetted and approved as the non-preferred alternative, or adopt the Commission-approved state-by-state conservation equivalency measures. But before it could adopt the Commission's management measures NMFS was legally bound to determine they complied with the Magnuson-Stevens Act. Perhaps NMFS could not itself change the 1998 Allocations (although it does have influence and a vote on the Management Board). But it did not have to accept a management regime based on the 1998 Allocations if the allocations did not reflect the best scientific information available. And the administrative record here shows that the 1998 Allocations that were the basis for management

41

measures NMFS adopted were not based on the best scientific information available.  Nowhere

in the record of the 2008 Rulemaking did NMFS refute or even address the evidence placed

before it by New York demonstrating that its 1998 Allocation is scientifically obsolete and too

low to reflect its fair share of the current summer flounder fishery.  NMFS offered no

explanation as to why it was ignoring that evidence and adopting a management regime based on

the 1998 Allocations.  Moreover, as the federal agency responsible for overseeing the nation's

marine fisheries, NMFS bears particular responsibility to uphold the principles on which the

Magnuson-Stevens Act and ACFCMA are based.

In issuing the 2008 Rule based on the undisputably obsolete 1998 Allocations, NMFS

violated National Standard 2.[16]

B.      The 2008 Rule Discriminated Against Summer Flounder
        Anglers Based In New York, In Violation Of NS 4

The 2008 Rule was based on New York scientifically obsolete 1998 Allocation, which

was too low to reflect its fair share of what NMFS itself conceded to be a "substantially

modified" summer flounder fishery.  This flaw was compounded by application of the

Performance Factor, which further decreased the harvest target that New York's 2008

management measures were intended to meet, based on past overages that had occurred while

the fishery changed but New York's 1998 Allocation did not.  (See above at pp. 23-24, 30-31.)

The limits New York was constrained to develop under the conservation equivalency regime that

_____

[16]  In its PI Order the Court did not directly address New York's National Standard 2
claim against NMFS.  It did, however, address the propriety of using the 1998 Allocations in the
context of the United Boatmen's claim that the 2008 Rule discriminated against New York
anglers in violation of National Standard 4.  The Court's analysis will be discussed below in
connection with New York's National Standard 4 discrimination claim.

it unsuccessfully opposed were the most stringent in the history of the fishery.  They were far more stringent than those of the neighboring states who were essentially pursuing the same fish. Party boats based in New York were placed at a distinct competitive disadvantage to boats based in neighboring states, particularly New Jersey, and all New York-based anglers fishing in New York or adjacent federal waters had to meet longer size limits and could keep fewer summer flounder than anglers based in any of the neighboring states of New Jersey, Connecticut and Rhode Island.  (FAR 1547.)

In issuing the 2008 Rule the Federal Defendants extended this disparate treatment based on state of landing to the EEZ, and endorsed this management regime as complying with National Standard 4.

National Standard 4 provides that:

Conservation and management measures shall not discriminate between residents of different States.  If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

16 U.S.C. § 1851(a)(4).

The 2008 conservation equivalent management measures endorsed and adopted in the 2008 Rule clearly treated recreational summer flounder anglers based in different states in dramatically different ways.  As noted above, in 2008 an angler sailing out of Brooklyn for a day of summer flounder fishing in the EEZ between New York and New Jersey could keep only four fish, which had to be 20.5 inches.  A fisherman on the boat 50 feet away who had sailed from New Jersey could keep eight 18 inch fish.  The question under National Standard 4 is thus whether the discriminatory treatment of New York-based anglers was justified as "reasonably

calculated to promote conservation." *See Massachusetts v. Daley*, 170 F.3d at 30 (state-by-state

quotas permissible under National Standard 4 "if shown to be necessary to meet the main

conservation goal...")

The Court addressed this issue in the PI Order in finding that the United Boatmen had

failed to demonstrate a likelihood of success on their claim against the Federal Defendants that

the 2008 Rule's conservation equivalent management measures discriminated against New

York-based anglers in violation of National Standard 4.  New York, which did not file papers on

that motion,[17] respectfully disagrees with the Court's findings on this issue, particularly with

respect to whether the discriminatory treatment afforded summer flounder anglers based in New

York was reasonably calculated to further a legitimate conservation purpose.

