## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _    X

The STATE OF NEW YORK, ALEXANDER B.         |
GRANNIS, As Commissioner of the New York State   |
Department of Environmental Conservation, and the   |
NEW YORK STATE DEPARTMENT OF              |    Civil Action No.
ENVIRONMENTAL CONSERVATION              |    08-CV-2503
                                                      |
              Plaintiffs,   |    (Sifton, J.)(Mann, M.J.)
                                                      |
    vs.                                          |
                                                      |
GARY LOCKE, in his Official Capacity as Secretary of   |
the United States Department of Commerce, the   |
UNITED STATES DEPARTMENT OF COMMERCE,   |
JANE LUBCHENCO, in her Official Capacity as Under   |    **PLAINTIFF-INTERVENORS**
Secretary of Commerce and Administrator for the   |    **MEMORANDUM IN SUPPORT OF**
National Oceanic and Atmospheric Administration, the   |    **MOTION FOR SUMMARY**
NATIONAL OCEANIC AND ATMOSPHERIC   |    **JUDGMENT PURSUANT TO**
ADMINISTRATION, James W. Balsiger, in his Official   |    **F.R.C.P. 56(A)**
Capacity as the Acting Assistant   |
Administrator for the National Marine Fisheries Service,   |    **Submitted: June 12, 2009**
the NATIONAL MARINE FISHERIES   |
SERVICE, and the ATLANTIC STATES MARINE   |
FISHERIES COMMISSION,   |
                                                      |
            Defendants,   |
                                                      |
UNITED BOATMEN OF NEW YORK, INC., NEW   |
YORK FISHING TACKLE TRADE ASSOCIATION,   |
INC., and the FISHERMAN'S CONSERVATION   |
ASSOCIATION   |
                                                      |
         Intervenor-Plaintiffs.   |
                                                      |
                                                      |
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _    X

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT..................................................................................1

II. BACKGROUND...................................................................................................3

    A. Procedural Review..........................................................................................3

    B. Federal and State Legal and Regulatory Framework............................4

        1. The ASMFC..........................................................................................5

        2. The 2008 Summer Flounder Regulation....................................7

        3.  Landings Data Used By Management Agencies......................8

III. ARGUMENT......................................................................................................11

    A. Standards  of Review.......................................................................................11

           1. Standard of Review For Summary Judgment.................11
           2. Standard of Review Under the APA..............................11

    B. The Defendants' Joint Promulgation Of State-by-State
        Conservation  Equivalency Regulations Violates The MSA, the
        Coastal Fisheries Act, the Compact, the ISFMP Charter and the APA
        Because It Is Not Based Upon The Best Science Available...................13

        1. The NAS/NRC Report Is The "Best Science Available" With
           Respect To Use And Application Of MRFSS Survey Data.........13

        2. The Best Available Scientific Information Indicates That
           MRFSS Data Are Inadequate For Small Scale Management........17

        3. Defendants' Recent Corrective Measures Attempting To
           Improve MRFSS Performance Cannot And Do Not Address The
           Flaws Present In The 1998 Allocation Baseline Data Used For
           Initial State-By-State Allocations...................................................18

        4. Council and Board Deliberations Misrepresent The True
           Motivations Behind The Voting Results On The Question of
           Coastwide Versus State-by-State Management..............................22

        5. Defendants failed to Properly Consider and Apply the Best Science
           Available by Approving State-by-State Regulations Rather Than
           Coastwide.........................................................................................25

6. The Defendants' Collective Failure to Address The Impacts of The Geographic Redistribution of the Fluke Stocks on Individual State Allocations and Landings Violates the "Best Scientific Information Available" Standard......................................26

C. The Defendants' Joint Promulgation Of State-by-State Conservation Equivalency Regulations Violates The MSA, The ISFMP Charter And The APA Because It Discriminates Against Fishermen of Different States And Does Not Fairly And Equitably Allocate The Resource Among The States......................30

1. The Massachusetts v. Daley Rule Is Directly Applicable to the Instant Case and Should Be Followed........................................31

2. New York's 2003 Support For The Use Of 1998 As A Base Year Was Preceded By Its Opposition To Conservation Equivalency And Support For Coastwide Management......................33

3. New York Has Consistently Done The Most To Promote Summer Flounder Conservation, And Thus Is Being Unfairly Penalized By Discriminatory Allocation of the Resource.......................................................................35

4. State-by-State Conservation Equivalency Unnecessarily Discriminates Against New York Anglers and Thus Should Be Set Aside In Favor Of Coastwide Regulations.........................................................37

D. Defendants NMFS' Continued Use of 1998 MRFSS Data As a Baseline For State Allocations Violates National Standard 6 Because This Static Baseline Fails To Account for Changes and Contingencies in the Recreational Fluke Fishery and in the Fluke Stocks....................................38

1. MRFSS Data From 1998 are Obsolete and Not Reflective of the Current Fishery.............................................................................39

2. Defendants Continued Use of Obsolete MRFSS Data Lacks the Flexibility to Respond Equitably and Rapidly to Changes in Fluke Stocks and Increases in Effort....................................................40

3. Defendants Departed From Prior Decision Making Criteria Without Providing a Reasoned Rationale for Such Departure.............41

IV. CONCLUSION.........................................................................................43

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ........................................................................................11

*Central Power & Light Co. v. U.S.,*
   634 F.2d 137 (5th Cir. 1981) ...................................................................13,41,43

*Citizens to Preserve Overton Park v. Volpe,*
   401 U.S. 402 (1971) ....................................................................................12,13

*Cleveland v. Policy Mgt. Sys. Corp.,*
   526 U.S. 795 (1999) ........................................................................................11

*Consumers Union of United States v. Consumer Product Safety Comm'n,*
   491 F.2d 810 (2d Cir. 1974) ............................................................................12

*Defenders of Wildlife v. U.S. Environmental Protection Agency,*
   420 F.3d 946 (9th Cir. 2005) ...................................................................13,41,43

*Henley v. Food and Drug Administration,*
   77 F.3d 616, 620 (2d Cir. 1996) ..................................................12,26,29,37,40

*J.H. Miles & Co., Inc. Brown*
   910 F.Supp. 1138 (E.D. Va. 1995).................................................................39,40

*Massachusetts v. Daley,*
   170 F.3d 23 (1st Cir. 1999). .......................................................................31,32,33

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986) ........................................................................................11

*Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto Ins. Co.,*
   463 U.S. 29 (1983) ..........................................................................................12

*Mukadam v. U.S. Dept. of Labor,*
   458 F.Supp. 164 (S.D.N.Y. 1978) ...........................................................13,41,43

*Ocean Conservancy v. Evans,*
   260 F. Supp. 1162 (M.D. Fl. 2003)..............................................................14,15

*Shoreham Cooperative Apple Producers Ass'n, Inc. v. Donovan,*
   764 F.2d 135 (2d Cir. 1985) .....................................................................12,26,38

*Southern Offshore Fishing Ass'n v. Mosbacher*, 995 F.Supp.
    1411 (M.D. Fla. 1998) ...................................................................14,15

## STATUTES AND RULES

United States Constitution Article I, Section 10, clause 3.............................3

5 U.S.C. § 705..............................................................................................1

5 U.S.C. § 706.........................................................................................1,12

16 U.S.C. § 1801..........................................................................................4

16 U.S.C. § 1811..........................................................................................4

16 U.S.C. § 1851...............................................................1,5,6,13,21,30,32,38

16 U.S.C. § 1852..........................................................................................4

16 U.S.C. § 1853..........................................................................................4

16 U.S.C. § 1854..........................................................................................5

16 U.S.C. § 5101..........................................................................................6

16 U.S.C. § 5104.....................................................................................1,6,13

Pub. L. 77-539 (1942) ..............................................................................1,4,6

Pub. L. 81-721 (1950) ..............................................................................1,4,6

Pub. L. 109-479 (2006)................................................................................7

50 C.F.R. § 600.315(b)(1) .......................................................................14,15

50 C.F.R. § 600.315(b)(2) .......................................................................14,15

50 C.F.R. §600.335(b) ...............................................................................38

50 C.F.R. § 602.16(b) .................................................................................39

Federal Rule of Civil Procedure 56(a) ......................................................1,43

Federal Rule of Civil Procedure 56(c) ......................................................11

### I.     PRELIMINARY STATEMENT

Intervenor-plaintiffs United Boatmen of New York, Inc. (hereinafter "UBNY") the New York Fishing Tackle Trade Association, Inc. (hereinafter "NYFTTA"), and Fisherman's Conservation Association (hereinafter "FCA") (collectively referred to as the "Boatmen *et al.*" or "Boatmen") hereby move this Court for Summary Judgment in their favor pursuant to Federal Rule of Civil Procedure 56(a) and the Administrative Procedures Act (5 U.S.C. § 705), (hereinafter "APA"), to declare that the contested 2008 summer flounder (or "fluke") state-by-state "conservation equivalency" regulations jointly promulgated by defendants National Marine Fisheries Service *et al*. (hereinafter "NMFS") and Atlantic State Marine Fisheries Commission (hereinafter "ASMFC" or "Commission") facially violated National Standards 2, 4 and 6 of the Magnuson-Stevens Fishery Conservation and Management Act, (16 U.S. § 1851(a)(2), (4) and (6) hereinafter "MSA");  facially violated the "best scientific information available" standard set forth in Atlantic Coastal Fisheries Cooperative Management Act (16 U.S.C. § 5104(a)(2)(A), hereinafter "Coastal Fisheries Act"); facially violated Art. VI § 3 of the Atlantic State Marine Fisheries Compact; Rules and Regulations, (Pub.L. 77-539 (1942), as amended by Pub.L. 81-721 (1950))(hereinafter "Compact"), and the Interstate Fishery Management Program Charter, § Six, ¶ (a)(2) (*available at* www.asmfc.org/publications/isfmpCharter03) (hereinafter "ISFMP Charter" or "Charter), and in doing so, also violated APA section 706(2)(A) (5 U.S.C. §706(2)(A)), by promulgating regulations that are arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with law. See *id*.