In finding the United Boatmen's discrimination claim unlikely to succeed, the Court

noted that inclusion of the 1998 baseline allocations to the FMP in 2003 was the product of

extensive research and debate, and "in fact, New York delegates to the ACFCMA supported the

use of 1998 as the baseline year."  The "Technical Committee and the Management Board

reevaluated the use of 1998 as the proxy year as recently as 2007 and 2008, and decided to retain

the use of 1998 as the proxy year.  Kearns Decl. P 19."[18]  "The justification advanced for

selection of 1998 as the baseline year is that it provides a measure of flounder harvest at the most

recent time when all states were subject to uniform regulations, since an approach based on more

recent catch data could effectively punish states that have done the most to promote

---

[17]  New York only has claims against the Federal Defendants, and preliminary injunctive
relief is unavailable under the Magnuson-Stevens Act.

[18]  The declaration of the Commission's Toni Kerns, executed March 31, 2009, is not part
of the administrative record and its content cannot be considered in assessing the propriety of the
Federal Defendants' earlier actions that are the subject of New York's challenge.

conservation.  *See* CAR at 73; FAR at 1549."  In addition, the Court asserted that "in light of National Standard 4's parallel requirement that necessary allocations must be 'reasonably calculated to promote conservation,' an argument exists that using a different baseline year would not result in fair and equitable treatment of fishermen residing in states having engaged in the most vigorous conservation efforts."  PI Order at 42, 2009 U.S. Dist. LEXIS 37091 *55.

The Court's analysis overlooked several critical factors.  First, the record shows that at the time of the 2003 vote New York supported coastwide management measures.  However, since the majority of states preferred state-by-state conservation equivalency, its delegates voted to add the 1998 Allocations to the FMP to streamline the annual process if the majority of the Management Board voted for state-by-state conservation measures.  (CAR 23, 25-29.)  At the time of the vote, the New York delegate with the DEC noted that the allocations could always be changed.  (CAR 313, 383.)  New York has more recently pressed its support for a return to coastwide management measures as it has become increasingly apparent that its 1998 Allocation is too low to reflect its fair share of the summer flounder fishery based on the best scientific information available.  (CAR 313, 383.)

The administrative record further shows that the 1998 Allocations were indeed reevaluated in 2007.  However, that review resulted in a recommendation by the Technical Committee –"[i]f the Board intends to implement a management strategy that is reflective of the current summer flounder fishing population" – that the fishery again be managed on a coastwide basis so that the allocations could be updated based on current data.  (CAR 90.)  Thus, while the Court was correct that the issue was reevaluated, the record shows that the most pertinent

resulting recommendation by neutral fishery scientists supported a return to coastwide

regulations because the 1998 Allocations were based on a fishery that no longer exists.[19]

NMFS' representative in the 2008 Rulemaking, Regional Administrator Kurkul, did not

directly speak to the issue of whether the 1998 Allocations should be updated.  (*See, generally,*

FAR 294-353.)  However, she did direct the Technical Committee that the 2008 conservation

equivalency measures should account for trends in increasing angling effort and stock size –

both trends central to why New York's 1998 Allocation had become obsolete.  (FAR 90.)  The

Technical Committee ultimately declined to factor either trend into its recommendations.  (See

FAR 647, 800.)

The Court also made the point that changing the baseline year might be considered unfair

to the fishermen residing in states having engaged in the "most vigorous conservation efforts."

PI Order at 42, 2009 U.S. Dist. LEXIS 37091 *55.  Absent from this point is the fact that each

and every summer flounder management measure developed by New York or any other state

was approved by both the Commission and NMFS, after those bodies concluded the measures

were appropriately designed to meet landings targets.  In each case NMFS formally adopted

New York's management measures and issued them as federal regulations.  There is nothing in

the record indicating that New York's overages resulted from lax regulating or shirking of

conservation responsibilities, and nothing indicating that it would further any reasonable

conservation purpose to punish New York for exceeding landings targets.  Indeed, since 2004

---

[19]  Later during the meeting, Monitoring Committee Chair Coakley similarly
recommended a return to coastwide measures to establish a new baseline so that the obsolete
1998 Allocations could be updated.  She additionally based her recommendation on the problems
with relying on MRFSS to regulate at the state level identified in the NAS/NRC Report.  (FAR
350.)

New York has issued the most stringent limits of any state in the recreational summer flounder

fishery for every year.  (*See* FAR 1266, 1374-76.)  And, in 2007 New York took the

unprecedented and controversial step of closing its recreational summer flounder fishery before

the scheduled end of the season when it appeared recreational harvest in the state was on the way

to exceeding its quota.  (FAR 708.)  Nothing in the record supports consigning New York's

anglers to second class status, burdened by more stringent regulations, because its allocation of

the fishery that has become too small to reflect its fair share based on current scientific reality.