The Boatmen challenge defendants' joint implementation of the controversial state-by-state "conservation equivalency" (hereinafter "CE") management regime for the 2008

recreational summer flounder (or "fluke") season, rather than the scientifically supported "coastwide" management regime. See Federal Administrative Record (hereinafter "FAR") p. 1547;  FAR p. 305 (Commission vote).  As this Court is aware, the contested and professionally discredited Marine Recreational Fishing Statistical Survey (hereinafter "MRFSS") continues to be employed by defendants as the basis for state-by-state allocation shares of the overall coastwide summer flounder quota. See FAR p. 1547.  The individual state allocation shares were set in 2001 using the MRFSS estimates of individual state fluke landings using the single year of 1998 as a base or "proxy" year to represent state percentage allocations of the coastwide recreational fluke quota. Commission Administrative Record (hereinafter "CAR") p. (S)9 and  p. 79.  The percent share New York received as indicated by the 1998 MRFSS survey is 17. 63 % of the overall recreational coastwide quota.  CAR p. 96, Table 2.

Despite the need for New York authorities to impose on its fluke anglers the most restrictive limitations of any fluke fishing state in 2007, (FAR p. 260, Table 6),  the MRFSS survey for that year indicated that New York had nonetheless again exceeded its allocation in 2007, (FAR p. 261, Table 7) notwithstanding that New York's regulations were preapproved by defendants' technical advisors and New York was not found to be "out of compliance" with the Fishery Management Plan (hereinafter "FMP").  As a result, New York's regulations for 2008 were required to constrain landings by more than the reductions sought in 2007. See *id*. and CAR p. 344.  Given the economic injury already caused to the New York fishing community over the previous six years by "Conservation Equivalency," (see Kanyuk Decl. ¶ 2-6 and Dearborn Decl. ¶ 3-5), the  2008 regulations continued to push more marginalized family-owned businesses into bankruptcy, while leaving the survivors with barely enough "crumbs" to meet their operating budget. See Kanyuk Decl. at ¶¶ 2-5.

In support of this Motion for Summary Judgment, the Boatmen *et al*. rely on their Complaint in Intervention, the other submissions of all parties in this action, this Memorandum in Support and accompanying Declarations, and the administrative records of defendants NMFS and ASMFC.

## II.   BACKGROUND

### A.   PROCEDURAL REVIEW

The above-mentioned state-by-state "conservation equivalency" management measure for 2008 was implemented over the objections of New York's representatives on both regulatory panels (FAR p. 304-305).  In response, the New York State Department of Environmental Conservation (hereinafter "NYSDEC"), through the New York State Attorney General's office, filed suit against the Secretary of Commerce, NOAA, NMFS and their respective chief administrators, to contest and set aside the administrative ruling.  The Boatmen *et al.* intervened in the suit pursuant to order of this Court and joined ASMFC as a defendant.  11/19/08 Opinion.

The Boatmen *et al*. collectively represent the interests of the for-hire fishing community, wholesale and retail bait and tackle suppliers, and a significant portion of the grass-roots marine recreational fishing community in the New York Marine District.  Interv. Compl. at ¶26. ASMFC is a regulatory agency approved by Congress pursuant to Article I, Section 10, clause 3 (the "Compact Clause") of the United States Constitution[1] for the purpose of "promot[ing] the better utilization of the fisheries of the Atlantic seaboard by the development of a joint program for the promotion and protection of such fisheries."  Compact, Pub. L. 77-539 (1942), as

---

[1] The Compact Clause provides in relevant part that "[n]o state shall, without the consent of Congress . . . enter into any agreement or compact with another state, or with a foreign power[.]"

amended by Pub. L. 81-721 (1950), Art. 1.

The subject matter of this action against defendants NMFS and ASMFC is their joint regulation of the recreational summer flounder ("fluke") fishery, the most important fishery to the intervenor-plaintiffs' collective livelihoods and recreational pursuits.  Interv. Compl. at ¶50. As explained *infra*, defendants NMFS' and ASMFC's continued implementation of state-by-state "Conservation Equivalency" to regulate the recreational fluke fishery is a grave threat to the Boatmen's livelihood and the way of life of their customers and other New York anglers. Kanyuk Decl. at ¶¶ 5-6, Dearborn Decl. at ¶ 5.

## B.    FEDERAL AND STATE LEGAL AND REGULATORY FRAMEWORK

Federal fishery regulation is governed principally by the MSA, 16 U.S.C. §§ 1801, *et seq.*, which embodies Congress' desire to implement a "national program for the conservation and management of the fishery resources of the United States." 16 U.S.C. § 1801(a)(6). The MSA establishes eight regional councils responsible for developing and recommending to the United States Secretary of Commerce (the "Secretary") fishery management plans ("FMPs") governing each fishery within their respective geographic areas. 16 U.S.C. §§1852(a), 1853. These FMPs govern fishing in federal waters in the United States Exclusive Economic Zone ("EEZ"), which encompasses ocean waters from three miles offshore to two hundred miles offshore. 16 U.S.C. § 1811(a).  State membership in the Regional Councils is governed by statutory provisions. 16 U.S.C. § 1852(a). New York is a voting member of the Mid Atlantic Fishery Management Council (the "MAFMC" or "Council"), which is responsible for the preparation of the federal summer flounder FMP.  FAR p. 7.

4

The MSA requires that federal FMPs be developed and implemented consistent with ten "national standards," (see 16 U.S.C. § 1851(a)), including National Standard 2, which mandates that management plans and measures adopted under the Act be based on the "best scientific information available," (*id.* at (a)(2)); National Standard 4, which requires that "[c]onservation and management measures shall not discriminate between residents of different States," (*id.* at (4)); and National Standard 6, which states that "[c]onservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches. (*id.* at (6)). The NMFS, by and through the authority of the Secretary of Commerce (the "Secretary"), is charged with determining whether these standards have been met before approving FMPs and promulgating rules implementing them. 16 U.S.C. § 1854(a). The rules managing summer flounder are usually published in late spring of each year, in time for the upcoming season. See FAR  p. 162.

## 1.    THE ASMFC

The management of coastal fisheries within state waters, including inland marine waters and coastal waters extending three miles seaward from shore, is subject to regulation by the states under their police powers.  See FAR p. 7.  In 1942, the fifteen Atlantic states, including New York and the District of Columbia, entered into an interstate compact establishing the ASMFC. Pub.L. 77-539 (1942), as amended by Pub.L. 81-721 (1950).  Congress expressly authorized the ASMFC Compact. ASMFC Compact, Preamble.  Recognizing that "voluntary" compliance with management measures in state waters was impeding the recovery of several important coastal fish stocks, Congress subsequently passed the Atlantic Coastal Fisheries Cooperative Management Act in 1993. 16 U.S.C. § 5101 *et seq*. (hereinafter "Coastal Fisheries

Act").  This Act essentially federalizes the functions and duties of the Commission and its promulgation of coastal Fishery Management Plans, by imposing federal standards of performance and review, and by authorizing a federally imposed moratorium scheme for when member states fail to implement regulations promulgated by the Commission.  Thus, the Commission now exercises its regulatory authority under the combined auspices of the Compact and the federal Coastal Fisheries Act.

Each ASMFC member state appoints three representatives to the ASMFC: its director of marine fisheries, a state legislator, and a public member appointed by the Governor. ASMFC Compact, Art. III.   The Commission operates through species-specific management boards, including the Summer Flounder, Scup, and Black Sea Bass Management Board (the "Board"), which develops and implements coastal FMPs for summer flounder, among others.  CAR p. 84. Anglers fishing in the territorial waters of ASMFC member states are thus required to abide by the regulations imposed by the Board.  Additionally, the Board is held to the same standard of "best scientific information available" as the defendant NMFS due to that same statutory directive being expressed in the Coastal Fisheries Act (16 U.S.C. § 5104(a)(2)(A)) as in the MSA, noted *supra*. 16 U.S.C. § 1851(a)(2).

### 2.      The 2008 Summer Flounder Regulation

Summer flounder or "fluke" are currently distributed along the Atlantic Coast from North Carolina to Canada.  FAR p. 9, ¶ 1.3.  They support important commercial and recreational fisheries along the Atlantic Coast, and are one of the most sought-after fish by both commercial and recreational anglers, particularly during the mild weather months that mark the height of the Boatmen's business season.  Interv. Compl. at ¶50.  Summer flounder are migratory, traveling

6

between state and federal waters throughout their life cycle. *Id.*,  However, most recreational summer flounder landings are taken inshore from state jurisdictional waters. FAR p. 20.  Even if taken from federal waters, a boat must invariably come under state jurisdiction when it returns to port to land its catch, once it is within three miles from shore. *Id.*; Interv. Compl. at ¶49.  The 1980s and early 1990s saw extensive depletion of summer flounder stocks, followed by a partial and continuing recovery in more recent years.  See FAR p. 796, footnote 1.  Congress has specified a January 1, 2013 deadline for the rebuilding of the summer flounder stock, which currently stands at approximately seventy-five percent of that objective.  Interv. Compl. at ¶57; ASMFC 9/8/08 Submission (citing Pub. L. 109-479, Sec. 120(a)).

The ASMFC Board (on behalf of the Atlantic states) and the federal Mid-Atlantic Fisheries Management Council ("MAFMC") meet together twice a year to plan management measures for the summer flounder fishery.  See FAR p. 162.   Beginning in 2001, and continuing through 2008, the Board and the MAFMC have jointly voted to implement management regimes for the recreational summer flounder fishery known as "conservation equivalency," or "state-by-state" regulation, which have been subsequently adopted by the NMFS and the Board, and implemented by the states each year.[2]  Interv. Compl. at ¶¶57-84.  In summary, the "state-by-state" approach takes the annual recreational coastwide quota ("total allowable landings," or "TAL") for summer flounder and divides that quota (expressed in pounds or numbers of fish) among the participating states in the form of a predetermined percentage share of the coastwide total for each state. Interv. Compl. at ¶¶70-71.  The predetermined percentage allocation share for each state is based on each states' historic recreational landings of fluke represented by the

7

single year of 1998 (the "proxy" year), which measure was authorized by Addendum VIII of the Commission's Summer Flounder , Scup and Black Sea Bass FMP. CAR pp. 70-76.  Once the TAL and state quotas are set, each state is then required to formulate management measures in terms of minimum size limits, daily bag limits, and seasonal limitations, that are expected to constrain that state's recreational landings to their assigned percentage of the coastwide TAL. See FAR p. 162., Interv. Compl. at ¶67.