To the extent the record provides any explanation for New York's overages, it is that they

resulted from inflexible management of a substantially changed fishery based on obsolete

science.  Imposing far more stringent size and possession limits on New Yorkers than on anglers

based in neighboring states, particularly New Jersey, who in many instances then literally

pursued the same fish, was discriminatory and served no reasonable conservation purpose.

Finally, in its published Comment Response to New York's claim of discrimination in

violation of National Standard 4, NMFS also asserted that different limits for different state

waters or vessels landing in different states could not be discriminatory because "[f]ishery

participants are free to participate in multiple states, land in adjacent states, etc., and are not

discriminated against based on their state of residence."  (FAR 1549.)  This response is

unreasonable and ignores reality.  NMFS' own data in the record indicating that recreational

anglers are strongly motivated in their choices of where to fish by "convenience."  The

environmental assessment 2008 summer flounder recreational specifications prepared by

the Council "in cooperation with NMFS" stated:  "'Convenience' and 'better catch rates' ... [are]

main reasons why anglers chose fishing sites. . . .  Forty-nine percent of the anglers in New

England and 57% of the anglers in the Mid-Atlantic Region indicated 'convenience' as either a

47

first or second reason for site choice." (FAR 458-59.)   The many Long Islanders who engage in recreational summer flounder fishing from private boats face a radically different, less convenient, and far more expensive experience if they want to take advantage of more relaxed limits in other states, as opposed to jumping on their own or a friend's boat, traveling a few miles, then bringing their catch home to prepare in their home kitchens.   Charter and party boats based in New York cannot simply go fish and land their clientele in New Jersey, Connecticut or Rhode Island (although in some cases, such as New York City residents, their clientele faces fewer constraints to doing so, putting them at a huge competitive disadvantage).

In developing and issuing the 2008 Rule, NMFS had a choice: state-by-state conservation equivalency or one set of coastwide measures.  The proposed coastwide measures treated all states equally, were designed to be more conservative than the suite of conservation equivalency measures, and were originally favored by NMFS based on concerns that were never addressed during the Rulemaking.  The proposed conservation equivalency measures unfairly singled out New York anglers for the most restrictive measures in the history of the fishery.  Nothing in the record shows any legitimate conservation-based reason to impose far more stringent limits on its summer flounder anglers than those of neighboring states pursuing essentially the same fish.  In issuing the 2008 Rule, the record shows that NMFS failed to consider record evidence demonstrating that the singularly stringent management measures New York was constrained to design were in no way necessary to effectuate the summer flounder recovery effort, and failed to articulate a satisfactory explanation why treating New York-based anglers in this discriminatory manner was reasonably calculated to promote conservation.[20]  For all of these reasons, the

---

[20]  New York's action does not seek to increase the recreational summer flounder TAL for the fishery.  New York is not trying to increase the size of the "pie."  It seeks a new division

administrative record demonstrates that the Federal Defendants violated National Standard 4 in

issuing the 2008 Rule for the EEZ and federally permitted vessels.

C.   In Issuing the 2008 Rule Based On The Scientifically Obsolete 1998 State Allocations, The Federal Defendants Violated National Standard 6 By Failing To Take Into Account and Allow for Variations Among, and Contingencies In the Summer Flounder Fishery

National Standard 6 provides that "[c]onservation and management measures shall take

into account and allow for variations among, and contingencies in, fisheries, fishery resources,

and catches." 16 U.S.C. § 1851(a)(6). Consistent with its broad language, the few cases that

have addressed this standard have interpreted it as a general mandate to apply flexibility to

fishery regulations and management plans so that new, relevant information can be timely

integrated. As the District of Rhode Island wrote in *Ace Lobster Co., Inc. v. Evans,* 165 F.

Supp.2d 148 (D.R.I. 2001):

> Whatever standard 6 requires was best articulated in the *J.H. Miles* case:
>
>> National Standard 6, on its face, dictates flexibility on the part of fishery managers. It suggests that the Secretary and his designees must be prepared to address uncertainties or changes that might arise. As the implementing regulations state, the "regime chosen must be flexible enough to allow timely response to resource, industry and other national and regional needs."

165 F. Supp. 2d at 181-82 (*citing J.H. Miles & Co., Inc. v. Brown*, 910 F. Supp. 1138, 1155

(E.D. Va. 1995).

The state-by-state conservation equivalency management measures issued by the Federal

Defendants through the 2008 Rule for the EEZ and federally permitted vessels violated National

Standard 6 because they were based on the obsolete 1998 Allocations which did not take into

account the substantial variations that have occurred in the fishery over the past decade. NMFS

of that pie because its slice is too small to reflect its fair share given the current state of the fishery.