### 3.        Landings Data Used By Management Agencies

The applicable state-by-state recreational quota shares mentioned *supra* were calculated based on recently discredited survey estimates rather than direct reporting of catch, as is done in the commercial fishery.  Interv. Compl. at ¶¶68-71.  For recreational quotas, both NMFS and ASMFC employ the Marine Recreational Fisheries Statistics Survey ("MRFSS"), developed by NMFS as a means of obtaining estimates of recreational participation, effort, and landings in marine waters. *Id.*  The MRFSS system is, however, the subject of strong criticism by the recreational fishing industry, professional and academic fishery management specialists, as well as NMFS officials. *Id.*; Interv. Compl. ¶¶5, 66-71.  As noted *supra*, the MRFSS data are the basis for the original state-by-state quota share allocations. CAR p. (S)7.  These shares are based on a single year's (1998) MRFSS data for recreational landings on the entire east coast during that year, referred to as the "proxy year."  *Id*.  In addition, annual recreational landings of summer flounder are also monitored and estimated using the MRFSS system; these annual landings estimates become the basis for each subsequent year's regulatory measures.  *Id*.

---

[2] The role of the MAFMC is advisory only and its advice is implemented by the Secretary upon a finding that such advice does not violate the Ten National Standards of the MSA.  The vote of the Board is a final, enforceable action as to its member states and their respective residents.

In 2005, in response to widespread public and professional criticism of the MRFSS system, the defendant NMFS commissioned the National Academy of Sciences/National Research Council ("NAS/NRC") to perform an independent evaluation of the MRFSS, and to make recommendations for its application and improvement.  FAR p. 1158.  One of the specific priority issues the NAS/NRC was tasked with by the NMFS was to "consider the match or mismatch between options for collecting recreational fisheries data and alternative approaches for managing recreational fisheries."  FAR p. 1159.  More specifically, the evaluating committee was instructed to

> [A]ssess current types of survey methods giving consideration to:  [t]he adequacy for providing the quality of information needed to support various approaches for managing recreational fisheries, with reference to **how the management approach might be restricted** by the type of survey method, stratification scheme, and sample size required. For example...**[i]s the geographic scale of management (e.g. state versus regional) appropriate for the resolution provided by the survey?**

*Id.*, Box S.1 (*emphasis added*).

The conclusions of the NAS/NRC concerning this specific issue were that "[c]urrently, many fisheries are monitored at the state level, which is a finer stratification than intended originally for the data collected" FAR p. 1181; that "[c]urrent users require data with higher resolution—spatially, temporally, and taxonomically – then the current MRFSS can deliver," (*id.*),  and that "[a]s managers use recreational data on finer temporal and spatial scales, issues of precision and bias become more pronounced.  Existing spatial and temporal sampling strata may be of too coarse a resolution to generate estimates that are adequate for the management

9

requirements." FAR  p. 1184.  These conclusions were reached after detailed review, analysis and comparison to other survey systems. See FAR p. 1164-1184.  Shortcomings and biases inherent in MRFSS were carefully parsed and weighed with an eye toward responding the Task set out by NMFS.  See *Id*.  Thus, these conclusions and statements were provided in direct response to the specific question posed by NMFS.  Given this context, it is clear that the NAS/NRC peer review of MRFSS strongly demonstrated that the MRFSS was unreliable and inadequate for the purpose for which it was and is used by the defendants, specifically, allocating and managing coastal fish stocks on a state level.

Because the baseline share of 17.63%  allocated to New York anglers based on 1998 MRFSS data (see CAR p. 96, Table 2) was and continues to be inadequate to provide reasonable recreational fishing opportunities, the annual MRFSS survey has also repeatedly found New York to be over its quota.  See FAR at p. 1549. This has led to the strictest fluke regulations on the coast every year for New York since 2004 (See FAR pp. 1374-1376 and p. 1266), discouraging recreational fluke fishermen and driving business away from New York. See Kanyuk Decl. ¶¶ 4-5.  Nevertheless, despite fewer and fewer fluke kept every year due to stricter regulation (see FAR p. 1386, Table 20), the ongoing annual MRFSS survey consistently finds New York to be over its quota (FAR at p. 1549), resulting in an ever-increasing spiral of damaging and unfair regulations being imposed upon the New York marine recreational fishing community.

### III.   ARGUMENT

#### A.   STANDARDS OF REVIEW

10

### 1.   STANDARD OF REVIEW FOR SUMMARY JUDGMENT

On motion for summary judgment, the moving party is entitled to judgment as a matter of law if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is also appropriate if it appears that the non-moving party cannot prove an element that is essential to the non-moving party's case and on which it will bear the burden of proof at trial. *See Cleveland v. Policy Mgt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999). A court must resolve all ambiguities and draw all reasonable inferences in favorable of the non-moving party in determining summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### 2.   STANDARD OF REVIEW UNDER THE APA

The APA enunciates the overarching standard and scope of review for the instant case. The relevant portion of the APA sets forth that "[t]he reviewing court shall…hold unlawful and set aside agency action, findings and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious or an abuse of discretion and should be set aside "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Henley v. Food and Drug Administration*, 77 F.3d 616, 620 (2d Cir. 1996)(citing *Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto Ins. Co*., 463 U.S. 29, 42

11

(1983) *see also  Shoreham Cooperative Apple Producers Ass'n, Inc. v. Donovan*, 764 F.2d 135, 140 (2d Cir. 1985).  The court must decide if the agency's decision "was based on a consideration of all relevant factors and whether there has been a clear error in judgment." *Shoreham Cooperative Apple Producers*, 764 F.2d at 140 (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).

In so deciding, the reviewing court "must be certain that an agency has considered all the important aspects of the issue and articulated a 'satisfactory explanation for its action, including a rational connection between the facts found and the choice made.'" *Henley,* 77 F.3d at 620 (quoting *Motor Vehicle Mfrs.,* 463 U.S. at 43*).* The defendants are obligated to examine all available evidence and to articulate a "rational connection" between that evidence and its exercise of discretion. *See Shoreham Cooperative*, 764 F.2d  at 140. *See also id.* at 140-41 (citing *Consumers Union of United States v. Consumer Product Safety Comm'n*, 491 F.2d 810, 812 (2d Cir. 1974)(finding that the agency explanation  "should take account of evidence placed before the agency by interested parties" ).

In addition,  "internally contradictory agency reasoning renders the resulting action arbitrary and capricious."  *Defenders of Wildlife v. U.S. Environmental Protection Agency*, 420 F.3d 946 (9th Cir. 2005).  An agency "must either conform itself to its prior norms and decisions or explain the reason for its departure."  *Central Power & Light Co. v. U.S.*, 634 F.2d 137, opinion supplemented on rehearing 639 F.2d 1104, cert. denied 454 U.S. 831 (5th Cir. 1981).  An agency decision is arbitrary and capricious and an abuse of discretion when it "inexplicably departs from [its] established policies."  *Mukadam v. U.S. Dept. of Labor*, 458 F.Supp. 164 (S.D.N.Y. 1978).

12

**B.** **THE DEFENDANTS' JOINT PROMULGATION OF STATE-BY-STATE CONSERVATION EQUIVALENCY REGULATIONS VIOLATES THE MSA, THE COASTAL FISHERIES ACT, THE COMPACT, THE ISFMP CHARTER AND THE APA BECAUSE IT IS NOT BASED UPON THE BEST SCIENCE AVAILABLE.**

**1.** **THE NAS/NRC REPORT IS THE "BEST SCIENCE AVAILABLE" WITH RESPECT TO USE AND APPLICATION OF MRFSS SURVEY DATA.**

Management measures developed and promulgated by both the NMFS, acting through the Secretary, and the ASMFC, acting through the Board, are required to meet the standard that fishery management measures be based upon the "best scientific information available" (hereinafter the "BSA standard" or "BSA"). *See* 16 U.S.C. § 1851(a)(2) *and* § 5104(a)(2)(A). The judicial determination of whether an agency defendant applied the "best scientific information available" in a particular circumstance is by necessity a fact specific, case by case determination by the courts, and the court's scope of review of this question is *de novo*. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).

As noted *supra*, according to the National Standard guidelines articulated in the Code of Federal Regulations, "[s]cientific information includes, but is not limited to, information of a biological, ecological, economic or social nature." *See Ocean Conservancy v. Evans*, 260 F.Supp. 1162, 1181 (M.D. Fla. 2003), *quoting* 50 C.F.R. § 600.315(b)(1). In addition, the CFR states: "FMPs must take into account the best scientific information available at the time of preparation." *Id., quoting* 50 C.F.R. § 600.315(b)(2), *see also Southern Offshore Fishing Ass'n v. Mosbacher*, 995 F.Supp. 1411, 1432 (M.D. Fla. 1998)("under the 'best scientific information available' standard, the Secretary must derive his determinations from the sum of pertinent and available information"). Similarly, the ISFMP Charter defines "best scientific information avaialable" in this way:

13

Includes but is not limited to that body of biological, environmental, ecological, economic, and social data concerning the fish stock and fisheries which are the subject of an FMP or amendment, provided that the methods of collecting such information are clearly described and are generally accepted as scientifically valid.  Data may come from state, federal, or private databases and from published or unpublished sources. Information that becomes available during the preparation of an FMP or amendment should be incorporated to the extent practicable.