49

failed to account for these admitted and substantial variations in the fishery, even after a seven year period in which, in the words of former NMFS' Assistant Regional Administrator for Fisheries Hogarth, the conservation equivalency regime based on the 1998 Allocations had "not served the rebuilding efforts well, as evident by the fact that the annually established management targets have been exceeded in most years."  (FAR 148.)

NMFS did not respond directly to New York's point in the comment responses it published with the 2008 Rule.  NMFS' response to Comment 4 did mention without question "the northward shift in summer flounder stock distribution."  However, the response never addressed the fact that NMFS' 2008 management measures did nothing to take this shift and related variations in the fishery into account, in order to regulate it based on its actual current state.  (FAR 1550.)  NMFS instead addressed the comment by New York and others indirectly with the conclusory statement that the commentators had misinterpreted the intent of National Standard 6.  That intent, it asserted, was only a general direction that fishery management plans have a suitable buffer in favor of conservation "to deal with uncertainty, which may also be stated as a precautionary approach."  (*Id.*)  In furtherance of this point NMFS pointed to several examples from the NMFS implementing regulation, incorrectly cited as 50 C.F.R. § 600.336 (the correct cite is 50 C.F.R. § 600.335).

The actual regulation is far broader than NMFS implied, encompassing any variety of contingencies that should be taken into account in promulgating and keeping fishery management measures current.  The regulation provides additional support to New York's claim that NMFS failed to adhere to National Standard 6 in issuing management measures for 2008 built on critical factors that uncontroverted changes in the fishery had rendered obsolete. NMFS' own guidance clearly encompasses the need to adjust management regimes when new

50

data becomes available demonstrating that change is necessary to reflect substantial changes in a

fishery.  For example, the guidance directs that:

 (b) Conservation and management. Each fishery exhibits unique uncertainties. The phrase "conservation and management" implies the wise use of fishery resources through a management regime that includes some protection against these uncertainties.... Continual data acquisition and analysis will help the development of management measures to compensate for variations and to reduce the need for substantial buffers.
                                        *   *   *
 (c) Variations. (1) In fishery management terms, variations arise from biological, social, and economic occurrences, as well as from fishing practices. Biological uncertainties and lack of knowledge can hamper attempts to estimate stock size and strength, stock location in time and space, environmental/habitat changes, and ecological interactions. . . . Changes in fishing practices, such as the introduction of new gear, rapid increases or decreases in harvest effort, new fishing strategies, and the effects of new management techniques, may also create uncertainties.... (2) Every effort should be made to develop FMPs that discuss and take into account these vicissitudes....
 (d) Contingencies. Unpredictable events -- such as unexpected resource surges or failures, fishing effort greater than anticipated, disruptive gear conflicts, climatic conditions, or environmental catastrophes -- are best handled by establishing a flexible management regime that contains a range of management options through which it is possible to act quickly without amending the FMP or even its regulations.
                                        *   *   *
 (3) Amendment of a flexible FMP would be necessary when circumstances in the fishery change substantially, or when a Council adopts a different management philosophy and objectives.

50 C.F.R. § 600.335 (emphasis added).

To demonstrate that the summer flounder conservation equivalency management regime

incorporated the flexibility required by National Standard 6, NMFS' response then explained

how the annual TAL is calculated under the FMP, taking into account:

[A]mong other things, stock distribution, changes in stock size and fishery removals. The stock assessment does fully account for changes in stock dynamics and distribution in providing the basis for setting the annual coastwide TAL, which is then divided among the recreational and commercial fisheries.

(*Id.*)  NMFS noted that added levels of precaution are built into the final TAL to guard against overfishing, and that states and NMFS can monitor landings during the fishing season, and take corrective or closure actions if necessary.  *Id.*

This information in no way refutes New York's point.  Indeed, the process NMFS described for annually updating the TAL based on multiple sources of the best, constantly updated scientific information available highlights the contrasting complete lack of flexibility shown by the fishery managers with respect to the 1998 Allocations, notwithstanding a decade of transformative changes to the fishery.

The Federal Defendants adopted the state-by-state conservation equivalency management regime approved by the Commission for the recreational summer flounder fishery in the EEZ and from federally permitted vessels in 2008.  Despite a decade of substantial variations to the fishery – which are not only undisputed but admitted by NMFS – NMFS chose a regime of management measures with a history of failure that was driven by obsolete state allocations. This violated National Standard 6.

III.