ISFMP Charter, Section Eight, ¶ (e), *available at* www.asmfc.org/publications/isfmpCharter03. These definitions are instructive  and lay a context within which to evaluate defendants' collective  failure to apply properly the BSA standard with respect to their decision to implement state-by-state "conservation equivalency" for the 2008 fluke season.  As noted *supra*, the Code of Federal Regulations contemplates the character and use of scientific information and its application to fisheries management:  "Successful fishery management depends, in part, on the timely availability, quality, and quantity of scientific information, as well as on the thorough analysis of this information, and the extent to which the information is applied." 50 C.F.R. § 600.315(b)(1)(*emphasis added*).  Clearly, the 1998 MRFSS data used by defendants to determine the state-by-state recreational fluke allocations, as well as the subsequent NAS/NRC peer evaluation of the MRFSS system, fall squarely within this general description of "scientific information."

In essence, the NAS/NRC report must now be considered part of the body of the "best scientific information available" with respect to the use and application of MRFSS data, and it becomes part of "the sum of pertinent and available information." *See Southern Offshore Fishing*

14

*Ass'n*, 995 F.Supp. at 1432. 600.315(b)(1).  Further supporting this assertion, as noted *supra*, the CFR states: "FMPs must take into account the best scientific information available <u>at the time of preparation</u>."  *See Ocean Conservancy v. Evans*, 260 F.Supp. at 1181, *quoting* 50 C.F.R. § 600.315(b)(2)(*emphasis added*).  While the Boatmen acknowledge that the NAS/NRC report was not "available" in 2003 when the initial decision was taken to implement state-by-state regulations on the basis of 1998 MRFSS data, it most certainly was "available at the time of preparation" of the 2008 regulations, and its implications regarding state-by-state allocation and management were clearly pointed out in public comment. FAR pp. 318-322 (spoken comments of Mark Hoffman, Anthony DiLernia and Phil Curcio), FAR pp. 1256-1257 (written comments of Sen. Charles E. Schumer), FAR pp. 795-800 (written comments of James Gilmore, NYSDEC), FAR pp. 001260-001263 (written comments of NYFTTA), FAR pp. 784-787 (written comments of UBNY).

Moreover, on the sole basis of the conclusions and recommendations contained in the NAS/NRC document, NMFS has undertaken a multi-million dollar[3], multi-year[4] program to replace and/or improve the existing MRFSS system in order to bring recreational fishery data into conformance with those recommendations, as this Court has noted. Opinion, 4/30/09 *at* 39. The Marine Recreational Information Program ("MRIP"), was implemented in late 2006 as a direct response to the recommendations of the NAS/NRC report. See <u>Marine Recreational Information Program Implementation Plan</u>, at 9 (Oct. 2008), *available at*

---

[3] The MRIP budget for FY '07 was $1.7 mil.; FY '08 was $3.5 mil.  Total estimated MRIP budget: $6.55 mil. See <u>Marine Recreational Information Program Implementation Plan</u>, at 9 (Oct. 2008), *available at* <u>http://www.st.nmfs.noaa.gov/mrip/aboutus/organization/downloads/MRIP_Implementation_Plan.pdf</u>.

[4] MRIP implementation was initially expected to take 5 to 6 years from inception. See "Timeline on MRIP Deveopment", *available at* <u>http://www.st.nmfs.noaa.gov/mrip/aboutus/timeline.html</u>.

http://www.st.nmfs.noaa.gov/mrip/aboutus/organization/downloads/MRIP_Implementation_Plan.pdf .  Given this significant commitment of administrative time and resources undertaken on the basis of the advice contained in the NAS/NRC document, it is hard to see how the defendants could consider it anything less than the best scientific information available with respect to MRFSS' shortcomings and appropriate applications.  Given that the NAS/NRC findings regarding the precision (or lack thereof) of MRFSS data at varying geographic scales were the impetus for launching a major revision of recreational survey methodologies, these same findings cannot then be disregarded in the development of individual species management measures simply because they don't fit the politically preferred management regime of state-by-state conservation equivalency.

In short, if the NAS/NRC report is "good enough" to launch a multi-million dollar upgrade and overhaul of MRFSS, than it must be considered good enough to use as a basis for determining the inappropriateness of state-by-state management of the fluke resource using MRFSS data as a baseline for allocation.  For these reasons, the NAS/NRC report must be considered to be the "best scientific information available" with respect to the use and application of MRFSS data at varying geographic scales.

**2.    THE BEST AVAILABLE SCIENTIFIC INFORMATION INDICATES THAT MRFSS DATA ARE INADEQUATE FOR SMALL SCALE MANAGEMENT.**

As noted *supra*, at the behest of the defendants NMFS, the NAS/NRC performed an independent peer evaluation of the MRFSS, and made recommendations for its application and improvement. FAR p. 1153.  First, as an overarching statement, the NAS/NRC report concludes

that the currently used recreational surveys "do not provide adequate data for management and policy decisions." FAR p. 1183.  Moreover, the report strongly indicates that the MRFSS is not appropriate for small-scale management and allocation of fish stocks, but rather is better suited for stock management on larger spatial scales. Specifically, as noted *supra*, the report stated that "[c]urrent users require data with higher resolution -- spatially, temporally, and taxonomically -- than the current MRFSS can deliver" (FAR  p. 1181); that "[c]urrently, many fisheries are monitored at the state level, which is a finer stratification than intended originally for the data collected"  (*id*.);  and that "[e]xisting spatial and temporal sampling strata may be of too coarse a resolution to generate estimates that are adequate for the management requirements."  *Id.* p. 1184.

　　　　These statements by the NRC were not simply casual *dicta* offered by the NRC committee members.  Rather, these statements are specific and penetrating conclusions, and they speak explicitly and unmistakably as to how the management approach might be restricted by the MRFSS survey, and whether the geographic scale of management (i.e. state versus regional) is appropriate for the resolution of the MRFSS survey. See FAR p. 1159, Box S-1.  They bear directly on the exact issues the Boatmen are complaining about, and conclusively support the Boatmen's assertion that the 1998 state-by-state allocations based on MRFSS are now scientifically unsupported.  Given the context of the questions asked of the NRC and in light of its responses to those questions, the only reasonable conclusion that can be reached regarding the use MRFSS data for state-by-state allocations is that the MRFSS data (whether from 1998 or the present) were not and are not adequate to support state-by-state allocations of the fluke stock, and this regime must therefore now be abandoned in favor of a coastwide regime.

　　　　Despite this advice of the NAS/NRC report that discredited the efficacy of state-by-state

allocations based on a single year of MRFSS data from ten years ago, NMFS and the ASMFC

have continued to implement state-by-state "conservation equivalency" based on allocations

indicated by the same obsolete and unreliable MRFSS data from 1998, rather than returning to a

coastwide regime for a number of years for the purpose resetting the baseline in recognition of

the change in stock distribution over the last ten years. See CAR p. 90. Disregarding what is now

the "best available science" contained in the advice of the NAS/NRC report, the defendants

jointly approved and implemented state-by-state "conservation equivalency" based on these

1998 MRFSS data for the 2008 summer flounder season. FAR p. 1547.


    **3.**    **DEFENDANTS' RECENT CORRECTIVE MEASURES ATTEMPTING TO IMPROVE MRFSS PERFORMANCE CANNOT AND DO NOT ADDRESS THE FLAWS PRESENT IN THE 1998 ALLOCATION BASELINE DATA USED FOR INITIAL STATE-BY-STATE ALLOCATIONS**


When applied to the instant facts, the NAS/NRC findings regarding the spatial limitations

of the MRFSS point unmistakably to the conclusion that the <u>initial</u> <u>allocation</u> of state-by-state

shares of the summer flounder stocks based on MRFSS data is now contraindicated, and thus this

method should no longer be implemented as a management measure.  Yet, despite the results set

out in the report, and the conclusions those results compel concerning the use of state-by-state

CE as a management measure, NMFS and the ASMFC nonetheless implemented this contested

and controversial management regime for the 2008 summer flounder season.

In its publication of the Final Rule on the matter in the Federal Register, defendant

NMFS attempts to explain its decision by pointing out that "nowhere did the [NAS] reviewers

indicate that use of the MRFSS data at smaller spatial scales (i.e., state-by-state) was an

inappropriate use of the data." FAR p. 1548.  While it is true that the text of the NAS/NRC

18

report did not use these exact words to describe the inadequacy of MRFSS for evaluating fisheries at the state level, the conclusion that MRFSS data are inappropriate for small scale allocations of a coastal fish stock is <u>the only reasonable interpretation of the language of the report, especially given the context of the question asked of the NAS/NRC by the NMFS</u>. See FAR  p. 1159, Box S.1 and § III(B)(2) of this Memorandum, *supra*.  However, the defendants never directly confront this central issue in their Federal Register notice, nor do they confront all the implications raised by the exact language of the NAS/NRC report, despite the fact that public comments frame those issues specifically. FAR pp. 318-322 (spoken comments of Mark Hoffman, Anthony DiLernia and Phil Curcio), FAR pp. 1256-1257 (written comments of Sen. Charles E. Schumer), FAR pp. 795-800 (written comments of James Gilmore, NYSDEC), FAR pp. 1260-1263 (written comments of NYFTTA), FAR pp. 784-787 (written comments of UBNY).  Rather, defendants seemingly attempt to deflect the thrust of  these comments by pointing out supposed improvements to MRFSS data that purport to improve stock conservation efforts, but that in no way address the inequitable allocation issues complained of by the Plaintiffs and Intervenor-Plaintiffs.  See *id*. and FAR p. 1548.

This Court has pointed to several corrective measures taken by defendants to address the shortcomings of the MRFSS.  Opinion, 4/30/09 at pp. 35-39.  The Court quotes a memorandum directing the Technical Committee to

> [p]rovide new guidance to states so that conservation equivalency will evaluate increases in angler effort and stock size, the percent standard error around MRFSS harvest estimates and noncompliance with 2007 regulations as a means of providing additional precaution to account for uncertainty in the approaches utilized to evaluate management measure effectiveness.