> THE COURT SHOULD DECLARE THAT ANY STATE-BY-STATE CONSERVATION EQUIVALENCY MANAGEMENT MEASURES BASED ON THE 1998 ALLOCATIONS VIOLATE THE MAGNUSON-STEVENS ACT, AND ORDER THAT THE NON-PREFERRED COASTWIDE ALTERNATIVE MANAGEMENT MEASURES ISSUED BY THE FEDERAL DEFENDANTS FOR 2009 BE IN EFFECT

The 2008 Rule has been replaced by new management measures for recreational summer flounder fishing in the EEZ and from federally permitted vessels for 2009.  *See* the 2009 Rule, 74 Fed. Reg. 14760, No. 61.  Although the 2008 state-by-state conservation equivalency management measures again overwhelmingly failed to constrain harvest to the TAL, the Federal

52

Defendants once again rejected coastwide management measures and opted for a suite of state-by-state conservation equivalency management measures based on the 1998 Allocations. *Id.* The federal conservation equivalency management measures for 2009 were again based on the same obsolete 1998 Allocations. It is thus clear that the controversy underlying this challenge to the 2008 Rule is not only capable of repetition, but has been repeated. New York's claims are therefore not moot. *See United Boatmen,* 429 F. Supp. 2d at 550 ("While the matter is now decided for the 2006 summer flounder TAL, it is not mooted because it may arise again and again and is 'capable of repetition, yet evading review.' *Roe v. Wade, 410 U.S. 113, 125, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973)* (*quoting Southern Pacific Terminal Co. v. Interstate Commerce Comm'n, 219 U.S. 498, 515, 31 S. Ct. 279, 55 L. Ed. 310 (1911).*").

While the underlying controversy remains, certain aspects of the relief sought in New York's complaint are in fact moot. In particular, this Court can no longer vacate the 2008 Rule, which has been replaced, or direct that the non-preferred coastwide option for 2008 be instituted, because that season has expired. However, if the Court finds for New York on any of its claims that the Federal Defendants violated the Magnuson-Stevens Act in issuing the 2008 Rule, it can and should issue a declaratory judgment that any state-by-state conservation equivalency management measures for the recreational summer flounder fishery that are based on the obsolete 1998 Allocations violate the Magnuson-Stevens Act, including the management measures issued by the Federal Defendants for 2009.

As mandated by the FMP, the 2009 Rule also includes non-preferred coastwide management measures for 2009, which are at least as conservative as the most stringent individual state's limits (once again New York's). They are a possession limit of 2 fish, a minimum size limit of 20 inches, and a season of May 1 to September 30, 2009. *Id.* In

53

conjunction with declaring that the 2009 state-by-state conservation equivalency management measures violate the Magnuson-Stevens Act, this Court should therefore vacate the 2009 conservation equivalency management measures issued by the Federal Defendants in the 2009 Rule, and order that the non-preferred coastwide limits chosen for 2009 be in effect for the EEZ and federally permitted vessels fishing for summer flounder in any location.

## CONCLUSION

For all of the above reasons, the Court should enter summary judgment in favor of New York on its first three causes of action:

1.   Declaring that in issuing the 2008 Rule, Defendants violated Magnuson-Stevens National Standards 2, 4 and/or 6, 16 U.S. § 1851(a)(2), (4) and (6), respectively.

2.   Declaring that any state-by-state conservation equivalency management measures for the recreational summer flounder fishery that are based on the 1998 Allocations to the various states in the summer flounder fishery violate the Magnuson-Stevens Act.

3.   Vacating the conservation equivalency measures for summer flounder issued by the Federal Defendants in the 2009 Rule, and directing that the alternate coastwide measures set forth in the 2009 Rule be in effect for summer recreational summer flounder fishing in the EEZ and from vessels holding federal fisheries permits.

4.   Awarding plaintiffs their costs of litigation pursuant to Fed. R. Civ. P. § 54 or any other appropriate authority; and

    5.  Granting plaintiffs such other relief as the Court deems just and proper.

Dated:  New York, New York
         June 12, 2009

                                 Respectfully submitted,


                                 ANDREW M. CUOMO
                                 Attorney General of the State of New York


                                 By:  /s/ Andrew J. Gershon
                                    ANDREW J. GERSHON
                                 Assistant Attorney General
                                 New York State Department of Law
                                 Environmental Protection Bureau
                                 120 Broadway
                                 New York, New York 10271
                                 (212) 416-8474
                                 Andrew.Gershon@oag.state.ny.us
                                 Attorney for Plaintiffs