19

*Id*. at p. 35, *quoting* FAR pp. 361-362.  The Court also points out that NMFS, in its Final Rule,

stated that the NAS/NRC criticism was influential in some of the actions taken by NMFS,

including encouraging states to take a more precautionary approach[5] to "improve conservation

equivalency's performance and to offset uncertainty," citing the development of the

"performance based adjustment factor" as a measure to improve CE for 2008. Id. at p. 37,

*quoting* FAR p. 1548.  These cited actions in actuality are examples of defendants' failure to

directly address the points raised by the Boatmen in its comments.

       These measures do not address the Boatmen's concerns about the inequitable allocation

of the stocks resulting from the use of obsolete MRFSS data as a basis for those allocations –

they only address concerns regarding the <u>conservation of the stocks</u>, and describe the

manipulation of <u>current</u> data in an attempt to yield more precise estimates of <u>current</u> landings.

The "precaution" to "offset uncertainty" refers to precaution with respect to the well-being of

the stocks and preventing continued overharvest under conservation equivalency in the face of

uncertain current landings estimates. (see Footnote No. 5 and FAR p. 1550, col. 1).  It does not

advise precaution or address uncertainty with respect to the inequitable allocations resulting

from the use of flawed and obsolete landings data from 1998.

       These measures are merely a *post hoc* correction to current data that do nothing but add

yet another layer of caution in favor of the stocks, with no concern for the punitive impacts

specifically directed against New York resulting from these measures.  Although the defendants

---

[5]  The "precautionary approach" to fisheries management is a term of art reflecting a heightened concern for stock status in the face of imperfect data.  (see Hillborn, *et al*.; <u>The Precautionary Approach and risk management: can they increase the probability of successes in fishery management?</u>  NRC Research Press, Dec. 20, 2000 (*available at* <u>http://article.pubs.nrc-cnrc.gc.ca/RPAS/rpv?hm=HInit&afpf=f00-225.pdf&journal=cjfas&volume=58</u>*). Under this principle, regulatory agencies are required to address uncertain information concerning stock integrity by always erring on the side of caution in favor of the stocks.  Recognizing the significance of the use of this term of

have a statutory obligation to account for concerns arising from distribution of fishing rights and their impacts on fishing communities as well as conserving stocks (see MSA National Standard 4, 16 U.S.C. § 1851(a)(4), and § III(C) of this Memorandum, *infra*), the measures they point to as a response to plaintiff's comments do nothing to correct the flawed allocation scheme employed under state-by-state CE.

Specifically, the "performance factor" and other "precautionary" adjustments inserted into the FMP <u>cannot and do not retroactively correct the flaws that were present in MRFSS landings estimates for 1998</u> (or any other past year except 2007), which flaws are precisely those that have placed New York at the "short end of the stick," and which are the heart of the Boatmen's complaint. These adjustments only provide an arguably more precise projection of what states may harvest in the future – they do not correct or compensate for the imprecision and bias present in the 1998 MRFSS landings data. The upshot of these measures, as can be seen by the target landings tables (FAR pp. 261 and 266), is that New York has now involuntarily shouldered an even greater proportion of the "conservation burden" for the rest of the coast, in the form of more punitive and damaging regulations in 2008. See CAR p. 344.

More importantly, however, <u>these measures superimpose "more precise" current landings estimates over an initially imprecise and unfair allocation</u>. The result of this attempt to correct flawed data *post hoc* yields an even greater benefit to other states, while New York continues to be singled out for <u>even more restrictive</u> and arguably punitive measures. See FAR p. 795-800. This, despite the fact that New York has "played by the rules" throughout the past seven years of CE, with every successive years' regulatory measures having been pre-approved by the

art by the defendants, it becomes clear that these additional "precautionary" measures are directed purely at conservation concerns, and in no way remedy the inequitable allocations complained of by the Boatmen.

Technical Committee before New York officials implemented them, and despite the fact that New York has never been found "out of compliance" with Commission mandates.  Thus, while the imposition of these additional measures may have alleviated certain concerns expressed by the Regional Administrator regarding stock rebuilding (see FAR pp. 194-197), they utterly fail to address the concerns expressed by the Boatmen in their comments.  Therefore this Court should view these responses and corrective measures as having utterly missed the mark with respect to the Boatmen's comments and complaints about the inadequacies of using old MRFSS data as a continuing basis for allocation of the fluke fishery, and as such should be afforded no probative weight.

4.   **COUNCIL AND BOARD DELIBERATIONS MISREPRESENT THE TRUE MOTIVATIONS BEHIND THE VOTING RESULTS ON THE QUESTION OF COASTWIDE VERSUS STATE-BY-STATE MANAGEMENT.**

The Court has suggested that the extensive discussions taking place during the December 2008 joint meeting of the Council and Board indicates that the respective panels took ample consideration of the MRFSS flaws and based their majority support for CE purely (or predominantly) on the scientific aspects of this discussion, and on the proposed technical remedies for these flaws offered by the Technical Committee. Opinion, 4/30/09 at pp. 35-39. However, upon close scrutiny of the technical information in possession of the panel members at the time, and a review of their subsequent roll call votes on both the Council and the Board, it becomes quite apparent that the motivation for each states' vote was based not on any conservation or scientific considerations, but rather on parochial interests and "bringing home the bacon" to their respective constituencies.  Put simply, when one analyzes how many fish a given state would stand to lose or gain by supporting either state-by-state or coastwide measures,

22

one could have predicted, <u>exact to a vote</u>, which side of the question each state would come down on.

The numeric table appearing at FAR p. 261 ("Table 7") indicates what the "Target" landings for 2007 were for each state under conservation equivalency; the table at FAR p. 266 indicates what the state targets would be for 2008 under that same regime; the arithmetic differences between these two datasets indicates the reductions in pounds for each state under state-by-state. The table at FAR p. 269 shows what each state would be projected to land under a coastwide regime. Juxtaposing and comparing these targets and projections for each state shows how many fish each state could expect its anglers to be allowed to land in 2008 as compared to 2007, both under conservation equivalency and coastwide regulations. Comparing these data to the roll call votes recorded at FAR p. 304, the following table strongly illustrates the Boatmen's assertion that the discussions concerning statistical "fixes" and the MRFSS data had nothing to do with the outcome of the vote. The Motion in question on this vote was whether state-by-state conservation equivalency should be implemented for 2008. FAR p. 304, comment of council chair Peter Jensen.

**Table 1 - Comparing Individual State Landings Expectations With Their Respective Votes. (Compiled from various sources contained in the FAR as noted *supra*).**

|        | Col. 1 '07 targ | Col. 2 '08 targ | Col. 3 '08 CW | Col. 4 % SxS | Col. 5 % CW | Col. 6 Council | Col. 7 Board |
|--------|-----------------|-----------------|---------------|--------------|-------------|----------------|--------------|
| MA     | 134             | 113             | 84            | -15.7%       | -25.6%      | n/a            | yes          |
| RI     | 138             | 116             | 227           | -15.9%       | +95.7%      | n/a            | no           |
| CT     | 91              | 77              | 89            | -15.4%       | +15.6%      | n/a            | no           |
| NY     | 430             | 361             | 655           | -16.0%       | +81.4%      | no             | no           |
| NJ     | 954             | 801             | 532           | -16.0%       | -33.6%      | yes            | yes          |
| DE     | 77              | 64              | 69            | -16.9%       | +7.8%       | no             | no           |
| MD     | 72              | 61              | 19            | -15.3%       | -68.8%      | yes            | yes          |
| VA     | 407             | 342             | 280           | -15.9%       | -18.1%      | yes            | yes          |
| NC     | 137             | 115             | 5             | -16.0%       | -95.6%      | yes            | yes          |
| NMFS   |                 |                 |               |              |             | abstain        | abstain      |
| PA     |                 |                 |               |              |             | no             | n/a          |
| PRFA   |                 |                 |               |              |             | n/a            | yes          |

- Columns 1 (FAR p. 261), 2 (FAR p. 266), and 3 (FAR p. 269) indicate numbers of fish in thousands.
- Column 4 shows percent loss to each state under state-by-state ("SxS") comparing 2007 targets to 2008 targets.
- Column 5 shows percent loss or gain to each state under coastwide ("CW") compared to 2008 SxS targets.
- Council votes allow each delegate to cast his/her own vote – all delegates for each state were in concurrence with one another. Current member names for each state are available at http://www.mafmc.org/members/members.htm.
- Board votes allow each state only one vote per state.
- Roll call votes recorded at FAR p. 304.

As this Table clearly shows, every single state that stood to <u>lose</u> more fish under coastwide than under state-by-state voted <u>for</u> state-by-state; while every state that stood to <u>gain</u> fish under coastwide voted <u>against</u> state-by-state. For example, Massachusetts stood to lose 15.67% from 2007 to 2008 under state-by-state, while under coastwide it stood to lose 25.66%. Predictably, Massachusetts voted "yes" for state-by-state. Conversely, Delaware stood to lose

24

16.88% under state-by-state, while it stood to <u>gain</u> 7.81% under coastwide – again, predictably, Delaware voted "no" for state-by-state.

Thus, while this is concededly not <u>conclusive</u> proof of each representatives' motivation to vote for or against conservation equivalency, it certainly militates strongly against the concept that the defendants' joint decision was based solely on the panel's lengthy discussion of MRFSS' shortcomings and analysis of the impacts on the fish stocks versus impacts on anglers.  Rather, it tends to show that this decision was and is purely political and has no basis in science whatsoever.  It is simply a function of the "have" states outnumbering the "have not" states.  For this reason, technical deliberations and feigned concerns noted on the record regarding the inequities, biases and insufficiencies perpetrated by MRFSS should be given little or no substantive weight by this Court when considering whether the defendants acted arbitrarily, capriciously, or in abuse of their discretion.

     **5.**     **DEFENDANTS FAILED TO PROPERLY CONSIDER AND APPLY THE BEST SCIENCE AVAILABLE BY APPROVING STATE-BY-STATE REGULATIONS RATHER THAN COASTWIDE**

As the foregoing arguments demonstrate, the defendants have never fully and satisfactorily explained why the advice of the NAS/NRC report was not implemented with respect to the use of MRFSS at small geographic scales, in that such advice clearly necessitates abandonment of the current state-by-state regime,  and why it is <u>necessary</u> to perpetuate state-by-state CE and the punishment inflicted thereby upon the Boatmen and their customers rather than reverting to coastwide regulations.

For all of these reasons, this Court should find that defendants failed to base their

management regime upon the best scientific information available, and by doing so acted arbitrarily and capriciously and abused their discretion by; a) entirely failing "to consider an important aspect of the problem," (*Henley*, 77 F.3d at 620), specifically, by not demonstrating the necessity of continuing to use the state-by-state percentage allocations arrived at by the unreliable and scientifically unsupported 1998 MRFSS data to set baseline percentage state shares of the fluke resource;  b) failing "to consider all the important aspects of the issue and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made" (*id*.), because they in no way offer a rational solution to the punitive and recurring impacts to the Boatmen *et al*. caused by  pre-existing shortcomings inherent in the obsolete 1998 MRFSS data, which were explicitly pointed out in UBNY's comments; and c) failing to take account of evidence placed before the agency by interested parties (*Shoreham Cooperative*, 764 F.2d  at 140-141), in that they failed to take account of one of the major questions posed to the NAS/NRC, to wit, whether the geographic scale of management (i.e. state versus regional) is appropriate for the resolution of the MRFSS survey, and commensurately failed to recognize that the NAS/NRC responses cited by the Boatmen clearly and unambiguously answered that precise question in the negative.  Moreover, the aforementioned failure to apply the best science available is a direct facial violation of National Standard 2 and thus is "not in accordance with law" in violation of the APA.

6.   **THE DEFENDANTS' COLLECTIVE FAILURE TO ADDRESS THE IMPACTS OF THE GEOGRAPHIC REDISTRIBUTION OF THE FLUKE STOCKS ON INDIVIDUAL STATE ALLOCATIONS AND LANDINGS VIOLATES THE "BEST SCIENTIFIC INFORMATION AVAILABLE" STANDARD**

The record shows that as the fluke stocks continue to recover, the geographic distribution

of these stocks have shifted north and east, with a larger body of fish now seasonally concentrating from Long Island waters into southern New England.  FAR pp. 389 and 1000. This fact is strongly supported by a large body of scientific research work performed on summer flounder over the last three decades (FAR pp. 946, 956, 970, 1014-1015 and 1037), and was pointed out specifically in Council deliberations (FAR p. 313 (comments of Charles Witek), p. 321 (comments of Anthony DiLernia), p. 334 (comments of David Pierce), p. 338 (comments of Pat Augustine) pp. 341-342 (comments of James Ruhle)) and written public comment. FAR pp. 786, 797.  The same concerns were expressed by Connecticut representative David Simpson, in his statements to the Board in February of 2008:

> I just wanted to say that this is exactly why I think the technical committee has encouraged coast-wide management or at least regional management because I think it's the subject of Amendment 15.  I lose track of which is which, but the whole issue of what would you use as a basis of allocation when you look at times changing.  Right now with summer flounder, the allocation is based on one year to the states, 1998.  That was a decade ago.  And how do you incorporate things like changes in demographics within states, changes in population size within states, changes in availability of the resource as it grows?  And if you believe there are trends in climate and temperature, **certainly it's viewed as fact among fishermen that fluke are moving north and east, and yet our allocation is based on a condition a decade ago**.  So, the only way out I see from a technical view is to get away from allocation on a very small spatial basis that is established on yesterday.  Ten years from now it will be even more absurd.

CAR p. 370, Comments of Mr. Simpson (*emphasis added*).  This scientific and anecdotal

27

evidence leads to the conclusion that fluke have become more and more available to New York anglers, and that 1998 MRFSS data are obsolete in that they no longer represent the status of the fishery, nor do they represent what New York's allocation should be in light of this "stock shift." It also suggests that as fish become more available to a certain geographic area, it becomes more difficult to constrain landings in those areas to existing state quota levels.  CAR p. 363, comments of Dr. Rich Wong.

Furthermore, the record reflects that defendants ASMFC have tacitly admitted that the use of 1998 data no longer reflects the status of the stocks, strongly implying that a new baseline is needed:

> If the Board **intends to implement a management strategy that is reflective of the current summer flounder fishing population** the TC recommends the following:  The Board  should set coastwide regulations for two to three years.  The TC would then use the catch and harvest data collected in that time period to determine coastwide shares. This methodology would establish a new baseline.

CAR p. 90. (*emphasis added*).  In sum, these sources all tend to advocate in favor of the concept of returning to a coastwide regime for a few years to establish a new, updated baseline.

However, despite the overwhelming scientific and anecdotal support for such action, defendants have refused to embrace the science, and simply recite the only excuse that can be mustered: "1998 was the last year regulations among the various states were consistent." CAR p. (S)2, p. (S)9, p. 89, FAR p. 1549.  Other than this language, the record is devoid of any scientifically supported reasoning why perpetuation of state-by-state CE is necessary, and why the fact that fluke stocks are shifting and becoming more available to New York anglers has been ignored *vis-a-vis* setting a new baseline to reflect same.  Ironically, despite the dramatic recovery

of the stocks coming as a direct result of the pain that has been endured by the fishing

community at large, and particularly by New York fishermen, they have not been allowed to reap

the benefits of these strenuous efforts despite earlier promises (not appearing on this record) that

they would be.

This failure by the defendants to act in the face of such strong scientific evidence is a

direct facial violation of National Standard 2 and thus "not in accordance with law" in that it

fails to base management measures on the best science available.  Further, it is arbitrary and

capricious and an abuse of discretion, because the defendants have "offered an explanation that

runs counter to the evidence before the agency, or is so implausible that it could not ascribed to a

difference in view or the product of agency expertise," (*Henley,* 77 F.3d at 620), in that the their

only explanation, to wit: "1998 was the last year regulations among the various states were

consistent," runs counter to the evidence that a viable, equitable and scientifically supported

option exists in the form of coastwide regulations, which would serve to set consistent

regulations among all the states, thereby providing a newer and more equitable baseline after two

to three years. See CAR p. 90. Moreover, defendants have failed to articulate "a satisfactory

explanation for its action, including a rational connection between the facts found and the choice

made" (*id.*) , because they do not explain why it is necessary to perpetuate state-by-state CE

despite the singular punitive impacts imposed upon the Boatmen *et al.*, rather than adopt

coastwide for two to three years in order to establish a new baseline, as suggested by their own

Technical Committee.  CAR p. 90.

In addition, this failure to make the necessary changes to the management measures as

dictated by the best science available has precipitated facial violations of National Standard 4, in

that perpetuation of the use of the existing 1998 baseline discriminates against New York

anglers, (16 U.S.C. § 1851(a)(4), see also § III(C) of this Memorandum, *infra*) and National Standard 6, in that defendants' inaction fails to account for "variations and contingencies" in the fishery and fishery resources. (16 U.S.C. § 1851(a)(6), see also § III(D) of this Memorandum, *infra*).  For these reasons, this Court should set aside the existing state-by-state conservation equivalency regime in favor of a coastwide regime, as recommended by the Commission's Technical committee, in order to ensure that the best science available is adopted and the "management strategy...is reflective of the current summer flounder fishing population." CAR p. 90.

C.    **THE DEFENDANTS' JOINT PROMULGATION OF STATE-BY-STATE CONSERVATION EQUIVALENCY REGULATIONS VIOLATES THE MSA, THE ISFMP CHARTER AND THE APA BECAUSE IT DISCRIMINATES AGAINST FISHERMEN OF DIFFERENT STATES AND DOES NOT FAIRLY AND EQUITABLY ALLOCATE THE RESOURCE AMONG THE STATES.**

National Standard 4 of the MSA sets forth that "[c]onservation and measurement measures shall not discriminate between residents of different States.  If it becomes necessary to allocate fishing privileges among various United States fishermen, such allocation shall be...fair and equitable to all such fishermen..." 16 U.S.C. § 1851(a)(4).  Likewise, concerning the Commission, the ISFMP Charter states that "fishery resources shall be fairly and equitably allocated or assigned among the states."  ISFMP Charter, Section Six, ¶ (a)(7)(ii), *available at* www.asmfc.org/publications/isfmpCharter03. Where a decision to impose state-by-state fishery quotas based on inaccurate historical data threatens more discrimination between states than it avoids and is not adequately supported by the administrative record, the regulation must be set aside as violative of National Standard 4 of the [MSA].  *Massachusetts v. Daley*, 170 F.3d 23, 30-32 (1st Cir. 1999).

30

1.     THE *MASSACHUSETTS V. DALEY* RULE IS DIRECTLY APPLICABLE
       TO THE INSTANT CASE AND SHOULD BE FOLLOWED

The *Massachusetts v. Daley* court (170 F.3d 23), considered many issues central to the instant case, and although not controlling in the Second Circuit, it should nonetheless be invoked here in that the analysis of the facts and the relevant legal standard provide a ready template upon which to base decisions concerning National Standard 4 of the MSA.  The *Massachusetts* case involved a commercial harvest quota of scup rather than a recreational harvest quota of fluke. However, similar the instant facts, the plaintiffs Commonwealth of Massachusetts were contesting a state-by-state management scheme that unfairly discriminated against their commercial fishing fleet, in comparison to those of Rhode Island and New York.  *Id*. at 26-27. The rule stated by the *Massachusetts* court as noted *supra*, is as follows: Where a decision to impose state-by-state fishery quotas based on inaccurate historical data threatens more discrimination between states than it avoids and is not adequately supported by the administrative record, the regulation must be set aside as violative of National Standard 4 of the [MSA].  *Id*. at 30-32.

The *Massachusetts* plaintiffs cited inaccurate historical landings estimates, [6]  resulting in a state allocation that was lower than it should have been and thus creating an inequitable and discriminatory regulatory environment for their fishermen. *Id*.  The data at issue were alleged to have underestimated the landings of the Commonwealth's inshore commercial scup fishermen,

---

[6] Although commercial landings are evaluated using a different method than the MRFSS survey, the practical result of anomalous data was nonetheless the same in the *Massachusetts* case as here:  undercounting of the "baseline" or "proxy" landings for a given state's fishermen led to inequitable and discriminatory state-by-state division of the overall quota.

resulting in a state quota share that disfavored those fisherman.  *Id*. at 29.  While the degree of disadvantage created by the contested regulation was not ascertainable due to a dearth of data, the court nonetheless agreed that it was substantial enough to support the Commonwealth's claims of discrimination (*id*.), and accordingly set aside the state-by-state regulation as violative of National Standard 4, in favor of a coastwide regime.

Like the plaintiff in the *Massachusetts* case, the Boatmen *et al*. have demonstrated that the historical landings data (MRFSS data) used by the defendants as the basis for the state-by-state share allocations are flawed and inaccurate, (see § III(B)(2) of this Memorandum, *supra*), and as such are inappropriate for such an application.  Further, New York's continued overages from year to year (see FAR p. 1549, col. 3), despite the successive imposition of the most restrictive regulations on the coast (see FAR pp. 1374-1376 and p. 1266), indicates that these flaws in the MRFSS data grossly underestimated New York's landings in the 1990s.  This underestimate has resulted in an inadequate share of the coastwide stocks for New York recreational fishermen, just as the underestimate in the *Massachusetts* case left its commercial scup fishermen with an inadequate share of that fishery.

Further, the defendants here, like the *Massachusetts* defendants, have promulgated and implemented regulations based on flawed historical data, the result of which discriminates against the recreational fishermen and businesses of the State of New York.  Moreover, defendants action is a direct facial violation of MSA National Standard 4 (16 U.S.C. § 1851(a)(4)), in that it discriminates against fishermen of different states and does not allocate privileges fairly and equitably among individuals or entities, and thus is not "in accordance with law," in violation of the APA.

Applying the *Massachusetts* rule, the instant defendants have: a) imposed state-by-state

fishery quotas based on inaccurate historical MRFSS data as discussed at length *supra*;  b) such

quotas threaten more discrimination between states than they avoid, in that New York has

carried for six years (and continues to carry, apparently indefinitely), a disproportionate share of

the coastal fluke conservation burden to its great harm and detriment, and to the benefit of other

fluke-fishing states who have not been required to impose such damaging regulations upon their

own fishing communities;  and c) the decision is not adequately supported on the record, in that

defendants have failed to adequately justify, either technically or scientifically, their joint

determination that state-by-state regulations and the discrimination accompanying them were

necessary.  For these reasons, this Court should apply the *Massachusetts* rule to the instant case,

and accordingly set aside the current state-by-state conservation equivalency management

regime in favor of coastwide regulations.

> 2.   NEW YORK'S 2003 SUPPORT FOR THE USE OF 1998 AS A BASE
>       YEAR WAS PRECEDED BY ITS OPPOSITION TO  CONSERVATION
>       EQUIVALENCY AND SUPPORT FOR COASTWIDE MANAGEMENT

The Court notes the fact that in 2003, New York representatives supported the initial

decision to employ 1998 as the baseline year for state-by-state allocations.  Opinion, 4/30/09 at

p. 41.  However, close scrutiny of the underlying context of that decision by New York's

representative reveals that Mr. Colvin had actually <u>objected</u> to the overall concept of adopting

state-by-state conservation equivalency as a management regime, and instead had <u>supported a

return to coastwide management</u> even at that time (see CAR p. 23; Comments of Mr. Colvin) – a

position which New York has consistently held ever since.  Thus, his decision to support the

1998 base year <u>must be construed not as affirmative support for conservation equivalency or the</u>

33

1998 base year, but rather as an attempt to mitigate the adverse effects he expected New York to

continue to suffer as a result of state-by-state allocations.  Specifically, Mr. Colvin stated:

> Now, for the last couple of years, we've managed the summer flounder recreational
>
> fishery on the basis of a state-by-state, state specific quota system, and I think that's
>
> exacerbated our problems...**I would remind the board that New York did not support**
>
> **that, still doesn't, and would be happy to support a return to a single coast-wide**
>
> **recreational management regime.**  I assume we're still in the minority, so I won't go
>
> any farther with it.

*Id.* (*emphasis added*) This assertion is further supported upon viewing the Table indicating state

percent shares under various baseline scenarios. CAR p. (S)4.  In the face of being forced by the

majority of states to accept state-by-state regulations against its own interests, New York's

support for the 1998 baseline year simply sought to select the least damaging state-by-state

alternative that would be supported by a majority of other states, among a suite of less attractive

options, and was based on the understanding that the baseline could be changed in the future.

CAR p. 28, comments of G. Colvin ("We always have the option of adopting another addendum

to change it if we want to in the future.").

The Boatmen *et al.* thus urge this honorable Court to bear in mind that they are

challenging state-by-state regulations which are based on any year's (or suite of years') MRFSS

data, not just 1998 data.  See Interv. Compl. at ¶¶87, 100, 103.  For this reason, the Court should

disregard New York's support for the 1998 baseline in light of the fact that New York explicitly

and unequivocally expressed (and continues to express) its opposition to the larger question of

whether to adopt state-by-state rather than coastwide regulations, which is the central question in

this case.

### 3.   NEW YORK HAS CONSISTENTLY DONE THE MOST TO PROMOTE SUMMER FLOUNDER CONSERVATION, AND THUS IS BEING UNFAIRLY PENALIZED BY DISCRIMINATORY ALLOCATION OF THE RESOURCE

The Court has stated that implementation of a management regime other than one based on 1998 data may have the effect of "punishing states that have done the most to promote conservation," and that "using a different baseline year would not result in fair and equitable treatment of fishermen residing in states having engaged in the most vigorous conservation efforts." Opinion, 4/30/09, at p. 42.  In response, the Boatmen first respectfully wish to emphasize that they are not asking that another baseline year be employed, nor do they challenge *per se* the decision to use 1998 as a base year.  Rather, as noted *supra*, they challenge the entire concept of state-by-state conservation equivalency based on MRFSS data, regardless of the year or years employed as a baseline.

Secondly, the Boatmen *et al.* respectfully oppose the implication or notion that New York has not done its fair share to promote fluke conservation, and instead strongly assert that New York and its angling community have <u>done more than any other state</u> in pursuit of that objective, and that <u>they</u> have "engaged in the most vigorous conservation efforts."  *Id.*, see FAR pp. 1374-1376 and p. 1266.  For this reason <u>they</u> should receive the considerations of fairness and equity that they have hitherto been inexplicably denied, and should be granted the same recognition and relief as those sister states who have done considerably less, yet have enjoyed considerably more "equity" during this same period of time. See *id.*.

Furthermore, in 2007, New York authorities took the unprecedented action of closing the fluke season several weeks earlier than originally planned, when it appeared that New York

might exceed its annual quota for that year. FAR p. 708.  <u>No other state has ever taken such action</u> – New York stands alone in this regard as the state that takes most seriously its responsibilities to conserve the fluke resource.  The singular pain that this action alone precipitated in the form of lost revenues cannot be calculated, yet the defendants took absolutely no recognition of this action, instead inflicting even more egregious regulations the following year and granting no quarter of equity or fairness to the New York fishing community.  Given this, the question then must become "when will <u>New York</u> be treated fairly and equitably for its unsurpassed conservation efforts?"

Finally to this point, the Boatmen reiterate, and respectfully urge this Court to acknowledge and consider, that despite grievous economic pain and injury New York has consistently "played by the rules."  Every year since the inception of CE, New York's regulations have been properly vetted and approved by defendants' collective technical staff prior to implementation.  Moreover, New York has never gone "out of compliance" in order to relieve the regulatory pressure endured by its fishermen, as some other states have done.  These facts suggest that the only logical reason this could consistently occur is if the regulatory system itself is not functioning properly.

Such is the heart of the Boatmen's argument: the fact is that New York's fishing community is the victim of a broken regulatory regime based on a discredited dataset, and defendants have failed or refused to fix this broken system purely because to do so is politically unpopular.  The slim majority of states that benefit from this broken system because they received a larger initial allocation than deserved are now refusing to let New York "out of the barrel." They instead continue bleeding New York's fishing businesses dry, as its resident anglers seek greener pastures in the form of more relaxed regulations in neighboring

jurisdictions. See Kanyuk Decl. ¶ 4. This situation is a disgraceful example of the "tyranny of the majority," a circumstance that cuts against the very fabric of the constitutional protections guaranteed by the Bill of Rights and reflected in National Standard 4 of the MSA.

### 4. STATE-BY-STATE CONSERVATION EQUIVALENCY UNNECESSARILY DISCRIMINATES AGAINST NEW YORK ANGLERS AND THUS SHOULD BE SET ASIDE IN FAVOR OF COASTWIDE REGULATIONS

Defendants' collective decision to unnecessarily discriminate against New York anglers is clearly arbitrary and capricious and an abuse of discretion in that defendants: a) failed to consider an important aspect of the problem (*Henley*, 77 F.3d at 620), specifically, the aspect that New York continues to exceed its quota despite its successive implementation of <u>approved and progressively more restrictive regulations</u>, tending to indicate that its initial share was insufficient to "perpetuate the existing fishing practices in place prior to the onset of regulations which substantially modified the recreational fishery" (see FAR 1549, col. 3 and FAR p. 313, comments of Charles Witek); b) failed to consider all of the relevant factors (*Shoreham Cooperative,* 764 F.2d at 140), specifically, by not explicitly acknowledging and considering that MRFSS data have been found to be decidedly inappropriate to serve as a basis for state level allocations; c) failed to consider all the important aspects of the issue and articulate a satisfactory explanation for its action (*Henley*, 77 F.3d at 620), by not explaining how they intended to alleviate the unnecessary discriminatory effects of MRFSS-based state-by-state regulations for the 2008 season, or in the alternative, why such discriminatory impacts are necessary; and, d) failed to take account of evidence placed before the agency by interested parties (*Shoreham Cooperative*, 764 F.2d at 140-141), in that they failed to take account of one

37

of the major questions posed to the NAS/NRC, to wit, whether the geographic scale of

management (i.e. state versus regional) is appropriate given the resolution of the MRFSS survey,

and commensurately failed to recognize that the NAS/NRC responses cited by the Boatmen

clearly and unambiguously answered that precise question in the negative.

For these reasons, this Court should find that state-by-state CE violates National Standard

4 and the Commission's rule that fishery resources must be allocated fairly and equitably,

(Charter Charter, Section Six, ¶ (a)(7)(ii)), and thus should commensurately set aside state-by-

state CE in favor of a coastwide regime.


     **D.**     **DEFENDANTS NMFS' CONTINUED USE OF 1998 MRFSS DATA AS A BASELINE FOR STATE ALLOCATIONS VIOLATES NATIONAL STANDARD 6 BECAUSE THIS STATIC BASELINE FAILS TO ACCOUNT FOR CHANGES AND CONTINGENCIES IN THE RECREATIONAL FLUKE FISHERY AND IN THE FLUKE STOCKS**

National Standard 6 of the MSA requires that management measures "shall take into

account and allow for variations among, and contingencies in, fisheries, fishery resources, and

catches." 16 U.S.C. 1851(a)(6). Federal regulations elaborate on this standard: "The particular

regime chosen must be flexible enough to allow timely response to resource, industry, and other

national and regional needs... [f]lexibility in the management regime and the regulatory process

will aid in responding to contingencies." 50 C.F.R. §600.335(b). A few relevant practical

illustrations of "changes and contingencies" are also provided: "Biological uncertainties and lack

of knowledge can hamper attempts to estimate...stock location in time and space," (*id*. at (c)) and

"[s]ocial changes could involve increases or decreases in recreational fishing, or the movement

of people into or out of fishing activities..." *Id*. National Standard 6 "dictates flexibility on the

part of fishery managers. It suggests that the Secretary and his designees must be prepared to

address uncertainties or changes that may arise.  As the implementing regulations state, the 'regime chosen must be flexible enough to allow timely response to resource, industry, and other national and regional needs.'"  *J.H. Miles & Co., Inc. Brown,* 910 F.Supp. 1138, 1155 (E.D. Va. 1995))(quoting 50 C.F.R. § 602.16(b)).

### 1.    MRFSS DATA FROM 1998 ARE OBSOLETE AND NOT REFLECTIVE OF THE CURRENT FISHERY.

Since the MRFSS "proxy" year of 1998, the summer flounder fishery and stocks have changed dramatically.  First, the stocks have "increased substantially during the 1990s and through 2004." FAR p. 810.  Second, and more importantly in the instant context, as the stocks have recovered, the bulk of these fish seem to have taken up summer residence in the waters surrounding Long Island and northwards. FAR pp. 389, 707 and 1000.  In effect, a trend has developed indicating that the fish migrate and spread to the north and east as the individuals become larger and the stocks more abundant. FAR pp. 946, 956, 970, 1014-1015 and 1037.  This has had the effect of making more and larger fish available to fishermen from northern New Jersey into southern New England, and specifically concentrated around Long Island, Connecticut and Rhode Island waters.  This fact has been explicitly acknowledged by defendants on the record. CAR p. 363.

Furthermore, MRFSS data from the last several years indicates that fishing participation in New York has been on the increase (see FAR p. 797), tending to show either a change in demographics or an increase in effort due to public perception of improved availability of fluke in local waters. *Id.*, CAR p. 363.  This is clearly a "variation or contingency" in the fishery and the stocks as contemplated by MSA and elaborated upon by the *J.H. Miles* court, in that the 1998

MRFSS data are not reflective of the current fishery.  Yet, defendants offer no refutation or

opposition to these data, and they provide no cogent reasoning as to why they have not

responded in an appropriate and timely fashion as required by the MSA and accompanying

regulations.

 

       2.       **DEFENDANTS' CONTINUED USE OF OBSOLETE MRFSS DATA LACKS THE FLEXIBILITY TO RESPOND EQUITABLY AND RAPIDLY TO CHANGES IN FLUKE STOCKS AND INCREASES IN EFFORT.**

As noted *supra*, National Standard 6 requires that managers and management regimes

must be flexible enough to allow for changes in stocks and fishing patterns as they arise.  *J.H.*

*Miles & Co., Inc. Brown,* 910 F.Supp. at 1155.  Defendants' continued implementation of state-

by-state CE based on obsolete 1998 MRFSS data flies in the face of this mandate, because it fails

to account for these changes and thus is inflexible, resulting in gross economic harm to New

York fishermen and businesses.  As such, defendants' collective failure to exercise flexibility in

the face of scientific data clearly showing changed conditions is a facial violation of National

Standard 6 and thus is "not in accordance with law," and is arbitrary and capricious and an abuse

of discretion in that defendants have "failed to articulate a satisfactory explanation for its action,

including a rational connection between the facts found and the choice made," (*Henley*, 77 F.3d

at 620), and has "offered an explanation that runs counter to the evidence before [it], or is so

implausible that it could not be ascribed to a difference in view or the product of agency

expertise." (*id.*),  in that the repeated statement that "1998 was the last year regulations among

the various states were consistent" is not a satisfactory explanation and runs counter to the

evidence in light of the availability of coastwide regulations and the ability to set a new baseline

after two to three years of coastwide.  For these reasons, state-by-state regulations must be struck down in favor of a coastwide regime.

### 3.   DEFENDANTS DEPARTED FROM PRIOR DECISION MAKING CRITERIA WITHOUT PROVIDING A REASONED RATIONALE FOR SUCH DEPARTURE.

As noted *supra*, agency decisions must be internally consistent and follow prior decisions, or the agency must provide a reasoned explanation for departing from its established norms.  See *Central Power & Light Co. v. U.S.*, 634 F.2d 137; *Mukadam v. U.S. Dept. of Labor*, 458 F.Supp. 164; *Defenders of Wildlife v. U.S. Environmental Protection Agency*, 420 F.3d 946. Here, defendants have set out a criterion for choosing a particular basis for state-by-state allocations, and then more recently, departed from that criterion without giving a reasoned justification for such departure.  In a memorandum dated October 24, 2001, concerning its preferred choice of using 1998 as a base year for state-by-state allocations, the Technical Committee stated:

> The Technical Committee considered the idea of base years other than 1998.  This year has been used as the base year because it was the most recent year that coastwide management measures were in place...It was decided that using the average landings for 1981-2000 was not a good idea **because the earlier years in the fishery did not reflect the current status of the fishery**.  State landings for 1992 were proposed as this was the year before Amendment 2 went into effect, but again, **1992 landings do not reflect the current fishery**.

CAR (S)2 (*emphasis added*).  This same language was repeated almost verbatim in the Commission's Public Hearing Draft of December 2002. CAR p. (S)9.  Clearly, this language

unmistakably establishes a standard upon which the defendants based their decision to use 1998 as a base year, to wit: other, <u>earlier years did not reflect the current status of the fishery</u>.  In April of 2007, this standard was again invoked by the Technical Committee when considering averaging landings from the years 1981 through 2005 as a baseline.  Again, "[i]t was decided that using these other options was not appropriate because the earlier years in the fishery did not reflect it's [sic] current status."  CAR p. 89.  The same document goes on to state:

> If the Board **intends to implement a management strategy that is reflective of the**
> **current summer flounder fishing population** the TC recommends the following:  The
> Board  should set coastwide regulations for two to three years.  The TC would then use
> the catch and harvest data collected in that time period to determine coastwide shares.
> This methodology would establish a new baseline.

CAR p. 90. (*emphasis added*).   As noted *supra* (see § III(B)(5) of this Memorandum, *supra*) the emphasized language is a <u>tacit admission that the current management strategy does not reflect the current status of the fishery</u>.  Despite this fact, defendants have nonetheless perpetuated the current state-by-state management regime based on 1998 data, <u>even though those data do not reflect the status of the fishery today</u>.  This is a clear departure from established agency norms, which states in effect that an allocation baseline must reflect the current status of the fishery.  Moreover, the TC explained how the defendants could establish a new, updated baseline that would more accurately reflect the current fishery (setting coastwide regulations for two to three years), yet this option was rejected by the defendants without a reasoned explanation as to why they chose to depart from the established norm of using data that are "reflective of the current fishery."

Thus, because defendants have failed to conform themselves to their prior norms and

decisions and have not explained the reason for their departure (*Central Power & Light Co. v. U.S.*, 634 F.2d 137), have inexplicably departed from their established policies (*Mukadam v. U.S. Dept. of Labor*, 458 F.Supp. 164), and have offered internally contradictory agency reasoning (*Defenders of Wildlife v. U. S. Environmental Protection Agency*, 420 F.3d 946) by failing to explain why they have not conformed to their prior reasoning of "reflecting the current status of the fishery," by not updating their management policies to "reflect the current status of the fishery" or alternatively offering substantive and defensible reasons for not doing so, their resulting action is rendered arbitrary and capricious. *Id*. Therefore, this Court should accordingly strike down state-by-state conservation equivalency in favor of coastwide management.

## IV.      **<u>CONCLUSION</u>**

On the basis of the foregoing, Intervenor-Plaintiffs the Boatmen *et al*. respectfully pray that this Court grant Summary Judgment in their favor against all defendants, pursuant to F.R.C.P. 56(a), declaring defendants' joint implementation of state-by-state Conservation Equivalency regulations for the 2008 summer flounder season and successive seasons to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, striking down such existing regulations in favor of coastwide regulations, and issuing an Order permanently enjoining defendants from any future promulgation of said state-by-state regulations.

Dated: Melville, New York
      June 12, 2009

Respectfully submitted,

PHILIP L. CURCIO, ESQ.
Attorney for Intervenor-Plaintiffs
*United Boatmen of New York, Inc., et. al*

s/Philip L. Curcio_____
Philip L. Curcio
445 Broadhollow Rd., Suite 200
Melville, N.Y.  11747
(631) 249-9230